# EXHIBIT 1

US010567391B2

(12) **United States Patent**
Hardt

(10) **Patent No.:** **US 10,567,391 B2**
(45) **Date of Patent:** ***Feb. 18, 2020**

(54) **GRADUATED AUTHENTICATION IN AN IDENTITY MANAGEMENT SYSTEM**

(71) Applicant: **Callahan Cellular L.L.C.**, Wilmington, DE (US)

(72) Inventor: **Dick C. Hardt**, Vancouver (CA)

(73) Assignee: **Callahan Cellular L.L.C.**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/417,361**

(22) Filed: **May 20, 2019**

(65) **Prior Publication Data**

US 2019/0273747 A1     Sep. 5, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/172,008, filed on Jun. 2, 2016, now Pat. No. 10,298,594, which is a (Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *H04L 29/06* | (2006.01) |
| *G06F 17/30* | (2006.01) |
| *G06F 15/16* | (2006.01) |
| *G06F 7/04* | (2006.01) |
| *G06F 21/60* | (2013.01) |

(52) **U.S. Cl.**
CPC .......... *H04L 63/105* (2013.01); *G06F 21/606* (2013.01); *H04L 63/08* (2013.01); *H04L 63/1416* (2013.01); *H04L 63/1466* (2013.01); *H04L 63/0428* (2013.01); *H04L 63/0815* (2013.01)

(58) **Field of Classification Search**
CPC ... H04L 63/105; H04L 63/08; H04L 63/1416; H04L 63/1466; H04L 63/0428; H04L 63/0815; G06F 21/606
USPC ............................................................. 726/4
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,837,501 A | 9/1974 | Pielkenrood |
| 4,067,813 A | 1/1978 | Pielkenrood |
| (Continued) | | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2003240323 A1 | 12/2003 |
| CA | 2222480 A1 | 7/1998 |
| (Continued) | | |

OTHER PUBLICATIONS

"724 Solutions—Products—Financial Services," www.724.com, Sep. 25, 2001, 1 page.

(Continued)

*Primary Examiner* — Monjur Rahim
(74) *Attorney, Agent, or Firm* — Perkins Coie LLP

(57) **ABSTRACT**

A method and system for graduated security in an identity management system utilize differing levels of time sensitivity, channel security and authentication security to provide a multi-dimensional approach to providing the right fit for differing identity requests. The differing levels of security can be selected by user preference, membersite request or homesite policy.

**20 Claims, 8 Drawing Sheets**



## US 10,567,391 B2

Page 2

### Related U.S. Application Data

continuation of application No. 14/622,722, filed on Feb. 13, 2015, now Pat. No. 9,398,020, which is a continuation of application No. 14/015,813, filed on Aug. 30, 2013, now Pat. No. 8,959,652, which is a continuation of application No. 11/039,885, filed on Jan. 24, 2005, now Pat. No. 8,527,752.

(60) Provisional application No. 60/605,150, filed on Aug. 30, 2004, provisional application No. 60/579,890, filed on Jun. 16, 2004.

(56)                  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,437,988 A | 3/1984 | James | |
| 4,713,753 A | 12/1987 | Boebert et al. | |
| 4,759,063 A | 7/1988 | Chaum | |
| 4,759,064 A | 7/1988 | Chaum | |
| 4,780,821 A | 10/1988 | Crossley | |
| 4,799,156 A | 1/1989 | Shavit et al. | |
| 4,914,698 A | 4/1990 | Chaum | |
| 4,949,380 A | 8/1990 | Chaum | |
| 4,991,210 A | 2/1991 | Chaum | |
| 5,487,826 A | 1/1996 | Back et al. | |
| 5,644,723 A | 7/1997 | Deaton et al. | |
| 5,677,955 A | 10/1997 | Doggett et al. | |
| 5,737,701 A | 4/1998 | Rosenthal et al. | |
| 5,774,551 A | 6/1998 | Wu et al. | |
| 5,781,629 A | 7/1998 | Haber et al. | |
| 5,794,207 A | 8/1998 | Walker et al. | |
| 5,794,259 A | 8/1998 | Kikinis | |
| 5,815,665 A | 9/1998 | Teper et al. | |
| 5,855,007 A | 12/1998 | Jovicic et al. | |
| 5,872,850 A | 2/1999 | Klein et al. | |
| 5,875,296 A | 2/1999 | Shi et al. | |
| 5,903,721 A | 5/1999 | Sixtus | |
| 5,911,141 A | 6/1999 | Kelley et al. | |
| 5,930,479 A | 7/1999 | Hall | |
| 5,953,710 A | 9/1999 | Fleming | |
| 5,983,208 A | 11/1999 | Haller et al. | |
| 5,995,965 A | 11/1999 | Experton | |
| 6,005,939 A | 12/1999 | Fortenberry et al. | |
| 6,009,410 A | 12/1999 | LeMole et al. | |
| 6,012,044 A | 1/2000 | Maggioncalda et al. | |
| 6,026,166 A | 2/2000 | LeBourgeois | |
| 6,029,141 A | 2/2000 | Bezos et al. | |
| 6,052,710 A | 4/2000 | Saliba et al. | |
| 6,061,790 A | 5/2000 | Bodnar | |
| 6,073,106 A | 6/2000 | Rozen et al. | |
| 6,073,241 A | 6/2000 | Rosenberg et al. | |
| 6,092,196 A | 7/2000 | Reiche | |
| 6,125,352 A | 9/2000 | Franklin et al. | |
| 6,131,096 A | 10/2000 | Ng et al. | |
| 6,154,768 A | 11/2000 | Chen et al. | |
| 6,192,380 B1 | 2/2001 | Light et al. | |
| 6,199,079 B1 | 3/2001 | Gupta et al. | |
| 6,208,659 B1 | 3/2001 | Govindarajan et al. | |
| 6,233,608 B1 | 5/2001 | Laursen et al. | |
| 6,243,688 B1 | 6/2001 | Kalina | |
| 6,247,029 B1 | 6/2001 | Kelley et al. | |
| 6,253,203 B1 | 6/2001 | O'Flaherty et al. | |
| 6,266,692 B1 | 7/2001 | Greenstein | |
| 6,285,983 B1 | 9/2001 | Jenkins | |
| 6,289,333 B1 | 9/2001 | Jawahar et al. | |
| 6,298,347 B1 | 10/2001 | Wesley | |
| 6,308,203 B1 | 10/2001 | Itabashi et al. | |
| 6,321,339 B1 | 11/2001 | French et al. | |
| 6,327,578 B1 | 12/2001 | Linehan | |
| 6,353,852 B1 | 3/2002 | Nestoriak, III et al. | |
| 6,356,905 B1 | 3/2002 | Gershman et al. | |
| 6,381,597 B1 | 4/2002 | Lin | |
| 6,385,596 B1 | 5/2002 | Wiser et al. | |
| 6,401,085 B1 | 6/2002 | Gershman et al. | |
| 6,421,768 B1 | 7/2002 | Purpura | |

| | | | |
|---|---|---|---|
| 6,442,696 B1 * | 8/2002 | Wray | G06F 21/31 |
| | | | 713/176 |
| 6,491,217 B2 | 12/2002 | Catan | |
| 6,496,855 B1 | 12/2002 | Hunt et al. | |
| 6,571,279 B1 | 5/2003 | Herz et al. | |
| 6,571,285 B1 | 5/2003 | Groath et al. | |
| 6,584,448 B1 | 6/2003 | Laor | |
| 6,605,224 B2 | 8/2003 | Aymong | |
| 6,606,643 B1 | 8/2003 | Emens et al. | |
| 6,609,198 B1 | 8/2003 | Wood et al. | |
| 6,629,081 B1 | 9/2003 | Cornelius et al. | |
| 6,651,090 B1 | 11/2003 | Itabashi et al. | |
| 6,665,704 B1 | 12/2003 | Singh | |
| 6,668,322 B1 | 12/2003 | Wood et al. | |
| 6,708,205 B2 | 3/2004 | Sheldon et al. | |
| 6,714,916 B1 | 3/2004 | Robertson et al. | |
| 6,725,050 B1 | 4/2004 | Cook | |
| 6,751,735 B1 | 6/2004 | Schell et al. | |
| 6,845,370 B2 | 1/2005 | Burkey et al. | |
| 6,865,426 B1 | 3/2005 | Schneck et al. | |
| 6,879,965 B2 | 4/2005 | Fung et al. | |
| 6,907,401 B1 | 6/2005 | Vittal et al. | |
| 6,944,677 B1 | 9/2005 | Zhao | |
| 6,957,334 B1 | 10/2005 | Goldstein et al. | |
| 7,016,875 B1 | 3/2006 | Steele et al. | |
| 7,016,877 B1 | 3/2006 | Steele et al. | |
| 7,054,906 B2 | 5/2006 | Levosky | |
| 7,076,558 B1 | 7/2006 | Dunn | |
| 7,089,208 B1 | 8/2006 | Levchin et al. | |
| 7,100,195 B1 | 8/2006 | Underwood | |
| 7,133,846 B1 | 11/2006 | Ginter et al. | |
| 7,197,539 B1 | 3/2007 | Cooley | |
| 7,216,292 B1 | 5/2007 | Snapper et al. | |
| 7,257,581 B1 | 8/2007 | Steele et al. | |
| 7,257,843 B2 * | 8/2007 | Fujita | G06F 21/52 |
| | | | 707/999.009 |
| 7,260,724 B1 * | 8/2007 | Dickinson | H04L 63/08 |
| | | | 713/182 |
| 7,277,546 B2 * | 10/2007 | Dhawan | H04K 1/04 |
| | | | 375/E7.04 |
| 7,289,971 B1 | 10/2007 | O'Neil et al. | |
| 7,333,942 B1 | 2/2008 | Cowles | |
| 7,343,351 B1 | 3/2008 | Bishop et al. | |
| 7,380,271 B2 | 5/2008 | Moran et al. | |
| 7,391,865 B2 * | 6/2008 | Orsini | G06F 21/31 |
| | | | 380/201 |
| 7,454,623 B2 | 11/2008 | Hardt | |
| 7,467,141 B1 | 12/2008 | Steele | |
| 7,487,130 B2 | 2/2009 | Steele | |
| 7,496,751 B2 | 2/2009 | de Jong et al. | |
| 7,546,349 B1 | 6/2009 | Cooley | |
| 7,610,391 B2 | 10/2009 | Dunn | |
| 7,694,335 B1 * | 4/2010 | Turner | H04L 63/1441 |
| | | | 708/250 |
| 7,783,741 B2 | 8/2010 | Hardt | |
| 7,793,095 B2 | 9/2010 | Hardt | |
| 7,827,115 B2 | 11/2010 | Weller | |
| 7,836,490 B2 * | 11/2010 | Smith | H04L 63/083 |
| | | | 726/13 |
| 7,941,669 B2 * | 5/2011 | Foley | H04L 63/083 |
| | | | 713/182 |
| 8,117,649 B2 | 2/2012 | Hardt | |
| 8,260,806 B2 | 9/2012 | Steele | |
| 8,296,825 B2 * | 10/2012 | Leone | H04L 63/0272 |
| | | | 726/4 |
| 8,504,704 B2 | 8/2013 | Hardt | |
| 8,527,752 B2 | 9/2013 | Hardt | |
| 8,566,248 B1 | 10/2013 | Steele | |
| 8,782,405 B2 * | 7/2014 | Okunseinde | G06Q 20/382 |
| | | | 709/229 |
| 8,959,652 B2 | 2/2015 | Hardt | |
| 9,245,266 B2 | 1/2016 | Hardt | |
| 9,398,020 B2 | 7/2016 | Hardt | |
| 10,298,594 B2 | 5/2019 | Hardt | |
| 2001/0011250 A1 | 8/2001 | Paltenghe et al. | |
| 2001/0018660 A1 | 8/2001 | Sehr | |
| 2001/0018675 A1 | 8/2001 | Blaze et al. | |
| 2001/0039586 A1 | 11/2001 | Primak et al. | |

# US 10,567,391 B2
Page 3

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2001/0047276 A1 | 11/2001 | Eisenhart | |
| 2002/0002684 A1 | 1/2002 | Fox et al. | |
| 2002/0016721 A1 | 2/2002 | Mason et al. | |
| 2002/0029201 A1 | 3/2002 | Barzilai et al. | |
| 2002/0049912 A1 | 4/2002 | Honjo et al. | |
| 2002/0062262 A1 | 5/2002 | Vasconi et al. | |
| 2002/0078233 A1 | 6/2002 | Biliris et al. | |
| 2002/0087641 A1 | 7/2002 | Levosky | |
| 2002/0091745 A1 | 7/2002 | Ramamurthy et al. | |
| 2002/0091798 A1 | 7/2002 | Joshi et al. | |
| 2002/0099671 A1 | 7/2002 | Mastin Crosbie | |
| 2002/0107807 A1 | 8/2002 | Ketonen et al. | |
| 2002/0107972 A1 | 8/2002 | Keane | |
| 2002/0112083 A1 | 8/2002 | Joshi et al. | |
| 2002/0112155 A1 | 8/2002 | Martherus et al. | |
| 2002/0112185 A1 | 8/2002 | Hodges | |
| 2002/0116642 A1 | 8/2002 | Joshi et al. | |
| 2002/0120599 A1 | 8/2002 | Knouse et al. | |
| 2002/0138581 A1 | 9/2002 | MacIntosh et al. | |
| 2002/0152170 A1 | 10/2002 | Racov | |
| 2002/0154157 A1 | 10/2002 | Sherr et al. | |
| 2002/0165960 A1 | 11/2002 | Chan | |
| 2002/0174369 A1 | 11/2002 | Miyazaki et al. | |
| 2002/0178365 A1 | 11/2002 | Yamaguchi | |
| 2002/0194138 A1 | 12/2002 | Dominguez et al. | |
| 2002/0198818 A1 | 12/2002 | Scott et al. | |
| 2002/0199095 A1 | 12/2002 | Bandini et al. | |
| 2003/0018587 A1 | 1/2003 | Althoff et al. | |
| 2003/0033528 A1 | 2/2003 | Ozog et al. | |
| 2003/0074580 A1 | 4/2003 | Knouse et al. | |
| 2003/0079123 A1 | 4/2003 | Mas Ribes | |
| 2003/0110397 A1 | 6/2003 | Supramaniam et al. | |
| 2003/0130960 A1 | 7/2003 | Fraser et al. | |
| 2003/0131232 A1 | 7/2003 | Fraser et al. | |
| 2003/0135732 A1 | 7/2003 | Vaha-Sipila | |
| 2003/0149781 A1* | 8/2003 | Yared | G06F 21/41 |
| | | | 709/229 |
| 2003/0154306 A1 | 8/2003 | Perry | |
| 2003/0158960 A1 | 8/2003 | Engberg | |
| 2003/0163733 A1 | 8/2003 | Barriga-Caceres | |
| 2003/0204725 A1 | 10/2003 | Itoi et al. | |
| 2003/0208684 A1 | 11/2003 | Camacho et al. | |
| 2003/0225841 A1 | 12/2003 | Song et al. | |
| 2003/0229783 A1 | 12/2003 | Hardt | |
| 2004/0008666 A1 | 1/2004 | Hardjono | |
| 2004/0010697 A1 | 1/2004 | White | |
| 2004/0049677 A1 | 3/2004 | Lee et al. | |
| 2004/0103324 A1 | 5/2004 | Band | |
| 2004/0128558 A1 | 7/2004 | Barrett | |
| 2004/0143750 A1 | 7/2004 | Kulack et al. | |
| 2004/0162786 A1 | 8/2004 | Cross et al. | |
| 2004/0177110 A1 | 9/2004 | Rounthwaite et al. | |
| 2004/0181665 A1 | 9/2004 | Houser | |
| 2004/0205243 A1 | 10/2004 | Hurvig et al. | |
| 2004/0225883 A1 | 11/2004 | Weller et al. | |
| 2004/0243823 A1 | 12/2004 | Moyer et al. | |
| 2004/0255117 A1 | 12/2004 | Paater et al. | |
| 2005/0005110 A1 | 1/2005 | Kim et al. | |
| 2005/0010653 A1 | 1/2005 | McCanne | |
| 2005/0015340 A1 | 1/2005 | Maes | |
| 2005/0114453 A1 | 5/2005 | Hardt | |
| 2005/0171811 A1 | 8/2005 | Campbell | |
| 2005/0210107 A1 | 9/2005 | Mora | |
| 2005/0210244 A1 | 9/2005 | Stevens et al. | |
| 2005/0283443 A1 | 12/2005 | Hardt | |
| 2005/0283614 A1 | 12/2005 | Hardt | |
| 2006/0005019 A1 | 1/2006 | Chao | |
| 2006/0005020 A1 | 1/2006 | Hardt | |
| 2006/0005263 A1 | 1/2006 | Hardt | |
| 2006/0031489 A1 | 2/2006 | Marcjan | |
| 2006/0106734 A1 | 5/2006 | Hoffman et al. | |
| 2006/0179003 A1 | 8/2006 | Steele et al. | |
| 2006/0200425 A1 | 9/2006 | Steele et al. | |
| 2006/0229944 A1 | 10/2006 | Walker et al. | |
| 2007/0130460 A1 | 6/2007 | Pfitzmann et al. | |
| 2007/0143860 A1 | 6/2007 | Hardt | |
| 2007/0277034 A1 | 11/2007 | LiVecchi | |
| 2007/0282733 A1 | 12/2007 | May | |
| 2008/0010298 A1 | 1/2008 | Steele et al. | |
| 2009/0125429 A1 | 5/2009 | Takayama | |
| 2009/0157531 A1 | 6/2009 | Bui | |
| 2009/0210293 A1 | 8/2009 | Steele et al. | |
| 2010/0306830 A1 | 12/2010 | Hardt | |
| 2015/0180879 A1 | 6/2015 | Hardt | |
| 2016/0140582 A1 | 5/2016 | Steele et al. | |
| 2017/0006042 A1 | 1/2017 | Hardt | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2245293 A1 | 9/1999 |
| CA | 2431311 A1 | 9/2003 |
| CA | 2458257 A1 | 9/2003 |
| CA | 2447121 A1 | 1/2004 |
| CA | 2468351 A1 | 8/2004 |
| CA | 2468585 A1 | 8/2004 |
| CA | 2493897 A1 | 4/2005 |
| CA | 2494225 A1 | 4/2005 |
| CN | 1289974 A | 4/2001 |
| EP | 1089516 A2 | 4/2001 |
| EP | 1089518 A2 | 4/2001 |
| EP | 1223527 A2 | 7/2002 |
| EP | 1316016 A2 | 6/2003 |
| EP | 1316028 A1 | 6/2003 |
| EP | 1316041 A1 | 6/2003 |
| EP | 1388986 A1 | 2/2004 |
| EP | 1520217 A2 | 4/2005 |
| EP | 1766840 A1 | 3/2007 |
| EP | 1766852 A1 | 3/2007 |
| EP | 1766853 A1 | 3/2007 |
| EP | 1766863 A1 | 3/2007 |
| FR | 1098155 A | 7/1955 |
| JP | 11282804 A | 10/1999 |
| JP | 2001186122 A | 7/2001 |
| JP | 2003071960 A | 3/2003 |
| JP | 2003323408 A | 11/2003 |
| JP | 2005529392 T | 9/2005 |
| WO | 0067415 | 11/2000 |
| WO | 0146783 A2 | 6/2001 |
| WO | 0167364 A1 | 9/2001 |
| WO | 0205092 A2 | 1/2002 |
| WO | 0205103 A1 | 1/2002 |
| WO | 0205139 A1 | 1/2002 |
| WO | 0205185 A1 | 1/2002 |
| WO | 0205487 A1 | 1/2002 |
| WO | 2002001462 | 1/2002 |
| WO | 03046748 | 6/2003 |
| WO | 03098898 | 11/2003 |
| WO | 03104947 | 12/2003 |
| WO | 2005048544 | 5/2005 |
| WO | 2005125077 | 12/2005 |
| WO | 2005125086 | 12/2005 |
| WO | 2005125087 | 12/2005 |
| WO | 2005125096 | 12/2005 |
| ZM | 200500060 | 3/2006 |

OTHER PUBLICATIONS

"724 Solutions—Products—m-Commerce," www.724.com, Sep. 25, 2001, pp. 1-4.
"724 Solutions—Products—Wireless Internet Platform," www.724. com, Sep. 25, 2001, pp. 1-3.
Affiliate Application,"How do Gator, Price Helper and Offer Companion Work?," www.gator.com, Sep. 6, 2001, 1 page.
"Choicepoint Unveils New Web-based Pre-Employment Screening Service," Business Wire pp. 1287, May 17, 1999.
"Co-Brand Partner Opportunities," www.yodlee.com, Sep. 6, 2001, pp. 1-2.
"Content Partner Opportunities," www.yodlee.com, Sep. 6, 2001, 1 page.
"Create Relationships," www.digitalme.com, Sep. 6, 2001, pp. 1-2.
"Digitalme™ Fact Sheet (www.digitalme.com)" www.digitalme. com, Sep. 6, 2001, pp. 1-3.

**US 10,567,391 B2**

Page 4

(56)          **References Cited**

OTHER PUBLICATIONS

"Ezlogin.Com Introduces Liveclips, Enabling Net Users to Clip Content From Anywhere on the Web and Paste It on a Custom Page," Java Industry Connection, Mar. 8, 2000, pp. 1-2.

"FAQ", www.digitalme.com, Sep. 6, 2001, pp. 1-2.

"Free Password Manager—Store passwords—Desktop or Online," www.passwordsafe.com, Oct. 10, 2001, 1 page.

"Implementing Mobile Passport," Copyright 1999-2001 Microsoft Corporation, Oct. 26, 2001, pp. 1-5.

"Learn More," www.digitalme.com, Sep. 6, 2001, pp. 1-2.

"Liberty Architecture Overview," Version 1.1, Internet Citation, Jan. 15, 2003, pp. 1-44.

"LinkUall.com—About Us—LinkUall Technology" www.linkuall.com, Copyright 1999-2000 Sinpaq Inc., 1 page.

"LinkUall.com—Products—Calendars and Address books," www.linkuall.com, Oct. 10, 2001, 1 page.

"Make it Convenient," www.digitalme.com, Sep. 6, 2001, pp. 1-3.

"Microsoft Passport Member Services. What is Passport," www.passport.com, Aug. 3, 2001, pp. 1-12.

"Microsoft Passport: A single name, password and Wallet for the web," WWW.passport.com, Aug. 3, 2001, pp. 1-2.

"Microsoft Passport: Streamlining Commerce and Communication on the Web," www.passport.com, Oct. 11, 1999, pp. 1-3.

"Online Businesses Use Microsoft Passport Single Sign-In and Wallet Services to Provide Customers with Secure and Convenient Shopping," www.microsoft.com, May 17, 2000, pp. 1-2.

"Security Overview," www.yodlee.com, Sep. 6, 2001, pp. 1-2.

"Spamgourmet: FAQ," by Spamgourmet.com, Web Archive dated Aug. 29, 2003, 3 pages.

"Spam-me-not Documentations," Web Archive Dated Oct. 11, 2003, 5 pages.

"Spoofed/Forged Email," 2002 Carnegie Mellon University, pp. 1-7.

"Sweet Enonymity," www.enonymous.com, Sep. 6, 2001, pp. 1-2.

"Take Control," www.digitalme.com, Sep. 6, 2001, pp. 1-2.

"Vision for an Enonymous Infomediary," www.enonymous.com, Sep. 6, 2001, pp. 1-3.

"Yodlee2Go: Web-enabled Phones", www.yodlee.com, Sep. 6, 2001, 1 page.

"Yodlee for Mobile: Simplify Your Life on the Road with Yodlee2Go," www.yodlee.com, Sep. 6, 2001, 1 page.

"Yodlee for Web: One-Click Access to All Personal Accounts," www.yodlee.com, Sep. 6, 2001, 1 page.

"Yodlee: e-Personalization Applications," www.yodlee.com, Sep. 6, 2001, 1 page.

"Yodlee: e-Personalization Platform," www.yodlee.com, Sep. 6, 2001, 1 page.

"Yodlee: e-Personalization Solutions," www.yodlee.com, Sep. 6, 2001, 1 page.

"Yodlee2Go: Palm OS Wireless," www.yodlee.com, Sep. 6, 2001, 1 page.

"Zkey—Corporate," www.zkey.com, Oct. 10, 2001, 1 page.

United States Patent and Trademark Office, Advisory Action before the Filing of an Appeal Brief for U.S. Appl. No. 09/988,811, dated Apr. 20, 2009, 3 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 09/933,567, dated Jul. 21, 2006, 3 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 10/455,438, dated Feb. 19, 2010, 3 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 10/867,768, dated Sep. 17, 2009, 3 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 11/039,885, dated Feb. 24, 2010, 4 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 11/039,886, dated Sep. 17, 2010, 3 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 11/327,176, dated Mar. 25, 2011, 2 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 11/824,358, dated Aug. 24, 2010, 3 pages.

Alan Cohen and Walaika Haskins, "Grab and-Go Web," *PC Magazine*, Oct. 19, 2000, pp. 1-5.

Asaravala, A, "A Question of Identity Passport, Liberty and the Single Sign-On Race," www.newarchitectmag.com, Jan. 31, 2003, pp. 22-24, XP009022582.

Bennett, "NGWS—Microsoft's Dot Net Strategy," PC_Buyers_Guide.com, Jun. 22, 2000, pp. 1-5.

Chu et al., "Web-Based Single Sign-On Solutions: An SSO Product Matrix," *Computer Security Journal*, CSI Computer Security Institute, XX, vol. 16, No. 1, 2000, pp. 39-49, XP008021056.

Coulouris, "Secure Communication in Non-Uniform Trust Environment," ECOOP Workshop on Distributed Object Security, Jul. 1998, 5 pages.

Erdos et al., "Shibboleth—Architecture DRAFT v05 Online!", May 2, 2002, pp. 5-9, XP002264221.

European Patent Office, Examination Report, European Patent Application 05757655.5, dated Apr. 13, 2012, 6 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 09/933,567, dated Nov. 1, 2007, 13 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 09/933,567, dated May 11, 2006, 9 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 09/988,811, dated Jan. 27, 2010, 8 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 09/988,811, dated Dec. 30, 2010, 10 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 09/988,811, dated Feb. 2, 2009, 9 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/455,438, dated Oct. 30, 2008, 14 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/455,438, dated Dec. 2, 2009, 8 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 10/455,438, dated Jun. 26, 2007, 10 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 10/713,100, dated Oct. 28, 2008, 9 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/713,100, dated Oct. 30, 2009, 11 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 10/713,100, dated Jun. 14, 2007, 14 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 10/867,768, dated May 28, 2009, 7 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/867,768, dated Jun. 1, 2006, 8 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 10/867,768, dated Jun. 25, 2010, 8 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 10/867,768, dated Jul. 28, 2005, 7 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/867,768, dated Jul. 5, 2007, 10 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 11/039,885, dated Nov. 29, 2010, 19 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,885, dated Dec. 16, 2009, 14 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 11/039,885, dated Mar. 18, 2009, 12 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,885, dated Sep. 10, 2009, 14 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 11/039,886, dated Mar. 5, 2009, 16 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,886, dated Jul. 9, 2010, 20 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 11/039,886, dated Nov. 8, 2011, 56 pgs.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 11/327,160, dated Feb. 23, 2007, 10 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/327,160, dated Mar. 25, 2008, 11 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 11/327,176, dated Dec. 22, 2010, 11 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/327,176, dated Dec. 9, 2009, 11 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/824,358, dated Jun. 29, 2010, 15 pages.

## US 10,567,391 B2
Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/824,358; dated Nov. 15, 2011, 35 pgs.
United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,886, dated Nov. 8, 2011, 29 pages.
Gabber et al., "Curbing June E-Mail via Secure Classification," FC-98: Proceedings of the Second International Conference on Financial Cryptography, 1998, pp. 198-213.
Gator Press Release "Gator Helps Consumers at More Than 25,000 E-Commerce and Registration Sites in First Month of Usage: Software an invaluable companion for more than 80,000 online consumers," Aug. 3, 1999, pp. 1-2.
Gator Press Release "Gator.Com Delivers on the Promise of the Electronic Commerce Modeling Language (ECML) Standard Today: Gator offers one click shopping at over 5,000 e-commerce sites today," Jun. 14, 1999, pp. 1-2.
Gator Press Release "Internet Start-up Gator.com Introduces Gator, the Web's First Smart Online Companion: New Internet product offers one-click login and express registration and checkout across the web," Jun. 14, 1999, pp. 1-3.
Gburzynski, "A Comprehensive Approach to Eliminating Spam," Proceedings of Euromedia, Plymouth, UK, Apr. 2003, 5 pages.
Gunnerson, "EZ Login," PC Magazine, Mar. 14, 2000, pp. 1-2.
Hall, "How to Avoid Unwanted Email," Communications of the Association for Computing Machinery, vol. 41, No. 3, Mar. 1, 1998, pp. 88-95.
Hallam-Baker, "Security Assertions Markup Language. Core Assertion Architecture—Examples and Explanations," Internet Citation, http://www.oasis-open.org/committees/security/docs/draft-sstc-core-phill-07.pdf, May 14, 2001, 24 pages.
International Search Report for PCT/CA2003/000857; Applicant: Hardt, Dick, C., Filed on Jun. 6, 2003, dated Dec. 12, 2003, 7 pages.
International Search Report for PCT/CA2003/01774, Applicant: Sxip Networks Srl, Filed on Nov. 17, 2003, dated Jul. 13, 2004, 3 pages.
International Search Report for PCT/CA2005/000934; Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Sep. 28, 2005, 4 pages.
International Search Report for PCT/CA2005/000935; Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Oct. 4, 2005, 3 pages.
International Search Report for PCT/CA2005/000936; Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Oct. 6, 2005, 3 pages.
International Search Report for PCT/CA2005/000937; Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Sep. 20, 2005, 3 pages.
Kormann et al., "Risks of the Passport single sign on protocol," *Computer Networks*, Elsevier Science Publishers S. V., vol. 33, No. 1-6, Jun. 2000, pp. 51-58, XP004304758.
Lopez et al., "Ubiquitous Internet access control: the PAPI system," Proc. of the 13th International Workshop on Database and Expert Systems Applications (DEXA'02), Sep. 2, 2002, pp. 368-372, XP010612047.
Marchiori, "Platform for Privacy Preference (P3P) Syntex Specification," Internet Citation, http://classic-web.archive.org/web/20031207022324/www.w3.org/tr/1999/wd-p3p-19990826/syntax, Aug. 26, 1999, pp. 1-25.
Menezes et al., "Handbook of Applied Cryptography," Chapter 12, Section 12.5.2, pp. 509-512, 1997.
Microsoft Press Release. "Microsoft Passport Offers Streamlined Purchasing Across Leading Web Sites," Oct. 11, 1999, pp. 1-4.
Microsoft PressPass, Microsoft.NET: "A Platform for the Next Generation Internet," Jun. 22, 2000, pp. 1-7.
"Microsoft.NET Passport Technical Overview," Sep. 2001, 29 pages.
Microsoft.NET Passport, "What's New," Sep. 2001, 14 pages.
United States Patent and Trademark Office, Non-Final Office Action and Interview Summary for U.S. Appl. No. 09/933,567, dated Feb. 20, 2007, 16 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/923,285, dated Jul. 12, 2004, 11 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/933,567, dated Sep. 29, 2005, 9 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/974,766, dated Feb. 4, 2005, 14 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811, dated Jan. 23, 2006, 12 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811, dated Dec. 5, 2007, 7 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811, dated Jul. 11, 2005, 5 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811, dated Jul. 14, 2009, 9 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811, dated Aug. 18, 2010, 8 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/455,438, dated Jan. 10, 2007, 12 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/455,438, dated Feb. 5, 2008, 11 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/713,100, dated Dec. 5, 2006, 15 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/713,100, dated Feb. 27, 2009, 8 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/713,100, dated Mar. 26, 2008, 8 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,635, dated Nov. 21, 2007, 5 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Oct. 31, 2008, 7 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Dec. 15, 2006, 7 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Dec. 19, 2005, 8 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Dec. 30, 2009, 8 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Mar. 24, 2008, 6 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Mar. 30, 2005, 8 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,885, dated Jun. 17, 2008, 11 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,885, dated Jun. 3, 2010, 17 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,886, dated Feb. 9, 2009, 20 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,886, dated Jun. 24, 2008, 14 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,886, dated Jun. 8, 2011, 33 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/327,160, dated Oct. 4, 2007, 9 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/327,160, dated Jul. 12, 2006, 12 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/327,176, dated May 28, 2009, 12 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/327,176, dated Jun. 9, 2010, 12 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/824,358, dated Jan. 29, 2010, 13 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/824,358, dated Oct. 8, 2010, 12 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/824,358, dated Mar. 18, 2011, 8 pages.
United States Patent and Trademark Office, Non-Final Office Action U.S. Appl. No. 10/007,785, dated Mar. 2, 2005, 26 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811; dated Oct. 13, 2011, 34 pages.
United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,885, dated Aug. 26, 2011, 36 pages.
United States Patent and Trademark Office, Notice of Allowance and Interview Summary for U.S. Appl. No. 09/974,766, dated Nov. 22, 2005, 10 pages.

## US 10,567,391 B2
Page 6

(56)          **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office, Notice of Allowance and Interview Summary for U.S. Appl. No. 10/713,100, dated Apr. 16, 2010, 12 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 09/923,285, dated Apr. 12, 2007, 13 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 09/933,567, dated Aug. 11, 2008, 9 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 10/007,785, dated Nov. 22, 2005, 10 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 10/007,785, dated Feb. 10, 2006, 3 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 10/455,438, dated Apr. 30, 2010, 10 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 10/867,635, dated Jun. 20, 2008, 4 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 11/327,160, dated Sep. 10, 2008, 12 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 12/851,464, dated Oct. 5, 2011, 41 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 09/988,811, dated Aug. 11, 2006, 4 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 10/455,438, dated Mar. 25, 2009, 11 pages.

Papadimitratos, P. et al., "Secure Routing for Mobile Ad hoc Networks," In Proceedings of the SCS Communication Networks and Distributed Systems Modeling and Simulation Conference, San Antonio, TX, Jan. 2002, pp. 1-13.

Rauschenberger, Secure Your Web Site With Passport, "Simplify Your Web Site Visitors' Experience by Authenticating Them," *Visual Studio Magazine*, Apr. 4, 2002, pp. 1-3.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 09/933,567, dated Jun. 17, 2005, 5 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 09/988,811, dated Mar. 7, 2007, 4 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 11/039,886, dated Sep. 14, 2009, 4 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 11/327,176, dated Feb. 17, 2009, 6 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 11/327,176, dated Mar. 20, 2008, 6 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 11/327,176, dated Jul. 9, 2008, 7 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 12/434,803; dated Nov. 14, 2011, 7 pgs.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 11/824,358, dated Aug. 3, 2009, 7 pages.

Secure Your Web Site With Passport, "Implement Passport," *Visual Studio Magazine*, Apr. 4, 2002, pp. 1-3.

Secure Your Web Site With Passport, "Passport Key to HailStrom's Success," *Visual Studio Magazine*, Apr. 4, 2002, pp. 1-2.

Secure Your Web Site With Passport, "Sign in, Please," *Visual Studio Magazine*, Apr. 4, 2002, pp. 1-3.

United States Patent and Trademark Office, Supplemental Advisory Action for U.S. Appl. No. 11/039,885, dated Apr. 1, 2010, 3 pages.

Supplementary European Search Report for PCT/CA2005/000934, Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated May 27, 2011, 3 pages.

Supplementary European Search Report for PCT/CA2005/000935, Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005; dated Apr. 4, 2011, 3 pages.

Supplementary European Search Report for PCT/CA2005/000936, Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Jul. 19, 2010, 3 pages.

Supplementary European Search Report for PCT/CA2005/000937, Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Jul. 19, 2010, 4 pages.

Tenebaum et al. "Commercenet Consortium," AFRL-ML-WP-TR-1999-4147. Air Force Materiel Command, Wright-Patterson AFB, Jul. 1999, 79 pages.

United States Patent and Trademark Office, Advisory Action, U.S. Appl. No. 10/867,768, dated Aug. 14, 2014, 3 pages.

United States Patent and Trademark Office, Advisory Action, U.S. Appl. No. 12/434,803, dated Nov. 29, 2013, 3 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 10/867,768, dated Jun. 6, 2014, 9 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 11/327,176, dated Oct. 27, 2014, 15 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 10/867,768, dated Oct. 7, 2013, 10 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 11/327,176, dated Mar. 21, 2014, 16 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 12/434,803, dated Mar. 18, 2014, 17 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 14/015,813, dated Apr. 21, 2014, 15 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 14/015,813, dated Sep. 26, 2014, 8 pages.

United States Patent and Trademark Office, Advisory Action, U.S. Appl. No. 10/867,768, dated Nov. 9, 2012, 2 pages.

United States Patent and Trademark Office, Advisory Action, U.S. Appl. No. 12/434,803, dated Oct. 23, 2012, 3 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 09/988,811, dated May 14, 2012, 16 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 10/867,768, dated Aug. 30, 2012, 13 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 11/039,885, dated Aug. 15, 2012, 16 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 11/039,886, dated Jan. 14, 2013, 31 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 12/434,803, dated Aug. 14, 2012, 11 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 12/434,803, dated Aug. 28, 2013, 12 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 10/867,768, dated Feb. 6, 2012, 40 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 11/039,885, dated Nov. 9, 2012, 17 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 11/039,886, dated Aug. 21, 2012, 27 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 12/434,803, dated Dec. 7, 2012, 15 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 12/434,803, dated Mar. 1, 2012, 12 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 09/988,811, dated May 24, 2013, 19 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 11/039,885, dated Apr. 29, 2013, 15 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 11/039,886, dated Apr. 5, 2013, 8 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 11/824,358, dated May 1, 2012, 9 pages.

United States Patent and Trademark Office, Supplemental Notice of Allowability, U.S. Appl. No. 11/824,358, dated Jun. 18, 2012, 6 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 12/434,803, dated Aug. 14, 2015, 13 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 10/867,768, dated Sep. 17, 2015, 16 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 14/622,722, dated Feb. 29, 2016, 35 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 11/327,176, dated Sep. 2, 2016, 15 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 11/327,176, dated Apr. 6, 2017, 12 pages.

United States Patent and Trademark Office, Advisory Action, U.S. Appl. No. 11/327,176, dated Jul. 12, 2017, 3 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 11/327,176, dated Nov. 16, 2017, 9 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 14/941,528, dated Jan. 26, 2018, 10 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 15/172,008, dated Jul. 14, 2017, 15 pages.

**US 10,567,391 B2**

Page 7

(56)          **References Cited**

OTHER PUBLICATIONS

Erdos, Marlena et al. "Shibboleth-Architecture Draft v05", MACE, May 2, 2002, pp. 1-44.
United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 15/172,008, dated Jan. 24, 2018, 13 pages.
United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 15/172,008, dated Aug. 28, 2018, 4 pages.
United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 15/172,008, dated Jan. 3, 2019, 8 pages.

* cited by examiner



Figure 1

Figure 2



Figure 3

Figure 4



Figure 5

Figure 6



Figure 7



Figure 8



Figure 9



Figure 10

Figure 11



Figure 12



Figure 13

Figure 14

US 10,567,391 B2

**1**

# GRADUATED AUTHENTICATION IN AN IDENTITY MANAGEMENT SYSTEM

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 15/172,008, filed Jun. 2, 2016 (U.S. Pat. No. 10,298, 594), which is a continuation of U.S. application Ser. No. 14/622,722, filed Feb. 13, 2015 (U.S. Pat. No. 9,398,020), which is a continuation of U.S. application Ser. No. 14/015, 813 filed Aug. 30, 2013 (U.S. Pat. No. 8,959,652), which is a continuation of U.S. application Ser. No. 11/039,885, filed Jan. 24, 2005 (U.S. Pat. No. 8,527,752), which claims the benefit of U.S. Provisional Application No. 60/579,890, filed Jun. 16, 2004 and U.S. Provisional Application No. 60/605, 150, filed Aug. 30, 2004, which are all incorporated herein by reference in their entireties.

## FIELD OF THE INVENTION

The present invention relates generally to electronic identity management systems. More particularly, the present invention relates to authentication and security for data exchange in a distributed hierarchical identity management system.

## BACKGROUND OF THE INVENTION

In the field of identity management, there are a number of known systems for providing user identity services on the Internet. Microsoft's Passport™, and the Liberty Alliance identity management system are two such known examples, as are the identity management systems taught in Canadian Patent No. 2,431,311, and Canadian Patent Application Nos. 2,458,257, 2,468,351, and 2,468,585.

Many known identity management systems offer secure logins, allowing a user to visit a site in the network (membersite) and obtain a secure login to that site using an identity store to authenticate the user identity over a secure channel. The use of a secure channel allows an identity store to provide the membersite with user login information and/or confidential user information.

However, the reliance on secure channels increases the barrier to entry for membersites. Under a secure setup, lightweight, or simple, login is encumbered by the overhead of a secure channel.

In an identity management system that relies upon homesites to act as an identity store which stores user identity information, it may be advantageous to provide a form of graduated security to allow a membersite to obtain identity information, including authentication, using a number of different channels, each with different security features.

There is a further need for a mechanism through which a webservice provider can obtain user authentication and authorization for a third party to receive information. At present, if a third party wishes to aggregate information from a number of webservice providers for the user, or if a third party requires information from a webservice provider to further process before providing the results to a user, the third party and the webservice must be heavily linked. Typically, the third party must become associated with the webservice, and have its services bundled by the webservice provider. Thus a financial institution can use an aggregation service to perform analysis on a client's holdings, but a client cannot easily obtain an aggregation across a number of financial institutions. There is therefore a need for a

**2**

mechanism for third parties to provide authentication of a user authorization for release of information provided by a webservice.

There are at present a number of contact management services that allow a user to provide a list of known contacts. If the contacts provided a user subscribe to the same service, when one of the users updates a segment of a profile, the change is automatically reflected in the other users contact list. However, at present, these services are highly centralized. There is no automated mechanism to obtain information about users that have not subscribed. There is a plurality of these services, and at present there is no convenient mechanism for data exchange between them. This results in users forming small collective islands of contact sharing. There is a need for a distributed contact management system that allows users to share information with people in a vast identity management system that allows for automated updating of contact information.

It is, therefore, desirable to provide an identity management system that can provide at least one of improved gradations in the security levels, support for third party webservices and support for distributed contact management.

## SUMMARY OF THE INVENTION

It is an object of the present invention to obviate or mitigate at least one disadvantage of previous identity management systems.

In a first aspect of the present invention, there is provided a method of selecting a security level for transmitting identity information from a homesite in an identity management network to a membersite in the identity management network. The method comprises the steps of receiving a request from a membersite; determining, in accordance with a security level associated with the received request, the security level for transmitting the response to the request and transmitting the response to the received request over a channel selected in accordance with the determined security level.

In an embodiment of the first aspect of the present invention, the received request is a request for identity information, a request for authentication of a user identity, or a combination of the two. In another embodiment, the security level associated with the received request is selected from a list including an authentication security level, a channel security level and a time sensitivity security level. In other embodiment, s the step of determining includes selecting a security level at least as secure as a level associated with the received request. In other embodiments, the step of determining includes one of selecting a security level specified in the received request, selecting a security level in accordance with information specified in the received request and selecting a security level in accordance with user preferences, that predefined and are associated with the information requested in the received request. The security level can also be selected in accordance with homesite policies.

In another aspect of the present invention, there is provided a homesite, in an identity management system, for receiving information requests from a membersite in the identity management system, and for determining a security level for transmitting a response to received information requests. The homesite comprises an input, an authentication engine, and a response engine. The input receives an information request from a membersite. The authentication engine authenticates a user associated with the information

US 10,567,391 B2

3

request. The response engine assembles information associated with the user in accordance with the received authentication request, and transmits the assembled information to the membersite over a channel selected in accordance with a security level determined in accordance with the received information request.

In an embodiment of the second aspect of the present invention, the response engine includes a security level determining engine for selecting one of an authentication security level, a channel security level and a time sensitivity security level. IN another embodiment, the response engine includes a security level determining engine for selecting a security level at least as secure as a level associated with the received request, for selecting a security level specified in the request or for selecting a security level in accordance with information specified in the received request. In another embodiment, the security level determining engine determines the security level in accordance with user preferences or a homesite policy.

Other aspects and features of the present invention will become apparent to those ordinarily skilled in the art upon review of the following description of specific embodiments of the invention in conjunction with the accompanying figures.

BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention will now be described, by way of example only, with reference to the attached Figures, wherein:

FIG. **1** is a flowchart illustrating a method of the present invention;

FIG. **2** is a flowchart illustrating a method of the present invention;

FIG. **3** is a block diagram illustrating a lightweight login in a system of the present invention;

FIG. **4** is a block diagram illustrating an increased security login in a system of the present invention;

FIG. **5** is a block diagram illustrating a further increased security login in a system of the present invention;

FIG. **6** is a block diagram illustrating a secure login in a system of the present invention;

FIG. **7** is a flowchart illustrating a method of the present invention;

FIG. **8** is a flowchart illustrating a method of the present invention;

FIG. **9** is a block diagram illustrating the dataflow for providing authorization and authentication to a webservice provider;

FIG. **10** is a block diagram illustrating an additional dataflow for authorization of a webservice provider;

FIG. **11** is a block diagram illustrating a rich client interfacing with a homesite and a webservice provider;

FIG. **12** is a block diagram illustrating a distributed contact management system of the present invention;

FIG. **13** is a block diagram illustrating an automated user information distribution system of the present invention; and

FIG. **14** is a block diagram illustrating a further embodiment of the automated user information distribution system illustrated in FIG. **13**.

DETAILED DESCRIPTION

Generally, the present invention provides a method and system for identity management supporting graduated security levels, third party web services and contact management.

4

In the following discussion, a hierarchical distributed identity management system is assumed, though one skilled in the art will appreciate that a number of these techniques can be utilized in other identity management networks or other environments where transactional security is of importance.

In view of the need for a graduated security mechanism, the system of the present invention can provide a series of different levels of security. As noted with regard to the prior art, a mechanism for providing a series of graduated security levels provides membersites with the ability to determine the degree of security that they require. For sites that relied upon identification by the presence of a cookie, as many news based website do, or sites that relied upon simple username password combinations transmitted in cleartext prior to joining the identity management network, there is little need for requiring a very secure user identification channel. For such sites, requiring a secure login with signature verification for exchanged data serves as a barrier for entry. On the other side of the equation, financial service websites or websites providing medical histories are best served by very secure logins, with a mechanism that reduces the ability of malicious parties to perform man-in-the-middle type attacks. To provide such a varied login, the system of the present invention allows for a graduated security login. The graduated security login can use both differentiated levels of user authentication and differentiated levels of channel security.

In prior art identity management systems, users are authenticated by providing a user identifier, such as a username, and a shared secret, such as a password. In other systems, typically reserved for specialty uses, other information was used in place of a shared secret, including fingerprint or biometric data. If the provided information was sufficiently unique, as it is with fingerprint and biometric data, the provision of this information was sufficient, and a user identifier was not required. Thus, depending on the level of security required for the authentication, different information has been required. However, in the prior art, login information has been globally set, so that regardless of what a user may want to do the same authentication test was applied. In the context of a membersite requesting user authentication, this is particularly cumbersome. A user, who is being authenticated by a news site so that a particular presentation layout can be selected based on user preference, does not need to be bothered with a request to authenticate using a user name and password, especially if the user has been recently authenticated. Additionally, the news site does not necessarily want the user to be authenticated by a username and password combination, or an even stronger authentication mechanism, as it makes the process too cumbersome for the user and diminishes the likelihood that the user will visit the site. Conversely, a financial institution may want the user to be authenticated by a homesite regardless of when the user was last authenticated, and may demand that that authentication. Similarly, a medical database may want to force the user to authenticate with the homesite and use a particularly robust authentication mechanism, such as a biometric scan, so that there is confidence that the user has been properly authenticated.

To service the varied needs of different membersites, the homesite can support a series of different authentication levels. By supporting the plurality of different authentication mechanisms, the homesite can receive requests from a membersite to authenticate at a certain level of security. Additionally, a user can set a preference that when certain information, such as a credit card number, is requested, the homesite will only release it if authentication at a predefined

US 10,567,391 B2

5

level has been obtained. Thus, when a homesite receives a request for user information or user authentication, it can determine from both the request, and the requested information, the level of user authentication that is required. If the request for authentication and the requested information specify different levels of security, the homesite can use the higher of the two for the maximum security.

One skilled in the art will appreciate that different dimensions of security can be applied independently of each other. Differing levels of user authentication security can be applied, so that users can be required to provide different complexities of authentication information, as can differing levels of security in the communication channel formed between the membersite and homesite through the user's browser. As a further dimension to the security level, a time sensitivity factor can be required of the user authentication, so that differing levels of user authentication security can be combined with a staleness factor that allows authentication of a user within a fixed period of time to be varied.

FIG. 1 illustrates an exemplary embodiment of a method for executing the above-described graduated authentication system. In step 100 a homesite receives a user identity request from a membersite. A user identity request typically includes a request for one or both of user authentication and information about the user. In step 100 the homesite determines a required security level in accordance with the request. This determination can take the form of examining the request to determine a membersite's explicit request for a security level, examining user preferences which indicate that a user wishes to authenticate with nothing less than a specified authentication security level, examining a user specified minimum authentication security level associated with requested identity information, and optionally a set of homesite policies regarding the authentication of users at minimum security levels can also be used in the determination of the required authentication security level. The determined security level is preferably a combination of both authentication security and a time limit. The time limit defines an acceptable level of staleness in the authentication, allowing the combined security level either to force the user to authenticate, or to allow a previous authentication. In step 104, the user is authenticated using an authentication mechanism having combination of a security level and time factor at least equal to the determined combined security level. For example, the determined combined security level could be that the user has been previously authenticated using a username and password, has been authenticated within a predetermined time limit previously, the user must authenticate for this transaction using a user name and password pair, a username and password pair in conjunction with another shared secret, or with biometric authentication. The previous list is intended to be exemplary, and in no way should it be considered exhaustive of either of the two dimensions of security or of their combination. Upon successful user authentication, the homesite provides the membersite with a user identity response in step 106. This response preferably contains the requested user information, and a statement from the homesite detailing the security level at which the user was authenticated. One skilled in the art will appreciate that the membersite can include in the user identity request a list of acceptable authentication mechanisms, and the homesite would then determine the required security level by selecting one from the provided list, optionally doing so in accordance with user preferences and homesite policies.

Thus, a homesite can use any of a number of authentication methods, and preferably uses the one specified by the

6

membersite. To allow for authentication methods to be properly specified, each authentication method can be assigned a security level, allowing the membersite to request authentication at a desired level. The homesite can then use any authentication method at, or above, that level to authenticate the user.

From the perspective of a membersite, when a user visits, the membersite can determine that the user has a homesite, through any number of known mechanisms, including looking for a cookie in a shadow domain. The user can be redirected to the homesite with a request for authentication, possibly including an information request. This request includes an indication of the security level, preferably for both the authentication and the time sensitivity, required. When a response from the homesite is received, the response can include a statement, preferably signed by the homesite, that authentication was performed at a given level either at or in excess of the one specified by the membersite.

FIG. 2 is a flowchart illustrating an exemplary embodiment of a method to implement the above-described graduated authentication method from the perspective of the membersite. In step 108, the membersite issues a user identity request containing a defined authentication security level. In step 110, the membersite receives the homesite's user identity response. In step 112, the membersite examines the user identity response to determine the security level at which the user was authenticated. The determined security level can then be compared to the security level defined in step 108. If the level does not meet the requirements, the membersite can handle the error in any number of ways. As an example, if a membersite is a financial institution that in a login procedure obtains the user login information from a homesite, and the membersite specifies that the user must authenticate using a user name and password combination, and receives an identity response that was authenticated on the basis of a previous authentication, the membersite can refuse the user login. The membersite can then present the user with a notice that the homesite did not use the required authentication and then query the user for account information for an out-of-identity-management-network login.

As an example of the above described authentication security levels, consider the scenario of a news server that provides users with specified layout and content filtering based on saved user profiles. When a user visits the news server, the server sends the user to the homesite for authentication, and specifies that the lowest form of authentication is required, which in this scenario is that the user possesses a cookie from the homesite indicating that an authentication has occurred in the last 30 days. The homesite receives the user authentication request, determines that the user identifier, such as a globally unique persona identifier or a pairwise unique identifier, can be released without obtaining further user authentication as the user has previously authenticated. The user's identifier, along with a statement that authentication has been performed at or above the desired level, is then provided to the news server in a response signed by the homesite. The news server can then cross reference the user identifier with a set of preferences to display the news content in the desired format. Upon reading a story, the user clicks on a link to purchase a photo associated with one of the news stories. The purchase will be done on a credit card, whose information is stored by the homesite. The news server sends a request for user information to the homesite and requests the user's credit card number and a shipping address. The news server requests that the homesite authenticate the user using at least a username and password combination. The homesite receives

US 10,567,391 B2

7

the request for user information, and checks the user preferences related to the release of information. These preferences indicate that though the user will release a shipping address from a username and password challenge, a stronger challenge, such as a username and a response to two personal identification questions selected from a pool of questions, must be used to release a credit card number. The homesite then randomly selects two questions from a pool of questions, including information such as birthdate, place of birth, mother's maiden name, a favorite color, and a pet's name. These questions are provided to the user as a challenge. Upon successful completion of the challenge, the information is released to the news server in a signed response that includes an indication that a challenge at least as rigorous as the username password was obtained. Other levels of security can include a biometric or fingerprint scan, an out of band challenge such as a telephone call placed to a designated phone number, an out of band challenge including a password request in the out of band connection, automated token generation systems, and other known authentication mechanisms. One skilled in the art will appreciate that the above list is intended to be exemplary and not limiting in any manner.

As a companion to the above authentication security levels, the present invention can optionally provide a series of different channel configurations so that the channel between the membersite and homesite can have different levels of security itself. These two systems can be implemented independently of each other, though in combination they provide a large number of security options.

FIG. 3 illustrates the data flow between the browser B 114 of a user, whose identity information is stored by homesite HS 116, when attempting a login to membersite MS 118. B 114 connects to MS 118 over a data connection 120. The degree of security required for the authentication operation can be determined by the needs of the membersite. In transactions that do not require high degrees of security, such as authentications that would otherwise be username and password pairs exchanged in the clear, encryption is not required at either end. As a result, after browser 114 connects to MS 118 over datapath 120, MS 118 requests authentication of the user by sending an authentication request to HS 116. This request is sent to HS 116 by sending an authentication request to B 114 over datapath 112. The request sent to B 114 contains a redirect command that redirects B 114 to HS 116 and sends the authentication request over datapath 126. Thus, the authentication request is sent over a virtual channel created by datapaths 122 and 126 connected by the user redirection shown as 124. HS 116 authenticates the user, using any of a number of techniques as described above, or in the prior art references, and then provides the requested information to MS 118 by sending it, via browser 114, on over the channel created by datapaths 128, 130 and 132. If MS 118 would have otherwise used a simple username and password pair transmitted in the clear, the authentication of the user at HS 116 may be done over a secure channel, but the data provided to MS 118 can be send in the clear over unsecured data path 132. This allows sites that do not require secure connections to belong to the identity management network without supporting secure connections. In a presently preferred embodiment, HS 116 will send a response to MS 118 using the same data connection type that MS 118 sends the authentication request using, unless otherwise specified. Thus, upon receiving the authentication request over unsecured channel 124, HS 116 provides the requested authentication to MS 118 over unsecured channel 130.

8

FIG. 4 illustrates the dataflow for a scenario where MS 118 requests data over an insecure channel, and HS 116 is required to send the data over a secure data channel. When making the authentication request, MS 118 may consider that though the confirmation of the user identity is confidential, the request for the information is not. As such, MS 118 may choose to not use a secure channel to request the authentication. MS 118 then transmits an authentication request to HS 116 over the unsecure virtual channel created by datapaths 122, 124 and 126. The request specifies that the response should be transmitted over a secure channel. This allows MS 118 to not cause a redirect to its own secure server at the time of making the request, and instead simply sends the user to HS 116. After authenticating the user of browser 114, and optionally obtaining user authorization, HS 118 redirects the user to MS 118 over secure channel 136. Security for the channel can be provided in any of a number of ways including the use of Secure Sockets Layer (SSL) connections, or the secure hypertext transfer protocol (https). If MS 118 requests more than authentication, and includes a request for user information, such as biographic or financial data, the secure return path 136 provides security for the transmitted data. One skilled in the art will appreciate that if a user specifies that certain data is only to be released over secure channels, HS 116 can, in response to a request, redirect browser 114 to MS 118 to provide the message that the response can only be provided over a secure link. Thus, the user can be guaranteed that confidential information is only provided in secure sessions.

In certain attacks on secure servers a "man in the middle" is used, so that requests for information are intercepted, modified, and then passed along. If a man in the middle type attack of this sort is attempted on the system of FIG. 4, HS 116 will receive a request for additional information, but will only send it over a secure channel. Nonetheless, it may be beneficial for MS 118 to be able to easily identify such attacks. To allow for this, a further gradient of security can be introduced. Such a further security gradient is illustrated in the dataflows of FIG. 5. After B 114 connects to MS 118 over connection 120, MS 118 makes an authentication or information request from HS 116, by redirecting B 114 to HS 116 over the virtual channel created by datapaths 122, 124 and 126. After authenticating the user of B 114, and optionally obtaining user approval for the release of information, HS 116 sends the requested information or authentication to MS 118 via B 114, by redirecting B 114 over the virtual channel created by datapaths 140 142 and 144. However, in addition to using a secure channel, HS 116 includes in the response the parameters of the request. MS 118, upon receipt of the response, can then easily identify if the parameters have been modified. This alerts MS 118 to the start of a man in the middle attack.

FIG. 6 illustrates a further security level for use in the present invention. The user of browser 114 visits MS 118, and, upon indicating a membership in the identity management network, is redirected to HS 116 along the virtual channel created by datapaths 146, 148 and 150. After authenticating the user, HS 116 transmits the response to the information and/or authentication request to MS 118 over secure the virtual channel created by datapaths 140 142 and 144 along with the request parameters. To provide enhanced data protection, MS 118 uses secure paths 146 and 150 to transmit the request to HS 116 and also signs the request. HS 116 can then verify that the request was signed by MS 118, and has not been tampered with during transmission. If a request has been tampered with, HS 116 can redirect B 114 to MS 118 without the requested information to provide a

US 10,567,391 B2

9

message that the request was modified prior to receipt. If HS **116** and MS **118** have no other connection to each other, other than belonging to the same identity management network, MS **116** can provide its public key to HS **116** along with the request. To ensure that the signature is not modified, or replaced, during an attack, the signature can be signed by a common trusted party, such as a network root or a trusted certificate authority.

To offer the different gradients of channel security, the present invention provides for both membersites and home-sites to communicate to each other, preferably through browser **114**, using a channel selected from a channel listing. The following listing is meant to be exemplary and is not necessarily exhaustive. The list is not strictly ordered to show increasing security, as certain features of some chan-nels offer security in a different manner than others. At a first level an open channel, with no encryption, can be used between the MS and the HS. To increase the security, and open channel can be used with HS signing the response to show that the content has not been modified in transit. A secure channel can be used, so that transit between the HS and B, and B and MS is secure. A secure channel with a signed response allows HS to have a secure connection to B, and then have a secure channel from B to MS, and allows MS to see that the response has not been modified in transit. An open channel can be used, with both the request and the response signed. This allows HS to know that the request for information has not been tampered with, and allows the MS to know that the response has not been tampered with. If HS passes the signed request back to MS along with the signed response, MS can also verify that the request was not tampered with. The same signed request and response can also be transmitted over a secure channel.

By offering a series of these security levels the identity management system of the present invention allows mem-bersites to use the most appropriate security for their needs, and does not force a one size fits all solution upon mem-bersites. Homesites include input ports to receive requests for information and authentication. Prior to release of the information or authentication, a homesite can examine the information to be released and compare it to specified user conditions for the release of that information. Thus, a user can specify a channel security level at which information can be released, similar to the authentication security level settings on information described above. This allows a membersite to make a low security request, and a user preference or homesite policy to override it, and inform the membersite that the requested information can only be released using secure channels. The use of redirect com-mands allows the HS and MS to pass these messages to each other transparently to the user. Thus, the homesite input ports receive membersite requests, while an authentication engine obtains user authentication, and optionally obtains user authorization for the release of requested information. A homesite response engine then prepares the response to the received request and transmits it to the membersite over either the requested channel, or over a channel required by user preferences or homesite policies.

MS **118** is always guaranteed that the message from HS **116** has not been modified when a signed response is sent. The signature can be verified against a signature signed by a trusted third party, such as a network root as described in other references, or by a certificate authority.

FIG. **7** illustrates an exemplary method for a homesite to select a channel as described above. In step **152**, a homesite receives a user identity request. In step **154**, the homesite determines a required channel security level in accordance

10

with the request. As described above the channel can be selected from a list defined a priori. In step **156**, the homesite provides a user identity response over a channel having the appropriate security level. As one skilled in the art will appreciate, the determination of a required channel can be done in accordance with both the request and user or homesite defined preferences. As described above, if a membersite requests information over a channel deemed unacceptably low by either homesite or user defined pref-erences, the homesite can attempt to force the membersite to use a higher security channel by redirecting the user to the membersite with a response that indicates that a more secure channel is required. This response can either simply indicate that a more secure channel is required or it can indicate the minimum channel required.

FIG. **8** illustrates an exemplary method for a membersite to specify a channel as described above. The membersite, in step **158**, issues a user identity request, which includes a defined channel security level. As described above the channel security level can be selected from a list defined a priori. In response to the user identity request, the member-site receives, in step **160**, a user identity response. In step **162**, the membersite can examine both the response and the channel, over which the response was received, to determine that the channel has the defined security level. If the mem-bersite requested that the response include a signed set of the request parameters over an unencrypted http channel, an inspection of both the channel and the response will indicate whether or not the response meets the requirements. If the response does not meet the requirements, the user can be informed that the homesite did not respond as expected and that an attack may be in progress on the user's identity. In the alternate the membersite could determine that it is under attack from a malicious third party, and determine that the safest course of action is to terminate the connection and log the IP address of the response sender, which, if the browser was used to redirect the response, should correspond to the user.

One skilled in the art will appreciate that the above described channel and authentication security levels can be provided either separately from each other or in tandem. They both rely upon a membersite issuing a user identity request with a defined security level, and the membersite receiving a response that is checked to ensure that it meets the defined security level. From the perspective of the homesite, both methods involve receiving user identity requests, determining a security level in accordance with the received request and sending a response that meets the specified security levels.

One skilled in the art will appreciate that the various systems of the present invention can be implemented using standard computing hardware controlled by software to receive information, analyze it and provide a response appropriate to the method of the present invention. Appli-cant notes that the homesite of the present invention pref-erably includes an input, and authentication engine and a response engine. The input receives membersite request, preferably via the user, the authentication engine determines the requested authentication and authenticates the user, while the response engine sends an appropriate reply to the membersite. A membersite of the present invention can include an input for receiving a user, an authentication request engine, for transmitting a user authentication request with specified security level, and a response analyzer for analyzing the response to the authentication request to ensure that the security level of the response either matches or exceeds the specified security level.

US 10,567,391 B2

11

FIG. **9** illustrates the application of the security system described above to allow a membersite to connect to a webservice on behalf of a user to obtain information or to have service performed. In FIG. **9**, HS **116**, MS **118** and webservice WS **166** all belong to the identity management network operated by root **164**. In belonging to the network, each node has trust in root **164**, and can identify other nodes in the network by requesting a signature, associated with the other nodes, that is signed by the root. By offering another node in the network a public signature block that is signed by the root, a node can establish both that it is part of the network, and that any transmission that it makes has not been tampered with.

When the user of browser **114** establishes a session with MS **118**, over connection **168**, an authentication with HS **114** takes place (not shown as part of the data flow). After authentication, the user may request a feature provided by MS **118** that requires access to a webservice, such as WS **166**. As an illustrative example, not intended to limit the scope of the invention, MS **118** may offer a financial portal service to the user of browser **114**, whereby MS **118** collects financial information from a number of other servers and presents it to the user in a consolidated format. WS **166** can match a globally unique persona identifier (GUPI) with the user of browser **114** and the services to which the user is subscribed. MS **118** provides a request to WS **166** over datapath **170**. WS **166** sends a request **172** to MS **118**. This request typically includes a request for user authentication and a set of information to allow WS **166** to identify the user. The request from WS **166** can also include requests for assertions from third parties that are held by the homesite **116**. Such assertions can include verifiable statements that a user is a member of an organization, such as a reward program, and even that the user has obtained a status level in the organization. Other assertions may be issued by governmental organizations indicating that a user has a geographical location. Those skilled in the art will appreciate that any number of third party assertions can be provided to WS **166**. This request is preferably accompanied with a nonce or other form of session identifier so that MS **118**, or another system, is prevented from using the user authentication as part of a replay attack. MS **118** forwards the request for authentication to HS **116** by redirecting the user along logical datapath **174**, one skilled in the art will appreciate that datapath **174** can include multiple channels established between different nodes on a point-to-point basis. The request from MS **118** to HS **116** may simply be the WS **166** request, or it may include a series of requests, including an aggregation of requests from the number of other web services (not shown). Furthermore, the request sent along datapath **174** may include other information needed by MS **118**. The request relayed to HS **116** preferably contains a request for a set of information about the user, user authentication, and an explanation of what information is being provided and why it is being requested. In a presently preferred embodiment, the explanation is provided both as plaintext so that HS **116** can easily display it to the user, and as a programmatic explanation, so that HS **116** can obtain one-time authorization for the release of the information to WS **166**. The programmatic explanation, if provided, allows HS **116** to simply perform a compare operation on existing authorizations, reducing the number of times that the user must interact with HS **116**, increasing the appearance of a seamless experience.

Upon obtaining user authorization and authentication, HS **116** prepares a response, signs the response and includes its public signature, signed by root **164**. If the request from MS

12

**118** is an aggregation of requests from multiple webservices, HS **116** can sign each corresponding response separately so that each webservice is provided with only the information that it requested. In an alternate embodiment, to reduce the computational overhead on HS **116** imposed by signing multiple data blocks, the entire response is signed, and each web service is provided the whole response. The response is sent to MS **118** via browser **114** over datapath **176**. MS **118** preferably breaks the response into the separately signed segments and forwards each segment to the respective WS. WS **166** then receives its request on datapath **178**. WS **166** can then authenticate that the data has not been modified in transit by examining the homesite signature and knowing the root signature. The use of a nonce, as described above, provides WS **166** the ability to track when the request was issued if a timeout value is to be applied. WS **166** can match information in the response from HS **116** to information held, such as bank account information, to determine which information to release to MS **118**. Upon validating the authorization and gathering the information to release to MS **118**, WS **166** sends the information to MS **118** over datapath **180**. Upon receipt of the information from WS **166**, MS **118** can act on the information as required. Depending on the content of the response, WS **166** may select the elements of the signed response that it needs and then examine the authorization it has received. If authorization has been received WS **166** will either provide a token to MS **118** that permits multiple access without further authentication, or will provide the requested information to MS **118** without a token to provide one-time access only. For the purposes of an example, not intended to limit the scope of the present invention, the following scenario is presented. A user directs browser **114** to MS **118**, where a session has already been established. MS **118** provides the ability to aggregate information, such as travel information, for a user. MS **118** has knowledge of the user's upcoming travel itinerary, and proceeds to connect to an airline travel webservice, WS **166**. WS **166** upon receiving the initial contact from MS **118** provides a request for authentication of the user, using datapath **172**, and requests the user's full name, address and frequent flier information. This request is forwarded to HS **116**, possibly along with other information requests, following datapath **174** through MS **118**, and browser **114**. Upon receipt of the request, HS **116** requests that the user re-authenticate. The request from WS **166** is accompanied by both a text explanation outlining the information that is going to be released and a programmatic explanation; so that at a later date the user does not need to interact with HS **116**, and HS **116** can simply send the response. After authentication and acceptance of the release of the information, the user authorizes HS **116** to release the information to WS **166**. HS **116** then prepares a response including a user identifier, such as a GUPI, the requested information, and a nonce provided with request. The response is signed by HS **116**, and a root-signed copy of HS **116**'s public signature is appended to the signed response. This response is forwarded to MS **118** via browser **114** by redirecting the browser, along the continuation of datapath **176**, using any of a number of known techniques. MS **118** then forwards the segment of the signed response corresponding to the request from WS **166** to WS **166** over datapath **178**. After verifying the nonce and the requested information, WS **166** obtains the flight information for the user, provides it to MS **118**, and allows any of a number of functions to be provided including seat selection and advance check-in with electronic boarding pass provisions. One skilled in the art will appreciate both that other services can be provided, and that MS **118** can

US 10,567,391 B2

13

connect to a plurality of webservices to aggregate data from each of them. In one embodiment of the present invention, MS **118** requests sessions with a plurality of webservice providers, and aggregates their information requests. The aggregated requests are then provided en masse to HS **116**, and user authorization for all requests is obtained at once. This allows HS **116** to provide a series of responses to MS **118**, at which time MS **118** then separates the responses and sends each of the individual responses to the respective webservice providers. The severing of the concatenated responses from HS **116** can easily be managed using the session identifiers issued by each webservice provider as a key. In alternate embodiments, HS **116** obtains user approval for the release of the information to each of the webservice providers, and then sends the responses one at a time to MS **118**, which after receiving a response simply redirects browser **114** to HS **116** to obtain the next response until all responses are obtained and forwarded to the webservice providers. One skilled in the art will appreciate that the actual mechanism used for the supporting of multiple web-service providers can vary without affecting the scope of the present invention.

Webservice providers, such as WS **166**, can relate the information that they requested to their database, and at the same time be assured that they are allowed to release the information, as HS **116** can be proven to be authoritative for the user's identifier by following a signature key chain through any number of delegations until a trusted source is used to show that HS **116** is authoritative for the information released.

Some of the information housed by HS **116** may be provided to it by an outside authoritative source as described in detail in related applications, such as Canadian Application Numbers 2,468,351, and 2,468,585, which are hereby incorporated by reference. In cases where the information, such as a frequent flier number, is housed by an external authoritative site, HS **116** can provide the externally signed assertion to WS **166**, allowing WS **166** to determine both that the information provided is authentic, and that HS **116** is authoritative for the user associated with the information.

One skilled in the art will appreciate that MS **118** may always connect to WS **166**. As a result, MS **118** can, upon receiving an indication that the user is part of the identity management system, initiate the connection to WS **166** to request a session over datapath **170**. When MS **118** requests information required by WS **166**, it can include its own user authentication request. Thus, authentication of the user at HS **116** can be done at the same time that the user authorizes the release of information to WS **166**.

As illustrated in FIG. **10**, HS **116** is authoritative for the user of browser **114**. As such, HS **116** can be used as an agent of the user and permitted to directly interact with WS **166**. In such a scenario HS **116** directly connects to WS **166**, and requests information using connection **182**. WS **166** uses a standard interface, and as a result does not notice a differ-ence between HS **116** and MS **118**. Because HS **116** is already authoritative for the user, the authentication and data passing through MS **118** can be bypassed. WS **166** can issue an authentication request **184**, which HS **116**, acting as an agent for the user, can directly respond to over connection **186**. WS **166** can then either issue a token or one-time-information **188**. The user's trust of HS **116** allows for this scenario to be permitted, as without user approval HS **116** will not interact with WS **166**.

A rich client can be provided that interacts with WS **166** on the user's behalf without having to interact with MS **118**, as illustrated in FIG. **11**. As an example, if WS **166** provides

14

financial information to users for a bank, the bank can provide users with a rich client (RC) **190** that will interact with WS **120**. The client is preferably a non-browser based application that can make calls to WS **166**. Due to its standardized interface, WS **166** is agnostic as to who inter-acts with it. RC **190** appears as another MS to WS **166**. When RC **190** issues a request **192** to WS **166**, it receives a request for authentication and information **194**. RC then launches a browser **114** from the local computer, and uses the browser **114** to transmit WS **166**'s request to HS **116** over datapath **196**. The user interacts with HS **116** in the normal manner, and approves the release of the information. The response **198** is sent from HS **116** to the browser **114**, which provides the information to RC **190**. RC **190** can then close the browser window, and forward the requested infor-mation to WS **166** over datapath **200**. RC **190** can obtain the requested information from the browser **114** prior to closing the window, by having the browser **114** redirected to the localhost address at a predetermined port. As long as RC **190** has control over that port and is listening on it, the infor-mation can be received and then sent along to WS **166**. WS **166** can then send the requested information, or a token, to RC **190** over datapath **202**.

To facilitate the interaction of RC with the rest of the network, RC can use a public API to interact with network nodes such as HS **116** and WS **166**. As new standards for connection are defined, or new node types arise, the API can be changed by a public administrator, and then provided to the users of RC. By replacing the API, the ability to connect either to new node types or to existing nodes in a new manner can be provided without requiring the rewriting of the code base for RC.

As described above, the network root administers admis-sion to the network, and provides signed assertions that a homesite is authoritative for a user. Each user is uniquely identified by both a GUPI and an email address. By lever-aging the trust model of this network, a distributed contact management network is provided. At present contact man-agement networks require a single database of contacts that are maintained by a sole provider. The distributed nature of the network of the present invention bypasses the drawbacks to that model. A distributed contact management system in the network of the present invention is illustrated in FIG. **12**.

Root **164** maintains a database **204** mapping email addresses to associated GUPI's and homesite identifiers used to identify the homesite that is authoritative for the GUPI. HS **116** is authoritative for a GUPI associated with the user of browser **114**. The user of browser **114** provides to HS **116** a listing of known contacts over datapath **206**. HS **116** extracts the email addresses from the contact listing and provides the email addresses to root **164** over datapath **208**. Root **164** then identifies the GUPI and homesite associated with each submitted email address, and provides this infor-mation to the HS **116** over return datapath **210**. HS **116** can then contact HS2 **212**, which is authoritative for a GUPI associated with one of the submitted email addresses over connection **214**. When HS **116** contacts HS2 **212** over datapath **214**, it can request additional contact information stored by HS2 **212**. HS2 **212** can release this information, if authorized by the relevant user, or can ask the relevant user for authorization at the next login. When providing the information, HS2 **212** can provide a URI to HS **116** allowing HS **116** to obtain updated information at other times, so that the contact information can be updated periodically. Con-versely, HS **116** can provide HS2 **212** with a URI so that when the requested information changes, or at fixed inter-vals, HS **116** will receive updated information over datapath

US 10,567,391 B2

15

**214**. After receiving the user information over datapath **214**, HS **116** can forward the information to browser **114** over datapath **216**. One skilled in the art will appreciate that a number of other software applications, other than a standard internet web browser, can be used by the user to communicate with HS **116** including email and contact management clients. In the above scenario the contact information can be transmitted in any of a number of formats including the virtual card (vcard) standard.

The above-described scenario allows homesites to communicate to each other using URI's to update information. A similar network service is illustrated in FIG. **13**, where HS **116** is provided with an update URI by MS **118**, through browser **114** during a request for information over datapath **218**. The requested information is provided to MS **118** over datapath **220**. Both channels **218** and **220** make use of the redirection of browser **114**. However, when the supplied information changes, and if the user has approved the updating of information, HS **116** can create a back channel connection **222** to MS **118** to supply the updated information. One skilled in the art will appreciate that in addition to the request interface described above, a homesite would preferably have an update interface or engine, to allow monitoring of information for a user, so that when a user modifies a profile, the relevant information can be updated by backchannel, without requiring user interaction with the membersite.

FIG. **14** illustrates the use of the update URI for a user who is changing from HS **116** to HS2 **212** as a principal identity store. As in the example of FIG. **13**, HS **116** has obtained an update URI associated with MS **118** over datapath **218**, and has provided contact information to MS **118** over data path **220**. The user, through browser **114** over datapath **224**, informs HS **116** that the GUPI, and all associated information, is to be transferred to HS2 **212**. This can be a permanent transfer of information, or it can be using one homesite to serve as a backup to another. HS **116** connects to HS2 **212**, either directly over a back channel, or through redirection of the browser **114**, and an exchange of data is made. This datapath is shown as datapath **226**, which is an example of a back channel connection, but one skilled in the art will appreciate that it can be performed using browser redirection. Along with the user information associated with the GUPI, HS **116** transfers the update URI from MS **118** to HS2 **212**. Thus, when HS2 **212** receives updated information from browser **114** the information can still be updated with MS **118** seamlessly over datapath **228**.

GUPI's are typically assigned by root **164** to a homesite, such as HS **116**. Thus far in identity management systems, each identifier is linked to an email address. This removes the ability of a user to be anonymous, as the identifier can be associated with an email address that is easily traceable to a user. To satisfy the need for anonymous personas, root **164** can assign a series of GUPIs to HS **116** as an anonymous pool. This allows HS **116** to provide a user with a pool of anonymous GUPIs, so that if a user wishes to remain anonymous, HS **116** is the only site that can identify the user. Once again, this model is predicated upon the user of browser **114** having trust in HS **116**, without which, HS **116** would never be able to server as a homesite that stores the user's identity information. With a sufficiently large pool of anonymous GUPIs, HS **116** can assign a different GUPI to each site that a user visits. Though this prevents the building of attributes that can establish a virtual reputation, the purpose of anonymous personas is to prevent the building of any reputation. Because no two sites will be given the same GUPI, the result is much the same as a pairwise unique

16

identifier, however, HS **116** can, in one embodiment, economize on GUPI's in the unique pool by allowing the same GUPI to be used by two different users at two different sites. Because the GUPI has no attributes associated with it, and no user can build a reputation with it, if treated communally it further anonymizes the behaviour of the user. In non-shared embodiments, HS **116** must track the pairings of the membersite identifier and the user to determine the GUPI to be used. If the GUPI is not shared, it is still globally unique, and can be ported to another homesite. When transferring persona information to another homesite, the user can obtain a GUPI list from the homesite and can have the authoritativeness of that GUPI transferred to another homesite. For the embodiment where GUPIs are communally shared, the new homesite can be made authoritative for the GUPI, maintaining the same membersite identifier and user pairing to associate to the GUPI, without revoking the authoritativeness of the original homesite, as other people at other sites may use the GUPI.

One of the issues that arise from using multiple GUPI to allow a user to keep persona separate, is that when assertions are made, they are typically made for a single persona. Thus, for a user with home and office persona, an assertion may be made for the office persona regarding membership in an organization. If the user's home persona needs to make use of the membership assertion attached to the office persona there are two mechanisms provided by the present invention for this. Using a first mechanism, a user can direct HS **116** to contact AS which issued the assertion for the work persona. HS **116** then provides AS with multiple GUPIs, and the assertions for any of the provided GUPIs issued by AS and indicates that it is authoritative for all the submitted GUPIs, and all the submitted GUPIs are the same individual. AS, upon being informed that all the GUPIs are issued to the same individual, can then provide any GUPIs that do not have an assertion, with the assertion provided by HS **116**. In an example, AS is a frequent flier program, and has provided an assertion indicating that the office persona of a user has obtained elite status. HS **116** provides the GUPIs for the user's office and home persona to AS along with the assertion that the office persona has obtained elite status. AS then verifies that HS **116** is authoritative for both GUPIs, and confirms that the office persona is certified as having elite status. AS then provides an assertion for the GUPI associated with the home persona indicating elite status. This allows for assertions to be shared between persona, but comes at the cost of having AS know that two GUPI are related to each other.

If a user wishes to avoid having two GUPI linked together by an AS, but one GUPI has an assertion needed by the other GUPI, the following method can be employed. When MS **118** requests an assertion about a first GUPI that is only held by a second GUPI, HS **116** can include in its signed response, both GUPIs, and the assertion held for the second GUPI. MS **118** can then determine from the response, that HS **116** is authoritative for both GUPIs, and sees that HS **116** states that both GUPIs are issued to the same person. MS **118** can then verify that the second persona has the required assertion, and apply the assertion to the first persona. As an example, a user with office and home persona has an assertion for the office persona that indicates elite status in a frequent flier program from AS. The user wants to use this assertion with the home persona when visiting MS **118**. In response to MS **118**'s request for the assertion, HS **116** sends both office and home GUPI, and the assertion for the office persona GUPI. MS **116** can then verify that the GUPIs are related, and can transitively apply the assertion to the home

US 10,567,391 B2

17

persona. In contrast to the first embodiment, AS does not know that the persona are linked, but MS **118** knows. Because the operation, by default, includes moving attributes from one persona to another, HS **116** must reveal the link between 2 GUPIs to at least one of the two. By offering both mechanisms, the user is provided the opportunity to choose which node in the network is shown the link.

The above described method and system for sharing credentials between GUPIs can also be used in relation to anonymous GUPI, though it should be noted that this reduces the anonymity of a GUPI, so should preferably not be done with a GUPI shared among users. For a MS **118** that has only ever been presented with an anonymous GUPI, the above-described method provides a method of transferring history to an identifiable GUPI. If HS **116** provides MS **118** with both an anonymous GUPI and an identifiable, or non-anonymous, GUPI, MS **118** can transfer any history associated with the anonymous GUPI to the identifiable GUPI. This allows a user to interact with MS **118** in an anonymous fashion, and then, having reached a comfort level with MS **118**, the user can present another GUPI and have any history and reputation transferred to the non-anonymous GUPI.

To increase the availability of homesite management capabilities, a homesite can be built-in to a browser. Such a homesite can be offered either as an integral part of a web browser, or can be offered using a plug-in architecture. Such a plug in, or integrated browser, can be used to simplify the communication with nodes in the network and reduce the redirection of previous embodiments.

At a first level, a browser can indicate that it understands extensions to HTML specific to the identity management network. When browsers make requests from web servers using the hypertext transfer protocol (http), they provide an indication of capabilities, including an HTML version. By indicating that the browser understands the identity management network extensions to HTML (or identity management HTML tags), MS **118** does not need to redirect the browser to the shadow domain to find out the homesite of the user. Instead, MS can simply send an HTML instruction to the browser to obtain user authentication. If the browser indicates that it is both identity management aware, and that a homesite has been configured, MS **118** need only provide authentication and information requests to the browser, and the browser will then handle any redirection needed. This allows MS **118** to avoid using redirections to shadow domains to find out what the user's homesite is, and avoids having to issue redirection requests to the browser. From the perspective of the user, fewer redirection requests are issued, and MS **118** never obtains the location of the users' homesite. If MS **118** simply instructs the enhanced browser to obtain authentication in an HTML tagged message, it does not need to tell the browser where to redirect to, and avoids using Javascript™ redirects and close window commands to make the user experience seamless. The MS only determines the user's HS, when a response is issued, which increases user privacy.

As an enhancement, an enhanced browser can also be provided with the ability to function as a homesite. As disclosed in the above-cited references, a homesite can be provided as a local application. By integrating the homesite within the web browser, redirection can be avoided. When the HS-enabled browser visits MS **118**, it indicates that it supports identity management HTML tags. MS **118** then instructs the browser to obtain user authentication and return user information. HS-enabled browser no longer needs to redirect to an external site, and instead can provide user

18

authentication using a locally controlled authentication tab or window. If the user his specified that use of the browser is a sufficient indication of authentication, HS-enabled browser can immediately return the requested information, having signed the response. This eliminates the user having to interact with an external homesite, and reduces the data transmission, which is especially important on low-bandwidth connections. The HS-enabled browser preferably does not have a homesite cookie, so that MS **118** will not know that the user is using a local homesite.

One skilled in the art will appreciate that when an identity management aware browser sends identity management information through http headers, it allows MS **118** to refrain from bouncing the browser to the shadow domain. This allows MS **118** to simplify its interaction with the browser, as the browser has indicated that it knows a homesite for the user. Instead of the MS being sent the HS identifying information, MS uses an http command to request authentication in a POST command. The browser will handle redirection if needed and will replace the request authentication command with the appropriate HTML if an external HS is used. If an external HS is used, it can identify that it does not need to use a redirect command to send the information to MS, and instead simply sends the response to the browser and tells the browser to send the information to the MS.

The above-described enhancement to a browser can either be integrated into the browser code, or can be provided as a plug in. One skilled in the art will appreciate that either embodiment can communicate with a root node to obtain updated schema, or can obtain the updated schema from a central service used to ensure that the browser has been updated to the most recent patches and bug-fixes.

The above-described embodiments of the present invention are intended to be examples only. Alterations, modifications and variations may be effected to the particular embodiments by those of skill in the art without departing from the scope of the invention, which is defined solely by the claims appended hereto.

What is claimed is:

1. A computer-implemented method for implementing variable transaction security levels, the method comprising:

  receiving a first request for user authentication as part of a first usage event, wherein the first request for user authentication includes information about a first type of transaction to be performed by a user during the first usage event;

  receiving a second request for user authentication as part of a second usage event,

wherein the second request for user authentication includes information about a second type of transaction to be performed by the user during the second usage event, and wherein the second type of transaction is different from the first type of transaction;

  performing, using one or more hardware processors, at least one transaction associated with the first request at a first transaction security level by selecting a first transaction mechanism having the first transaction security level, wherein the first transaction mechanism is selected based on the first type of transaction to be performed by the user during a first usage event; and

  performing, using the one or more hardware processors, at least one transaction associated with the second request at a second transaction security level by selecting a second transaction mechanism having the second transaction security level,

19

wherein the second transaction mechanism is selected based on the second type of transaction to be performed by the user during the second usage event,

and wherein the first transaction security level is different from the second transaction security level.

**2**. The method of claim **1**, wherein the first transaction security level, the second transaction security level, or both comprise at least one of: a transaction authentication security level, a transaction channel security level, or a transaction time sensitivity security level.

**3**. The method of claim **2**, wherein the performance of transaction comprises:

selecting, using the one or more hardware processors, a channel with a channel security level to perform the transaction, the channel selected based on a correspondence between the transaction channel security level for the transaction and the channel security level of the selected channel, or

selecting, using the one or more hardware processors, an authentication mechanism with an authentication security level to perform the transaction, the authentication mechanism selected based on a correspondence between the transaction authentication security level for the transaction and the authentication security level of the selected authentication mechanism, or

performing, using the one or more hardware processors, at least a part of the transaction within a specified time limit corresponding to the transaction time sensitivity security level for the transaction.

**4**. The method of claim **3**, wherein one or more of the selected channel, the selected authentication mechanism, or the specified time limit used for performing the transaction is based on one or more policies specifying a minimum security level required for a response.

**5**. The method of claim **1**, wherein the first request for user authentication is sent via a first data path and the second request for user authentication is sent via a second data path different from the first data path.

**6**. The method of claim **1** further comprising:

selecting a first channel having a first channel security level to perform the at least one transaction associated with the first request, the first channel selected based on a correspondence between the first transaction security level and the first channel security level; and

transmitting first data to perform the at least one transaction associated with the first request over the selected first channel.

**7**. The method of claim **1** further comprising:

selecting a second channel having a second channel security level to perform the at least one transaction associated with the second request, the second channel selected based on a correspondence between the second transaction security level and the second channel security level; and

transmitting second data to perform the at least one transaction associated with the second request over the selected second channel.

**8**. The method of claim **1** further comprising:

determining that the first transaction security level, the second transaction security level, or both are below a minimum threshold;

providing an indication that a more secure transaction security procedure is required or an indication of a minimum security level; and

redirecting the first request, the second request, or both to a computing system that requires a higher security level.

20

**9**. The method of claim **1**, wherein the first transaction mechanism, the second transaction mechanism, or both are selected based on user preferences, wherein the user preferences are associated with information requested in the first request, the second request, or both.

**10**. A computer-readable storage device storing instructions that, when executed by a computing system, cause the computing system to perform acts for implementing variable transaction security levels, the acts comprising:

receiving a first request for user authentication as part of a first usage event, wherein the first request for user authentication includes information about a first type of transaction to be performed by a user during the first usage event;

receiving a second request for user authentication as part of a second usage event,

wherein the second request for user authentication includes information about a second type of transaction to be performed by the user during the second usage event, and wherein the second type of transaction is different from the first type of transaction;

performing, using one or more hardware processors, at least one transaction associated with the first request at a first transaction security level by selecting a first transaction mechanism having the first transaction security level, wherein the first transaction mechanism is selected based on the first type of transaction to be performed by the user during a first usage event; and

performing, using the one or more hardware processors, at least one transaction associated with the second request at a second transaction security level by selecting a second transaction mechanism having the second transaction security level,

wherein the second transaction mechanism is selected based on the second type of transaction to be performed by the user during the second usage event,

and wherein the first transaction security level is different from the second transaction security level.

**11**. The computer-readable storage device of claim **10**, wherein the first transaction security level, the second transaction security level, or both comprise at least one of: a transaction authentication security level, a transaction channel security level, or a transaction time sensitivity security level, and

wherein the performance of transaction comprises:

selecting, using the one or more hardware processors, a channel with a channel security level to perform the transaction, the channel selected based on a correspondence between the transaction channel security level for the transaction and the channel security level of the selected channel, or

selecting, using the one or more hardware processors, an authentication mechanism with an authentication security level to perform the transaction, the authentication mechanism selected based on a correspondence between the transaction authentication security level for the transaction and the authentication security level of the selected authentication mechanism, or

performing, using the one or more hardware processors, at least a part of the transaction within a specified time limit corresponding to the transaction time sensitivity security level for the transaction.

**12**. The computer-readable storage device of claim **11**, wherein one or more of the selected channel, the selected authentication mechanism, or the specified time limit used

US 10,567,391 B2

21

for performing the transaction is based on one or more policies specifying a minimum security level required for a response.

**13**. The computer-readable storage device of claim **10**, wherein the first request for user authentication is sent via a first data path and the second request for user authentication is sent via a second data path different from the first data path.

**14**. The computer-readable storage device of claim **10**, wherein the acts further comprise:

selecting a first channel having a first channel security level to perform the at least one transaction associated with the first request, the first channel selected based on a correspondence between the first transaction security level and the first channel security level; and

transmitting first data to perform the at least one transaction associated with the first request over the selected first channel.

**15**. The computer-readable storage device of claim **10**, wherein the acts further comprise:

selecting a second channel having a second channel security level to perform the at least one transaction associated with the second request, the second channel selected based on a correspondence between the second transaction security level and the second channel security level; and

transmitting second data to perform the at least one transaction associated with the second request over the selected second channel.

**16**. The computer-readable storage device of claim **10**, wherein the acts further comprise:

determining that the first transaction security level, the second transaction security level, or both are below a minimum threshold;

providing an indication that a more secure transaction security procedure is required or an indication of a minimum security level; and

redirecting the first request, the second request, or both to a computing system that requires a higher security level.

**17**. The computer-readable storage device of claim **10**, wherein the first transaction mechanism, the second transaction mechanism, or both are selected based on user preferences, wherein the user preferences are associated with information requested in the first request, the second request, or both.

**18**. A system for implementing variable transaction security levels, the system comprising:

at least one memory;

at least one interface configured to:

receive a first request for user authentication as part of a first usage event, wherein the first request for user authentication includes information about a first type of transaction to be performed by a user during the first usage event;

22

receive a second request for user authentication as part of a second usage event,

wherein the second request for user authentication includes information about a second type of transaction to be performed by the user during the second usage event, and wherein the second type of transaction is different from the first type of transaction; and

one or more processors configured to:

perform at least one transaction associated with the first request at a first transaction security level by selecting a first transaction mechanism having the first transaction security level, wherein the first transaction mechanism is selected based on the first type of transaction to be performed by the user during a first usage event; and

perform at least one transaction associated with the second request at a second transaction security level by selecting a second transaction mechanism having the second transaction security level,

wherein the second transaction mechanism is selected based on the second type of transaction to be performed by the user during the second usage event,

and wherein the first transaction security level is different from the second transaction security level.

**19**. The system of claim **18**, wherein the first transaction security level, the second transaction security level, or both comprise at least one of: a transaction authentication security level, a transaction channel security level, or a transaction time sensitivity security level, and

wherein the performance of transaction comprises:

selecting, using the one or more hardware processors, a channel with a channel security level to perform the transaction, the channel selected based on a correspondence between the transaction channel security level for the transaction and the channel security level of the selected channel, or

selecting, using the one or more hardware processors, an authentication mechanism with an authentication security level to perform the transaction, the authentication mechanism selected based on a correspondence between the transaction authentication security level for the transaction and the authentication security level of the selected authentication mechanism, or

performing, using the one or more hardware processors, at least a part of the transaction within a specified time limit corresponding to the transaction time sensitivity security level for the transaction.

**20**. The system of claim **18**, wherein one or more of the selected channel, the selected authentication mechanism, or the specified time limit used for performing the transaction is based on one or more policies specifying a minimum security level required for a response.

*   *   *   *   *

# EXHIBIT 2

US008332844B1

(12) **United States Patent**
Kulkarni et al.

(10) Patent No.: **US 8,332,844 B1**
(45) Date of Patent: **Dec. 11, 2012**

(54) **ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT**

(75) Inventors: **Pradip Kulkarni**, Pune (IN); **Mukul Kumar**, Pune (IN); **Adhir Potdar**, Pune (IN); **Richard Au**, Woodside, CA (US); **Tung Nguyen**, Cupertino, CA (US)

(73) Assignee: **Emendable Assets Limited Liability Company**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1193 days.

(21) Appl. No.: **11/709,477**

(22) Filed: **Feb. 21, 2007**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/395,816, filed on Mar. 30, 2006, now Pat. No. 7,721,282, which is a continuation-in-part of application No. 11/026,622, filed on Dec. 30, 2004, now abandoned.

(51) **Int. Cl.**
*G06F 9/445* (2006.01)

(52) **U.S. Cl.** ...................................... **717/176**

(58) **Field of Classification Search** .................. 345/557; 717/176
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,113,523 A | 5/1992 | Colley | |
| 5,127,104 A | 6/1992 | Dennis | |
| 5,175,852 A | 12/1992 | Johnson et al. | |
| 5,764,902 A | 6/1998 | Rothrock | |
| 5,974,547 A | 10/1999 | Klimenko | |
| 5,999,734 A | 12/1999 | Willis | |
| 6,018,747 A | 1/2000 | Burns | |

| | | | |
|---|---|---|---|
| 6,101,576 A * | 8/2000 | Kobayashi et al. | 711/122 |
| 6,195,680 B1 | 2/2001 | Goldszmidt | |
| 6,292,941 B1 | 9/2001 | Jollands | |
| 6,421,777 B1 * | 7/2002 | Pierre-Louis et al. | 713/2 |
| 6,442,605 B1 | 8/2002 | Rodriguez | |
| 6,502,238 B1 | 12/2002 | Pavan et al. | |
| 6,597,956 B1 | 7/2003 | Aziz | |
| 6,606,744 B1 | 8/2003 | Mikurak | |
| 6,745,192 B1 | 6/2004 | Libenzi | |
| 6,751,658 B1 * | 6/2004 | Haun et al. | 709/222 |
| 6,779,177 B1 | 8/2004 | Bahrs | |
| 6,871,219 B2 | 3/2005 | Noordergraaf | |
| 6,938,057 B2 | 8/2005 | Gusler | |
| 6,986,005 B2 | 1/2006 | Vo | |
| 6,990,513 B2 | 1/2006 | Belfiore | |

(Continued)

OTHER PUBLICATIONS

Calzarossa, M., and M. Kubát, "Processor Allocation in Parallel Systems," Proceedings of the IEEE International Conference on Computer Systems and Software Engineering (COMPEURO '91), Bologna, Italy, May 13-16, 1991, pp. 133-137.

(Continued)

*Primary Examiner* — Edward Martello
(74) *Attorney, Agent, or Firm* — Christensen O'Connor Johnson Kindness PLLC

(57) **ABSTRACT**

Described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

**27 Claims, 6 Drawing Sheets**



**US 8,332,844 B1**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,990,573 | B2 | 1/2006 | Cherian |
| 7,127,712 | B1 | 10/2006 | Noble |
| 7,150,015 | B2 | 12/2006 | Pace |
| 7,155,714 | B2 | 12/2006 | Makris |
| 7,200,715 | B2 | 4/2007 | Kleiman |
| 7,246,221 | B1 | 7/2007 | Soltis |
| 7,246,351 | B2 | 7/2007 | Bloch |
| 7,263,551 | B2 | 8/2007 | Belfiore |
| 7,269,664 | B2 | 9/2007 | Hutsch et al. |
| 7,290,258 | B2 | 10/2007 | Steeb |
| 7,331,047 | B2 | 2/2008 | Chu |
| 7,334,157 | B1 | 2/2008 | Graf |
| 7,430,610 | B2 | 9/2008 | Pace |
| 7,454,462 | B2 | 11/2008 | Belfiore |
| 7,467,293 | B2 | 12/2008 | Zhang |
| 7,475,274 | B2 | 1/2009 | Davidson |
| 7,496,739 | B1 | 2/2009 | Raghavan |
| 7,499,988 | B2 | 3/2009 | Keohane |
| 7,536,686 | B2 | 5/2009 | Tan |
| 7,549,055 | B2 | 6/2009 | Zimmer |
| 7,590,653 | B2 | 9/2009 | Sparks |
| 7,668,938 | B1 | 2/2010 | Phillips |
| 7,685,148 | B2 | 3/2010 | Engquist |
| 7,870,106 | B1 * | 1/2011 | Nguyen et al. ................ 707/694 |
| 2002/0016891 | A1 | 2/2002 | Noel |
| 2002/0083120 | A1 | 6/2002 | Soltis |
| 2002/0087813 | A1 | 7/2002 | Harris |
| 2002/0087846 | A1 | 7/2002 | Nickolls |
| 2003/0046511 | A1 | 3/2003 | Buch |
| 2003/0126242 | A1 * | 7/2003 | Chang ............................ 709/222 |
| 2003/0130832 | A1 | 7/2003 | Schulter |
| 2003/0233648 | A1 | 12/2003 | Earl |
| 2004/0015899 | A1 | 1/2004 | May |
| 2004/0078779 | A1 | 4/2004 | Dutt |
| 2004/0088473 | A1 | 5/2004 | Ogle |
| 2004/0199919 | A1 | 10/2004 | Tovinkere |
| 2005/0128319 | A1 | 6/2005 | Morino |
| 2005/0131962 | A1 | 6/2005 | Deshpande |
| 2006/0173993 | A1 | 8/2006 | Henseler |
| 2008/0229040 | A1 | 9/2008 | Honma |

## OTHER PUBLICATIONS

Chen, D., et al., "Exploiting High-Level Coherence Information to Optimize Distributed Shared State," Proceedings of the 9th ACM Symposium on Principles and Practice of Parallel Programming, San Diego, Jun. 11-13, 2003, pp. 131-142.

Cohen, A., and M. Woodring, "Win32 Multithreaded Programming," O'Reilly Online Catalog, Chapter 1, <http://www.oreilly.com/catalog/multithread/excerpt/ch01.html> [retrieved Nov. 21, 2006], pp. 1-8.

Couturier, R., et al., "A Compiler for Parallel Unity Programs Using OpenMp," Proceedings of the International Conference on Parallel and Distributed Processing Techniques and Applications, Las Vegas, Nevada, Jun. 28-Jul. 1, 1999, pp. 1992-1998.

Ismail, I.M., and J.A. Davis, "Program-Based Static Allocation Policies for Highly Parallel Computers," Proceedings of the 1995 IEEE Fourteenth Annual International Phoenix Conference on Computers and Communications, Scottsdale, Arizona, Mar. 28-31,1995, pp. 61-68.

Kandemir, M., et al., "Minimizing Data and Synchronization Costs in One-Way Communication," IEEE Transactions on Parallel and Distributed Systems 11(12):1232-1251, Dec. 2000.

Li, K.-C., et al., "Design Issue of a Novel Toolkit for Parallel Application Performance Monitoring and Analysis in Cluster and Grid Environments," Proceedings of the 8th International Symposium on Parallel Architectures, Algorithms and Networks (ISPAN'05), Las Vegas, Nev., Dec. 7-9, 2005, 6 pages.

Nguyen, T.M., et al., "Branching Store File System," U.S. Appl. No. 11/026,622, filed Dec. 30, 2004.

Ohta, K., et al., "Improving Parallel Write by Node Level Request Scheduling," Proceedings of the 9th IEEE/ACM International Symposium on Cluster Computing and the Grid, Shanghai, May 18-21, 2009, pp. 196-203.

OpenMP Fortran Application Program Interface (Version 2.0), Nov. 2000, <http://www.openmp.org/drupal/mp-documents/fspec20.pdf>, pp. 1-3 and 34-36.

OpenMP Fortran Application Program Interface (Version 2.0), Nov. 2000, <http://www.openmp.org/drupal/mp-documents/fspec20.pdf>, pp. 1-3, 18-19, 25-27, 34-37, and 67.

"Sequent's NUMA-Q SMP™ Architecture," Sequent Computer Systems, Inc., 1997, <http://parallel.ru/ftp/computers/sequent/NUMA__SMP__REV.pdf>, pp. 1-18.

Sivathanu, G., et al., "Ensuring Data Integrity in Storage: Techniques and Applications," Proceedings of the 2005 ACM Workshop on Storage Security and Survivability (StorageSS '05), Alexandria, Va., Nov. 7-10, 2005, pp. 26-36.

Zhu, T., et al., "Scheduling Divisible Loads in the Dynamic Heterogeneous Grid Environment," Proceedings of the First International Conference on Scalable Information Systems, Hong Kong, May 29-Jun. 1, 2006, 10 pages.

* cited by examiner



FIG. 1



FIG. 2

300
310
Store blocks of a root image of a compute node.
320
Store a leaf image on a second storage unit.
322
Cache blocks of the root image that have been accessed by a compute node.
324
Receive a read request from a compute node.
326
Is a portion of the data requested currently stored in cache?
Yes
328
Serve that portion of the requested data from the cache.
No
330
Merge the blocks of the root image, the blocks of the leaf image, and the blocks of the cache, if any, to create an application environment.
340
Deliver the application environment to the compute node.
345
Update the cache based on the read request.
A

FIG. 3A

300



FIG. 3B



**FIG. 4**

500



510    Receive data blocks of a file system.

520    Index a root image portion of the file system.

530    Store the indexing results on a shared storage unit accessible by another compute node.

540    Provide the indexing results to another compute node.

550    Index a leaf image portion of the file system.

560    Re-index the file system by re-indexing the leaf image portion and merging the re-indexing results with the indexing results of the root portion.

**FIG. 5**

US 8,332,844 B1

**1**

# ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT

## CLAIM OF PRIORITY UNDER 35 U.S.C. §120

The present application for patent is a continuation-in-part of application Ser. No. 11/395,816, entitled "BLOCK-LEVEL I/O SUBSYSTEM FOR DISTRIBUTED APPLICATION ENVIRONMENT MANAGEMENT," filed Mar. 30, 2006, now U.S. Pat. No. 7,721,282, assigned to the assignee hereof and hereby expressly incorporated by reference herein.

## REFERENCE TO CO-PENDING APPLICATIONS FOR PATENT

The present application for patent is related to the following U.S. patent application:

"VIRUS SCANNING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT," by Kulkarni et al., filed Feb. 28, 2007, now U.S. Pat. No. 8,065,737, assigned to the assignee hereof and expressly incorporated by reference herein.

## BACKGROUND

### Background

Over the years, as the internet has expanded and computers have multiplied, the need for clustered computing such as High Performance Computing (HPC) has increased. Clustered computing involves multiple compute nodes, usually a server grid, that work together to achieve a common task. For example, several (typically hundreds of) compute nodes may be clustered together to share the load of serving a high-traffic website. In large-scale systems such as this, a trend in software deployment is to centralize data management on a globally accessible file system with stateless computing nodes. A common example of this is Operating System (OS) software image management, where the compute nodes are activated with the distributed application environment by either diskless booting protocols or remote software installation to local storage. Under this architecture, a boot image is required for each compute node in the cluster. The boot image necessarily contains the kernel; it may additionally contain the application software that is intended to be run on the compute node.

The primary concern in clustered computing is low cluster bring-up time. The software that provides the boot images for the cluster typically stores a master boot image. It may then either pre-create clones of this master image for each such server, or it may create them "on the fly."

Creating a boot image on the fly involves copying the entire contents of the master image, which are typically in the range of 5-15 GB. Even with a significant amount of bandwidth by today's standards, this method will result in a large bring-up time.

Pre-creating a boot image for each server is advantageous from the point of view of cluster bring-up time. However, since one often does not know in advance how many servers will ever be booted, this scheme may result in wasted disk space.

Regardless of which of the preceding methods is used, both suffer from the same major problem—updating the boot image(s) for the cluster is cumbersome, as it means updating a number of copies of the boot image.

**2**

Additionally, once some compute nodes have booted, they will often engage in redundant activities with respect to each other. For example, assume that a cluster involves 20 compute nodes each running the same operating system and using substantially similar hardware. The 20 compute nodes will generally need to access much of the same data (e.g., drivers, library files, etc.). Moreover, when each of the 20 compute nodes index their file systems, the index results will only vary slightly to the extent that each compute node has developed its own "personality." Thus, to the extent that there is redundancy in the operations of the compute nodes, CPU resources, disk space, and data bus bandwidth are wasted.

In a branching store file system, a read-only base image (or "root" image) of the application environment is created. The root image is accessible by all compute nodes in the cluster. Changes made by a compute node to the root image are stored in a "leaf" image unique to that compute node. A filter operates between the compute nodes and the file system(s), which merges the changes recorded on the leaf images with the root image and delivers the result to the appropriate compute node. From the point of view of the compute node, it is running its own unique and cohesive instance of the application environment. While this system allows for creation of boot images on the fly without severely diminishing bring-up time, a separate version of the system must be created for each unique operating system because data is stored at the file system level (i.e., on a "per file basis"). Thus, migrating a computing cluster from one operating system to another is much more complicated than simply installing a new root image containing the new OS.

## SUMMARY

Described herein is technology for, among other things, root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

Thus, embodiments of the present disclosure provide an operating system-independent system and method for distributing an application environment to a compute node. By utilizing a root-leaf system of application environment storage, embodiments of the present disclosure allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not require copying the contents of the root image. Rather it involves registering a new UBD with the system, which occurs very quickly. Bring up time, and access time in general, can be further improved by caching commonly accessed portions of the root image. Moreover, updating the boot image for the entire cluster simply involves updating the root image. Additionally, because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node. Thereafter, the results of that operation can be

US 8,332,844 B1

**3**

shared with the other compute nodes in the cluster, thus saving the other compute nodes valuable time and resources.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a diagram of a suitable system on which embodiments may be implemented.

FIG. **2** is a diagram of a system, for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure.

FIGS. **3**A-**3**B are flowcharts illustrating a process for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure.

FIG. **4** illustrates a flowchart for a process for updating the cache based on a read request, in accordance with an embodiment of the present disclosure.

FIG. **5** illustrates a flowchart for a process for indexing a root image, in accordance with various embodiments of the present disclosure.

### DETAILED DESCRIPTION

Reference will now be made in detail to various embodiments of the disclosure, examples of which are illustrated in the accompanying drawings. While the disclosure will be described in conjunction with the various embodiments, it will be understood that they are not intended to limit the scope of the claims to these embodiments. On the contrary, the disclosure is intended to cover alternatives, modifications and equivalents, which may be included within the spirit and scope of the disclosure as defined by the claims. Furthermore, in the detailed description of the present disclosure, numerous specific details are set forth in order to provide a thorough understanding of the present disclosure. However, it will be obvious to one of ordinary skill in the art that the present disclosure may be practiced without these specific details. In other instances, well-known methods, procedures, components, and circuits have not been described in detail so as not to unnecessarily obscure aspects of the present disclosure.

Some portions of the detailed descriptions that follow are presented in terms of procedures, logic blocks, processing, and other symbolic representations of operations on data bits within a computer or digital system memory. These descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art. A procedure, logic block, process, etc., is herein, and generally, conceived to be a self-consistent sequence of steps or instructions leading to a desired result. The steps are those requiring physical manipulations of physical quantities. Usually, though not necessarily, these physical manipulations take the form of electrical or Magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated in a computer system or similar electronic computing device. For reasons of convenience, and with reference to common usage, these signals are referred to as bits, values, elements, symbols, characters, terms, numbers, or the like with reference to the present disclosure.

It should be borne in mind, however, that all of these terms are to be interpreted as referencing physical manipulations and quantities and are merely convenient labels and are to be interpreted further in view of terms commonly used in the art. Unless specifically stated otherwise as apparent from the discussion herein, it is understood that throughout discussions of the present embodiment, discussions utilizing terms

**4**

such as "determining" or "outputting" or "transmitting" or "recording" or "locating" or "storing" or "displaying" or "receiving" or "recognizing" or "utilizing" or "generating" or "providing" or "accessing" or "checking" or "notifying" or "delivering" or the like, refer to the action and processes of a computer system, or similar electronic computing device, that manipulates and transforms data. The data is represented as physical (electronic) quantities within the computer system's registers and memories and is transformed into other data similarly represented as physical quantities within the computer system memories or registers or other such information storage, transmission, or display devices.

Briefly stated, described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

Example Compute Node Operating Environment

With reference to FIG. **1**, an example system for implementing embodiments includes a general purpose computing system environment, such as compute node **100**. In its most basic configuration, compute node **100** typically includes at least one processing unit **102** and memory **104**. Depending on the exact configuration and type of compute node, memory **104** may be volatile (such as RAM), non-volatile (such as ROM, flash memory, etc.) or some combination of the two. This most basic configuration is illustrated in FIG. **1** by dashed line **106**. Additionally, compute node **100** may also have additional features/functionality. For example, compute node **100** may also include additional storage (removable and/or non-removable) including, but not limited to, magnetic or optical disks or tape. Such additional storage is illustrated in FIG. **1** by removable storage **108** and non-removable storage **110**. Computer storage media includes volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules or other data. Memory **104**, removable storage **108** and nonremovable storage **110** are all examples of computer storage media. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can be accessed by compute node **100**. Any such computer storage media may be part of compute node **100**.

Compute node **100** may also contain communications connection(s) **112** that allow it to communicate with other devices. Communications connection(s) **112** is an example of communication media. Communication media typically embodies computer readable instructions, data structures, program modules or other data in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limi-

tation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media. The term computer readable media as used herein includes both storage media and communication media. Compute node **100** may also have input device(s) **114** such as a keyboard, mouse, pen, voice input device, touch input device, etc. Output device(s) **116** such as a display, speakers, printer, etc. may also be included. All these devices are well known in the art and need not be discussed at length here.

Example Systems

FIG. **2** is a diagram of a system **200** for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure. In one embodiment, system **200** is implemented in a multi-computer system, such as an HPC cluster. In one embodiment, the application environment includes an operating system. In other embodiments, the application environment may contain other applications. System **200** has a number of compute nodes **220***a-n* coupled to first storage unit **240** and a corresponding second storage unit **250***a-n* though a corresponding union block device (UBD) **230***a-n*. To the compute nodes **220***a-n*, it appears that they have access to their own version of a distributed application environment. However, a separate and complete boot image is not created and stored for each compute node **220***a-n*.

System **200** has a first storage unit **240** for storing blocks of a root image of an application environment. The root image contains data initially common to the compute nodes **220***a-n*. The root image is not changed by compute nodes **220***a-n*. For example, in one embodiment, compute nodes **220***a-n* have read-only access to the first storage unit **240**.

Moreover, each compute node **220***a-n* has a corresponding second storage unit **250***a-n* for storing a leaf image. The first storage unit **240** and second storage units **250***a-n* may each be contained on separate physical storage devices, on separate logical spaces on the same storage device, or any combination thereof. Regardless, the first storage unit **240** and the second storage units **250***a-n* may be contained within a single storage appliance. The leaf image may contain blocks of new data, blocks of changed data, or other blocks of data unique to the individual compute node. The leaf image may also contain a block modification log. In other words, a leaf image will describe the changes made by the respective compute node **220***a-n* to its instance of the application environment. Thus, when a compute node (e.g., node **220***a*) makes changes involving the root image, modifications are made to that compute node's leaf image (e.g., leaf image stored on second storage device **250***a*). With respect to changes to the root image, only the specific blocks that are changed are stored in the leaf image. For example, a particular file on the root image may comprise twenty blocks of data (e.g., blocks **1-20**). One compute node (e.g., compute node **220***a*) desires to make a change to this file which involves a modification of only a few specific blocks of the file (e.g., blocks **4-9**). In this example, only the modified blocks (e.g., blocks **4-9**) will be stored in the compute node's leaf image (e.g., leaf image stored on second storage device **250***a*) plus some small overhead.

A compute node **220***a-n* mounts its instantiation of the application environment via its respective UBD **230***a-n*. In one embodiment, UBDs **230***a-n* are effectively low-level drivers that operate as an interface between the first and second storage devices and the file system of each compute node **220***a-n*. The file system may reside on the server side of the system **200**. The file system may also reside on each of the compute nodes **220***a-n*. Because UBDs **230***a-n* operate below the file system, they are concerned merely with the blocks of data themselves, rather than files they form. As a result, system **200** is completely file system, and thus operating system, independent.

UBDs **230***a-n* determine what leaf image (from the appropriate second storage unit **250**) is needed for portions of the application environment that their respective compute nodes **220***a-n* have changed. UBDs **230***a-n* also locate the portions of the application environment that are not changed by their respective compute nodes **220***a-n*. These portions may reside in the root image. There may also be intermediate images (not depicted in FIG. **2**) comprising versions of the root image from which a compute node's instance of the application environment is derived. Further, UBDs **230***a-n* create a new leaf image on a respective second storage unit **250***a-n* when their respective compute nodes **220***a-n* make changes to their instantiations of the application environment. In one embodiment, the UBDs **230***a-n* obtain the information necessary to create the application environment from a block modification log located in its respective leaf image.

UBDs **230***a-n* may also modify the leaf image in response to their respective compute node's access to its instance of the application environment. For example, upon receiving a write request from their respective compute nodes for a sector X, the UBDs **230***a-n* will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units **250***a-n*, where sector X can then be modified. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be mapped and copied from the root image before modification.

By providing an application environment to multiple compute nodes via a branching store system, embodiments allow for a more streamlined update/patch procedure. In one embodiment, first storage device **240** may be refreshed with a new operating system patch, thereby automatically refreshing the image for all dependent compute nodes.

Caching

An embodiment of the present disclosure provides for caching of portions of the root image. Because several compute nodes in a cluster may often access the same data (e.g., same drivers, same library files, etc.) on the root image, tremendous speed improvements can be realized by caching such data in cache **260**. For example, by current standards, it is common for a storage disk to achieve a data transfer rate around 76 MB/s, whereas cache memory can achieve speeds up to and greater than 800 MB/s. In one embodiment, the cache may be contained within a single storage appliance, along with the first storage unit **240** and the second storage units **250***a-n*.

The value of such caching becomes even more apparent in the context of initial boot sequences. For example, a cluster of 20 compute nodes may be booted for the first time. Since it is a first boot, the cache is empty. The first compute node to boot (e.g., compute node **220***a*) will therefore load its data directly from the pertinent disks (e.g., first storage unit **240** and second storage unit **250***a*). While the first compute node is loading its data, its reads are intercepted and cached on a per-block basis in cache **260**. Thereafter, when a second compute node (e.g., compute node **220***b*) goes to boot, any data required by the second compute node that was previously accessed by the first compute node can be served out of the cache **260** rather than the first storage unit. It is appreciated that to the extent that the configurations of the first and second compute nodes are substantially the same, the relationship between the data requested by the second compute node and the data stored in the cache **260** approaches a 1:1 ratio (i.e., a greater than ten-fold improvement in root image access time is realized).

US 8,332,844 B1

7

It is further appreciated that the entire contents of the root image may not necessarily be accessed to achieve a boot (e.g., unused drives and the like). Therefore, the data capacity of cache **260** can be much less than that of the first storage unit **240**.

As new data is accessed on the root image that is not currently stored in the cache **260**, the cache **260** may thereafter be updated with the new data. Moreover, as the amount of data in the cache **260** approaches or exceeds a threshold value, certain data will need to be removed from the cache **260** to make way for the new data. The data to be removed, deleted, overwritten, etc., may be selected the basis of, for example, how recently the data was accessed, how frequently the data has been accessed, or a combination of both. It should be appreciated that other cache arbitration algorithms known in the art may similarly be used.

Indexing

An embodiment of the present disclosure provides for indexing the root image. From the standpoint of seek time, it is beneficial for a compute node to have access to an index of its file system. In a traditional clustered computing situation, each compute node would independently index its file system. To the extent that each compute node in a cluster has similar operating environments to the others, indexing performed on common data is therefore redundant.

As an added benefit of the architecture **200** depicted in FIG. **2**, because the data stored in the root image is by definition common to all the compute nodes **220**a-n, one compute node (e.g., compute node **220**a) can index the contents of the root image and then provide the indexing results to the other compute nodes (e.g., compute nodes **220**b-n). Thereafter, the compute nodes **220**a-n need only be concerned with indexing their respective leaf image, which are relatively small compared to the root image. Moreover, in embodiments where the first storage unit **240** is read-only, the root image will not have to be re-indexed because the contents of the root image do not change. It is appreciated that the indexing results can be provided to the other compute nodes in a number of ways. For example, the results may be stored on a shared storage unit (such as, but not limited to, cache **260**), the results may provided directly to the other compute nodes, etc. Moreover, the initial indexing of the root image does not have to be performed by a compute node. For example, the indexing may be performed by a dedicated indexing host.

Example Methods

FIGS. **3**A-**3**B are flowcharts illustrating a process **300** for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure. Although specific operations are disclosed in process **300**, such operations are exemplary. Process **300** may not include all of the operations illustrated by FIGS. **3**A-**3**B. Also, process **300** may include various other operations and/or variations of the operations shown by FIGS. **3**A-**3**B. Likewise, the sequence of the operations of process **300** can be modified. Steps of process **306** may be stored as instructions on a computer readable medium and executed on a computer processor.

Step **310** involves storing blocks of a root image of the compute node on a first storage unit. By storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent.

Step **320** involves storing a leaf image on a second storage unit. The leaf image includes, but is not limited to, new data blocks for the compute node and blocks of the root image that the compute node has changed. The leaf image includes a block modification log in one embodiment.

8

Step **322** involves caching blocks of the root image that have been accessed by a compute node. In doing so, embodiments improve the access time for subsequent compute nodes requesting to access the same blocks of data.

Step **324** involves receiving a read request from a compute node. At step **326**, a determination is made as to whether the data requested by the compute node is currently stored in the cache. If a portion of the data is currently stored in the cache, that portion is then served from the cache (step **328**), thus improving the access time with respect to that portion of data as compared to otherwise retrieving it from a storage unit such as a hard disk.

Step **330** involves merging the blocks of the root image, the blocks of the leaf image, and the relevant blocks of the cache, if any, to create the application environment. In other words, the merging occurs at an operational level between the file system of a compute node and the first storage unit, the corresponding second storage unit, and the cache. Once the application environment has been created, it will appear to the compute node as one cohesive image rather than a base image plus its additions, deletions, and modifications. To the compute node, it appears that it has access to its own unique version of an application environment. However, a separate and complete boot image is not actually stored for the compute node.

Step **340** involves delivering the application environment to the compute node. Step **340** may comprise a low-level driver determining which data blocks are needed for the compute node's instance of the application environment and delivering the application environment to the compute via the compute node's file system.

Step **345** involves updating the cache based on the read request. For instance, to the extent that a compute node has accessed root image data not currently stored in the cache, the cache should be updated to include that cache. In some cases, the amount of data in the cache may approach a capacity limit, either due to the physical capacity of the cache itself or due to threshold limit set in software.

FIG. **4** illustrates a flowchart for a process **345** for updating the cache based on a read request, in accordance with an embodiment of the present disclosure. It should be appreciated that the steps illustrated in FIG. **4** are exemplary and the updating performed in block **345** of process **300** may be achieved in many other ways as well. Process **345** may not include all of the operations illustrated by FIG. **4**. Also, process **345** may include various other operations and/or variations of the operations shown by FIG. **4**. Likewise, the sequence of the operations of process **345** can be modified. Steps of process **345** may be stored as instructions on a computer, readable medium and executed on a computer processor.

At step **410**, a determination is made as to whether the amount of data currently in the cache plus new data to be added exceeds a threshold value (physical or software-imposed). If the threshold value will be exceeded, the least recently accessed data is removed from the cache (step **420**). This sequence repeats until there is adequate headroom in the cache to accommodate the new data. Once it is determined that the amount of data currently in the cache plus the new data to be added will not exceed the threshold value, FIG. **4** proceeds to step **430**. Step **430** involves caching the portion of the requested data that is not currently stored in the cache (i.e., the "new data").

With reference again to FIG. **3**B, step **350** involves modifying the leaf image in response to the compute node's access to its instance of the application environment. The modifying of the leaf image may include copying one or more data

US 8,332,844 B1

**9**

blocks from the root image to the leaf image, and modifying the data block in the leaf image. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be copied from the root image before modification.

Step **352** involves receiving indexing results pertaining to the root image from a compute node. Step **356** involves providing the indexing results to other compute nodes. It is appreciated that this may be done in a number of ways. For example, the indexing results may be provided directly to the compute nodes. Alternatively, the indexing results may be stored on a shared storage unit (step **354**) and then provided to the compute nodes via the shared storage unit. By receiving the indexing result of the root image from one compute node and providing it to the rest of the compute nodes, valuable time, resources, and bandwidth are saved for the other compute nodes. Since the root image is common to all the compute nodes, any re-indexing of the root image would be redundant and a waste of resources.

Step **360** involves reconciling the root image and the leaf image to form a new root image. This may be desirable if, for example, the leaf image has grown to exceed a particular disk quota. Furthermore, if there are multiple compute nodes that access the root image, each having their own respective leaf image, and there is substantial commonality between the leaf images, it may also be beneficial to reconcile the leaf images with the root image.

FIG. **5** illustrates a flowchart for a process **500** for indexing a root image, in accordance with various embodiments of the present disclosure. Although specific operations are disclosed in process **500**, such operations are exemplary. Process **500** may not include all of the operations illustrated by FIG. **5**. Also, process **500** may include various other operations and/or variations of the operations shown by FIG. **5**. Likewise, the sequence of the operations of process **500** can be modified. Steps of process **500** may be stored as instructions on a computer readable medium and executed on a computer processor.

Step **510** involves receiving data blocks of a file system at a compute node. The data blocks include a root image portion in the leaf image portion. As described above, the leaf image portion includes additional data blocks not previously contained in the root image portion and also changes made by the compute node to the blocks of the root image. Thus, the file system actually seen by the compute node is a product of merging the root image portion in the leaf image portion together at the block level.

Step **520** involves the compute node indexing the root image portion of its file system. In such a case, the compute node is to some extent agnostic to the fact that its file system is divided between a root image portion and a leaf image portion. At step **540**, the compute node provides the indexing results of the root image portion to another compute node. It is appreciated that this may be achieved a number of ways. For example, the first compute node may simply provide the indexing results to the second compute node directly. Alternatively, the first compute node may store the indexing results on a shared storage unit that is accessible by the second compute node (step **530**).

Thereafter, the compute node may complete its indexing of its file system by indexing the leaf image portion of the file system (step **550**). Further down the road, the benefits of indexing the root image separately from the leaf image are realized when the compute node requires that its file system be re-indexed. At step **560**, the compute node re-indexes its file system by re-indexing its corresponding leaf image portion with the previous indexing results of the root portion.

**10**

Thus, by operating at the block level, embodiments of the present disclosure provide file system and operating system independent systems and methods for distributing an application environment to a compute node. By utilizing a branching store system of application environment distribution, embodiments of the present disclosure allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not require copying the contents of the root image, but rather it involves registering a new UBD with the system, which occurs very quickly. Bring up time, and access time in general, can be further improved by caching commonly accessed the portions of the root image. Moreover, updating the boot image for the entire cluster simply involves updating the root image.

Embodiments of the present disclosure also allow for scalability and redundancy. For example, a server containing the root image may only have the resources to supply the root image to 100 compute nodes. Thus, in order to implement a 200-compute node system, two servers, each containing a copy of the root image, are used. This scalability provided by embodiments also lends itself to dynamic scaling. In other words, the number of root images required for a specific configuration can change based on the I/O workload, and new root images can be created on the fly accordingly. Moreover, additional servers containing the root image may be added into the system to provide redundancy and increase reliability. For example, and with reference to FIG. **2**, cache **261**, first storage unit **241**, and second storage units **251***a-n* provide failover/redundancy security for system **200**. As an added security measure, some of the root nodes may be located remotely from each other (e.g., half located in a main office and half in a satellite office). In addition, it is possible to copy the contents of one or more leaf nodes into a non-UBD (regular block device) copy (e.g., for use as an isolated backup).

Moreover, because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node. Thereafter, the results of that operation can be shared with the other compute nodes in the cluster, thus saving the other compute nodes valuable time and resources.

The previous description of the disclosed embodiments is provided to enable any person skilled in the art to make or use the present disclosure. Various modifications to these embodiments will be readily apparent to those skilled in the art, and the generic principles defined herein may be applied to other embodiments without departing from the spirit or scope of the disclosure. Thus, the present disclosure is not intended to be limited to the embodiments shown herein but is to be accorded the widest scope consistent with the principles and novel features disclosed herein.

What is claimed is:

**1**. A system for providing data to a plurality of compute nodes, the system comprising:

a first storage unit configured to store blocks of a root image of said compute nodes;

a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

US 8,332,844 B1

**11**

a cache configured to cache blocks of said root image previously accessed by at least one of said compute nodes.

**2**. The system as recited in claim **1** wherein said cache is configured to store X most recently accessed blocks of said root image, and wherein X represents a cache threshold value.

**3**. The system as recited in claim **1** wherein said first storage unit, said second storage units, and said cache are contained within a single storage appliance.

**4**. The system as recited in claim **1** further comprising:

a plurality of union block devices configured to interface between respective compute nodes and said first storage unit, respective second storage units, and said cache to distribute application environments to the compute nodes, wherein said union block devices are configured to create said application environments by merging the blocks of said root image with the blocks of respective leaf images.

**5**. The system as recited in claim **4** wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first storage unit, respective second storage units, and said cache.

**6**. The system as recited in claim **1** wherein said first storage unit is read-only.

**7**. A method for providing data to a plurality of compute nodes, comprising:

storing blocks of a root image of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

**8**. The method as recited in claim **7** further comprising:

receiving a read request from at least one of said compute nodes, wherein a first portion of the data requested is currently stored in said cache memory; and

providing said first portion of said data to said at least one of said compute nodes from said cache memory.

**9**. The method as recited in claim **8** further comprising:

updating said cache memory based on said read request.

**10**. The method as recited in claim **9** wherein a second portion of the data requested is not currently stored in said cache memory and said updating comprises:

caching said second portion in said cache memory; and

removing the least recently accessed data from said cache memory if the amount of data in said cache memory is above a threshold value.

**11**. The method as recited in claim **7** further comprising:

merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments.

**12**. The method as recited in claim **11** wherein said merging occurs at an operational level between file systems of the respective compute nodes and said first storage unit, respective second storage units, and said cache memory.

**13**. The method as recited in claim **7** wherein said first storage unit is read-only.

**14**. A system for indexing file systems for a plurality of compute nodes, the system comprising:

**12**

a first storage unit configured to store blocks of a root image of said compute nodes;

a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

a plurality of union block devices corresponding to said compute nodes, said union block devices configured to interface between said compute nodes and said first and second storage units to distribute said file systems to said compute nodes, wherein said union block devices are configured to create said file systems by merging the blocks of said root image stored on the first storage unit with the blocks of respective leaf images stored on respective second storage units, and wherein further at least one of said compute nodes is configured to index said root image and provide the indexing results to another of said compute nodes.

**15**. The system as recited in claim **14** wherein said first storage unit and said second storage units are contained within a single storage appliance.

**16**. The system as recited in claim **14** further comprising:

a plurality of union block devices configured to interface between respective compute nodes and said first storage unit and respective second storage units, said union block devices configured to distribute application environments to the compute nodes, wherein said union block devices are configured to create said application environments by merging the blocks of said root image with the blocks of respective leaf images.

**17**. The system as recited in claim **16** wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first storage unit, respective second storage units, and said cache.

**18**. The system as recited in claim **14** wherein said first storage unit is read-only.

**19**. A method for indexing file systems for a plurality of compute nodes, comprising:

storing blocks of a root image of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images for respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes;

merging the blocks of said root image with the blocks of respective leaf images stored on respective second storage units to create respective file systems for respective compute nodes;

receiving indexing results pertaining to said root image from one of said compute nodes; and

providing said indexing results to the others of said compute nodes.

**20**. The method as recited in claim **19** further comprising: storing said indexing results on a shared storage unit.

**21**. The method as recited in claim **19** wherein said merging occurs at an operational level between respective file systems of the compute nodes and said first storage unit and respective second storage units.

US 8,332,844 B1

**13**

**22**. The method as recited in claim **19** wherein said first storage unit is read-only.

**23**. A computer-readable storage medium having instructions stored thereon that, in response to execution by at least one computing device, cause the at least one computing device to:

receive data blocks of a file system, said data blocks comprising a root image portion and leaf image portion, said leaf image portion comprising only additional data blocks not previously contained in said root image portion and, changes made by said first compute node to the blocks of said root image, wherein said leaf image portion does not include blocks of said root image that are unchanged by said first compute node, wherein said file system is the result of merging said root image portion and said leaf image portion together at the block-level; index said root image portion; and

provide the results of said indexing to a second compute node, wherein said logic encoded in the one or more

**14**

tangible media comprise computer executable instructions executed by the first compute node.

**24**. The computer-readable storage medium of claim **23**, wherein the instructions further cause the at least one computing device to store said results of said indexing on a shared storage unit accessible by said second compute node.

**25**. The computer-readable storage medium of claim **23**, wherein the instructions further cause the at least one computing device to index said leaf image portion.

**26**. The computer-readable storage medium of claim **25**, wherein the instructions further cause the at least one computing device to re-index said file system by re-indexing said leaf image portion and merging the results of said re-indexing of said leaf image portion with said results of said indexing of said root image portion.

**27**. The computer-readable storage medium of claim **23** wherein said root image portion is read-only.

*   *   *   *   *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.           : 8,332,844 B1                          Page 1 of 1
APPLICATION NO.      : 11/709477
DATED                : December 11, 2012
INVENTOR(S)          : Kulkarni et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On Title Page 2, item (56), under "OTHER PUBLICATIONS", in Column 2, Lines 28-30, delete "OpenMP Fortan..............34-36.".

In the Specifications:

In Column 3, Line 8, delete "system," and insert -- system --, therefor.

In Column 3, Line 54, delete "Magnetic" and insert -- magnetic --, therefor.

In Column 7, Line 55, delete "306" and insert -- 300 --, therefor.

In Column 8, Line 50, delete "computer, readable" and insert -- computer readable --, therefor.

In the Claims:

In Column 13, Line 11, in Claim 23, delete "and," and insert -- and --, therefor.

Signed and Sealed this
Eleventh Day of June, 2013

*Teresa Stanek Rea*

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

# EXHIBIT 3

US007314167B1

(12) **United States Patent** (10) **Patent No.:** **US 7,314,167 B1**
Kiliccote (45) **Date of Patent:** **Jan. 1, 2008**

(54) **METHOD AND APPARATUS FOR
PROVIDING SECURE IDENTIFICATION,
VERIFICATION AND AUTHORIZATION**

(75) Inventor: **Han Kiliccote**, Los Altos, CA (US)

(73) Assignee: **Pisafe, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 232 days.

(21) Appl. No.: **11/075,493**

(22) Filed: **Mar. 8, 2005**

(51) **Int. Cl.**
**G06K 5/00** (2006.01)

(52) **U.S. Cl.** ...................................... **235/380**; 235/382

(58) **Field of Classification Search** ................ 235/380,
235/375, 379, 382, 382.5; 705/39, 76; 340/10.52,
340/10.3, 5.8; 358/1.15, 1.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2003/0216831 A1* 11/2003 Hart et al. .................. 700/235

| 2004/0125402 | A1* | 7/2004 | Kanai et al. | ............... | 358/1.15 |
| 2006/0087407 | A1* | 4/2006 | Stewart et al. | ........... | 340/10.52 |
| 2006/0095369 | A1* | 5/2006 | Hofi | ............................ | 705/39 |

* cited by examiner

*Primary Examiner*—Thien Minh Le
(74) *Attorney, Agent, or Firm*—Pillsbury Winthrop Shaw
Pittman LLP

(57) **ABSTRACT**

An apparatus for providing a secure transaction is disclosed.
The apparatus includes an image capture device configured
to capture an image, the image having information embed-
ded therein, a memory configured to store predetermined
information, an input unit configured to receive input infor-
mation provided by a user, a processor configured to: verify
the user based on the input information to ensure that the
user is authorized to use the apparatus, and generate an
output based on the information embedded in the image and
the predetermined information, and an output unit config-
ured to forward the output generated by the processor.

**43 Claims, 13 Drawing Sheets**





**FIG. 1**



**FIG. 2**



*FIG. 3*



FIG. 4



FIG. 5



FIG. 6



**FIG. 7**



**FIG. 8**



FIG. 9



**FIG. 9**
**(Continued)**



FIG. 10



*FIG. 11*



*FIG. 12*

US 7,314,167 B1

**1**

# METHOD AND APPARATUS FOR PROVIDING SECURE IDENTIFICATION, VERIFICATION AND AUTHORIZATION

## BACKGROUND

### 1. Field

The present invention relates generally to secure transactions, and more specifically, to methods and devices for providing secure identification, verification and authorization using a portable secure device.

### 2. Background

There are many applications where authentication can be useful including, for example, e-commerce transactions, secure system access, etc. Authentication technologies are generally implemented to verify the identify of a user prior to allowing the user to have ability to perform certain tasks, such as, accessing confidential information or conducting authorized transactions. Many authentication systems are known in the art and the methodologies associated with these systems cover a wide range of techniques.

The use of credit and debit cards to conduct payment transactions is very popular. Credit and debit cards can be used for paying telephone charges and purchase transactions. With the burgeoning growth of online or e-commerce, the use of credit and debit cards to pay for online transactions is also increasing. Such increase use of credit and debit cards also results in increase in identity theft crimes including credit card fraud. In response, card issuers are employing various different measures in order to minimize and/or prevent such crimes. For example, in order to provide sufficient authentication, a user may be required to provide additional information during the card approval process, such as, certain numbers printed on the back of the card, the postal zip code for the billing address associated with the card, or a persona identification number (PIN) linked to the card. Because such information is static, it may be of nominal effectiveness.

In one existing system, an apparatus is provided for identifying an individual. The apparatus employs a static value and a dynamic variable to generate passwords. For every transaction to be completed, a fixed code is entered into the card by the user at the start of the access request procedure. This fixed code constitutes the static value. The dynamic variable is produced which varies dynamically as a function of time. The static value and the dynamic variable are next used as input parameters of a secret encryption algorithm implemented in order to produce a password in the card. This password is displayed on the card and the user is invited to transfer it to a server. The fixed code is also transferred to the server. The server then calculates the password by using the same encryption algorithm and the dynamic variable. The password generated by the password is compared with the password transmitted to the server by the user. In the event of matching, authorization for access to the function can be delivered. It will be noted that the dynamic variable is a time-dependent dynamic value. Since this variable is necessarily produced independently, both in the card and in the server, the clocks of these two facilities used to produce the dynamic variable on each side must be synchronized with a given accuracy. As a result, the apparatus requires time-dependent synchronization and shared secret keys.

Another existing system discloses a method and apparatus for secure credit card transactions. This apparatus comprises an authorization computer and a credit card that work in conjunction with each other to enhance the security of credit

**2**

card transactions. More specifically, the system includes a smart credit card that has a microprocessor, associated memories and a liquid crystal display. The credit card is used to produce a unique verification number by processing a transaction sequence number with an encryption algorithm. The verification number is then displayed in the display device, and can be transmitted to the authorization computer along with a customer identifying account number. The computer, which is used for authorizing the credit card transactions for the customers of the credit card issuer, uses the account number to access an account file for the credit cardholder. The account file contains a de-encryption algorithm, which is complementary to the encryption algorithm of the credit card, such that the computer can use the de-encryption algorithm together with the verification number to produce a computed transaction sequence number. Both transaction sequence numbers, the one in the card and the one in the computer, are changed by increment after the authorized transaction so that a different verification number is generated and used in the authorization in each subsequent credit card transaction. Synchronization between the card and the computer is required.

In another existing system, a portable information and transaction processing system and method utilizing biometric authorization and digital certificate security is disclosed. The system uses a portable client PDA with touch screen, microphone, and CPU for processing voice commands, and processing biometric data to verify a user. In fact, the system requires the use of a PDA in which the user stores his financial and personal information. A digital certificate is downloaded from a central server of a service provider. The digital certificate accomplishes the goal of identification verification by checking whether the digital certificate is expired before providing any credit card information. This system is intended for managing financial data. The foregoing system requires use of shared secret keys between the user and the verifier. It also requires time-dependent synchronization for user verification purposes.

Another prior art system discloses a token issuing system, a mobile communication means, a token verification system and tokens. A user of the mobile communication means can use this system by ordering a certain token from the token issuing system, which produces a token and transmits the token to the mobile communication means. The user of the mobile communication means can then later use the token by effecting the transfer of the token to the token verification system, which receives and processes the token, and allows the user to obtain the benefit, right, or product associated with the token. In one embodiment, the user of the mobile communication means types the token on a kepyad of the verifying system. The verifying system can include a scanning or image capture device for reading information on a display of the mobile communication means. The verifying system can comprise a digital camera for obtaining images. In another embodiment, the mobile communication means displays the token as a bar code on a display of the mobile communication means. The verifying system uses a shared key to decrypt the encoded string received from the mobile communication means.

Another prior art system discloses an authentication and verification method and apparatus employing tokens. The token, which can be a credit-card sized clip or carried as part of a key chain, works in conjunction with hardware or software running on a supplier's server system to generate a new, unpredictable code every 60 seconds that is known to the supplier server. For instance, each user may receive a personal token having a hidden 6-digit numerical string. The

US 7,314,167 B1

**3**

user further selects a 4-digital personal identification number (PIN) that is appended to the hidden numerical string in the token. The user's password is therefore the combination of the 4-digit PIN plus the hidden 6-digit numerical string. The 6-digit numerical string in the token automatically changes every 60 seconds. A security server compares the user-entered password with its knowledge of what password should have been entered for that 60-second period. The foregoing system requires time-dependent synchronization. Further, the passwords change every 60 seconds.

Hence, it would be desirable to provide methods and devices that are capable of providing secure transactions in a more efficient manner.

## SUMMARY

An apparatus for providing a secure transaction is disclosed. In one embodiment, the apparatus includes an image capture device configured to capture an image having information embedded therein, a memory configured to store predetermined information, an input unit configured to receive input information provided by a user, a processor configured to: verify the user based on the input information to ensure that the user is authorized to use the apparatus, and generate an output based on the information embedded in the image and the predetermined information, and an output unit configured to forward the output generated by the processor.

The processor may be further configured to generate the output using the input information. The input information may include one of a personal identification number and biometric information. The processor may also be configured to decode the information embedded in the image for use in generating the output by using an encryption, decryption or message authentication code algorithm.

In one aspect, the information embedded in the image may include information relating to a transaction. The output may represent an authentication code to be used to authenticate the user with respect to the transaction. The output may also include a digital signature to be used to signify authorization by the user with respect to the transaction. The transaction includes an online transaction.

In another aspect, the information embedded in the image may include information relating to a set of items and the information embedded in the device may include payment card account information. The output may further include some or all of the information relating to the payment card account to be used for payment with respect to the transaction along with the signature or authorization code to be used as proof that the user of the device has authorized the transaction.

In yet another aspect, the information embedded in the image may include information relating to a password to be used to unlock a secured document. The output may include the password to be used to unlock the secured document.

In a further aspect, the information embedded in the image may include information provided by a vendor relating to a pending transaction. The output may include some or all of the information provided by the vendor to be used to alert the user with respect to the pending transaction.

The apparatus may include one of a mobile device, a smartcard, a card, a badge or a token. The mobile device may further include one of a cell phone and a personal digital assistant.

It is understood that other embodiments of the present invention will become readily apparent to those skilled in the art from the following detailed description, wherein

**4**

various embodiments of the invention are shown and described by way of illustration. As will be realized, the invention is capable of other and different embodiments and its several details are capable of modification in various other respects, all without departing from the spirit and scope of the present invention. Accordingly, the drawings and detailed description are to be regarded as illustrative in nature and not as restrictive.

## BRIEF DESCRIPTION OF THE DRAWINGS

Aspects of the present invention are illustrated by way of example, and not by way of limitation, in the accompanying drawings, wherein:

FIG. **1** is a simplified schematic diagram illustrating a secure device according to one embodiment of the present invention;

FIG. **2** is a flow diagram illustrating general operations of the secure device according to one embodiment of the present invention;

FIG. **3** is a simplified schematic diagram illustrating one authentication application of the secure device according to one embodiment of the present invention;

FIG. **4** is a simplified schematic diagram illustrating another authentication application of the secure device according to one embodiment of the present invention;

FIG. **5** is a simplified schematic diagram illustrating one authorization application of the secure device according to one embodiment of the present invention;

FIG. **6** is a simplified schematic diagram illustrating another authorization application of the secure device according to one embodiment of the present invention;

FIG. **7** is a simplified schematic diagram illustrating one digital signature application of the secure device according to one embodiment of the present invention;

FIG. **8** is a flow diagram illustrating general operations of a document distribution application using the secure device according to one embodiment of the present invention;

FIG. **9** is a simplified schematic diagram illustrating one online e-commerce application of the secure device according to one embodiment of the present invention;

FIG. **10** is a simplified schematic diagram illustrating one check-out application of the secure device according to one embodiment of the present invention;

FIG. **11** is a simplified schematic diagram illustrating another check-out application of the secure device according to one embodiment of the present invention; and

FIG. **12** is a simplified schematic diagram illustrating one phishing-prevention application of the secure device according to one embodiment of the present invention;

## DETAILED DESCRIPTION

The detailed description set forth below in connection with the appended drawings is intended as a description of various embodiments of the present invention and is not intended to represent the only embodiments in which the present invention may be practiced. The detailed description includes specific details for the purpose of providing a thorough understanding of the present invention. However, it will be apparent to those skilled in the art that the present invention may be practiced without these specific details. In some instances, well-known structures and components are shown in block diagram form in order to avoid obscuring the concepts of the present invention.

The present invention may be used for a number of different purposes including, for example, authentication,

US 7,314,167 B1

**5**

authorization, secure document distribution and guarding against phishing attacks, as will be further described below. The present invention may be used in both the offline and online environments and provide on-demand input capability.

One or more embodiments of the present invention will now be described. FIG. **1** illustrates one secure device **100** according to one embodiment of the present invention. The secure device **100** may include a processor **100**, an image capture device or circuit **120**, an input unit **130**, an output unit **140** and a memory **150**. The secure device **100** may be incorporated as part of a token, card, badge, key fob, personal digital assistant (PDA), and cellphone, etc.

The processor **110** may include control logic configured to control operations of the secure device **100** including, for example, managing decryption and encryption functions. In some embodiments, the processor **110** may be implemented in the form of a smartcard. The smartcard may include a ciphering unit and a secure memory for storing, public keys, private keys and/or shared keys.

The image capture circuit **120** may include a digital camera or other types of image capturing devices. The image capture circuit **120** is used to capture image and/or video information. The captured image and/or video information may include a barcode including an one-dimensional barcode, such as a linear barcode, or a multi-dimensional barcode, such as a 2D barcode, multiple barcodes in a single image or multiple barcodes in multiple images where multiple images form a stream of images or a video. As will be further described below, the captured image and/or video information is used and processed for a number of different purposes.

The input device **130** may include a keypad, a touch sensitive screen, a biometric input unit or other types of devices that are capable of allowing a user to provide input information. The biometric input unit may include at least one of a fingerprint recognition module and a facial recognition module. As will be further described below, the input information may be used for identification purposes to allow the secure device **100** to be activated by the user, as well as other purposes.

The output unit **140** may include a LCD (Liquid Crystal Display). The display **140** is used to display information to a user of the secure device **100**.

The memory **150** may include any type of storage devices that can be used to store information.

The secure device **100** generally operates in the following manner, as shown in FIG. **2**. At block **200**, the secure device **100** via the image capture circuit **120** captures information on a still or moving image or a stream of images. The stream of images may constitute a video. The image or video may include, for example, a linear or 2D barcode. Multiple barcodes may be embedded in the same image, or alternatively, multiple barcodes may be transmitted in multiple frames or images. The image or stream of images contain embedded information that is relevant to the transaction to be conducted. The information embedded in the image or stream of images may be created using any one of a number of well-known decryption/encryption algorithms, such as, a symmetric system using shared keys an asymmetric system using public/private key pairs. For example, the information embedded in an image may be encrypted using a public key or signed by a private key. Based on the disclosure and teachings provided herein, a person of ordinary skill in the art will know how to select the appropriate decryption/encryption algorithm for use according to the present invention.

**6**

At block **210**, the secure device **100** also prompts a user to provide identification information via the input unit **130**. The identification information may include a personal identification number (PIN), a password, and/or biometric information. The identification information is used to identify the user to ensure that the user is authorized to use the secure device **100**.

At block **220**, the secure device **100** via the processor **110** decodes the captured image or video and extracts the relevant embedded information. The processor **110** has knowledge of the encryption algorithm that is used to create the image and thus is able to use the corresponding decryption algorithm to decode the captured image. The decryption algorithm may use one or more input parameters for decoding. For example, if the image is created using a public key, the corresponding private key (as well as other information, such as, predetermined information stored in the memory **150** and the input information provided by the user) may be used to decrypt or decode the captured image. The predetermined information may include, for example, address information, personal profile information and payment account information. The secure device **100** also checks the identification information provided by the user to verify or authenticate the user's identity. The identification information provided by the user is checked against information previously supplied by the user during registration.

At block **230**, upon successful verification of the user's identity and decoding of the captured image, the secure device **100** generates the appropriate instructions or information for the user. The instructions or information may then be provided via the output unit **140** for further action by the user. The user may act on the instructions or information in a number of ways. For example, the instructions or information may be transmitted in the form of a radio or sonic signal. The transmitted signal may then be received by another party, such as, a merchant, seller, vendor or third-party service provider, for use in connection with various purposes, as will be further described below.

The secure device **100** can be deployed in a number of applications. In one illustrative application, the secure device **100** is used to effect authentication, as shown in FIG. **3**. Authentication is needed for any system where the identity of a user has to be ascertained. As shown in FIG. **3**, a user visits a website and is presented with a log-on screen **300**. The user is required to enter certain correct information (such as, company ID **310**, user ID **320** and password **330**) before further access to the website is granted. In addition, the log-on screen **300** further displays an image or video **340**. The image or video **340**, such as a linear barcode, or multiple barcodes in moving images contain certain embedded information that will be used to derive the corresponding authentication code **350**. The correct authentication code **350** has to be entered in order to allow the user to continue to access the website.

The user activates the secure device **100** and uses the secure device **100** to scan the image or video **340**. As part of the activation process, the user may need to enter a password or other types of identification information into the secure device **100** to ensure that the user is authorized to use the secure device **100**. The secure device **100** then derives the authentication code **350** and other relevant information **360** based on the embedded information stored in the scanned image or video **340** and, optionally, other types of information including, for example, predetermined information stored in the secure device **100** and identification information provided by the user. The derivation process may be performed using an encryption, a decryption or a message

US 7,314,167 B1

**7**

authentication algorithm. If the image **340** has been generated using an encryption or decryption algorithm, the derivation process may correspond to the encryption or decryption algorithm used to create the information embedded in the image or video **340**. The authentication code **350** and other relevant information **360** are displayed on secure device **100** for viewing by the user. The user may then key in the authentication code **350** as well as other required information (such as, company ID **310**, user ID **320** and password **330**) to obtain further access to the website. Since the website initially provides the image or video **340**, the website also has knowledge regarding the correct authentication code **350** corresponding to the information embedded in the image or video **340**. The foregoing method may also be used to identify users or authenticate users to computer terminals, servers, and devices, etc.

If the output of the secure device **100** is transmitted in the form of a radio or sonic signal, a corresponding reception device at a station (such as, a computer, terminal or server) receiving the transmitted signal may deem the user identified if the signal corresponds to an expected value at the station for a specific user and secure device **100** previously registered for that station.

The secure device **100** may also be used to identify or authenticate persons for physical access to structures and/or vehicles through entry points, such as, doors and gates. If the output of the secure device **100** is transmitted in the form of a radio or sonic signal, a station (e.g., a merchant, seller, vendor, third part service provider, guard) receiving the transmitted signal may deem the user identified if the signal corresponds to an expected value at the station for a specific user and secure device **100**. If, on the other hand, the output is in the form of a visual display displayed on the secure device **100**, the user can enter the displayed information on a keypad attached to the station. The user can also read the information to a machine or a person over the telephone at the station. The user can also write down the displayed information on paper for immediate or later processing. The display may display an image that can be captured with a camera at the station, thereby eliminating the need for user to enter, read or write down the information.

In the identification mode, the output from the secure device **100** received at a station may be compared to all the registered users and devices to identify the user and the secure device **100** that would generate the expected output. With suitable selection of the encryption protocols, the output can be rendered deterministically or probabilistically unique for each user and device combination.

The image or video captured by the secure device **100** may also include additional information, such as, information relating to a website, server, terminal, device, structure or vehicle which the user is gaining access to. The image or video captured by the secure device **100** may further include a description of the action, such as, login to a server or terminal or access to a structure. In addition, the image or video captured by the secure device **100** may include a unique number, nonce, a transaction number or a random number, a number that the secure device **100** will use to derive the authentication code. Furthermore, the image or video captured by the device may include a digital signature generated by a trusted party.

The authentication process can also be accomplished in two steps to improve the security. The user may provide his or her information such as company ID, user ID, and a password in the first step of the authentication. The terminal, server, or website receiving the information may generate an image in the second step of the authentication process. The

**8**

image generated in the second step of the authentication process may contain information specific for the user. Such information may include the identity of the user as established by the first step and a piece of information that can be used to prevent replay attacks. The piece of information that can be used to prevent replay attacks include, for example, time of the last login, a sequence number assigned at the last authentication process, or a sequence number greater than a number embedded in the image at the last authentication process. Furthermore, such information may be digitally signed to prevent other parties from generating such information. The secure device **100** can be used to capture such information and the secure device **100** may verify the validity of such information by verifying the signature and the piece of information added to prevent replay attacks. For example, the secure device **100** may verify that the sequence number used by the site is larger than the last sequence number that the secure device **100** has captured.

The speed of the authentication process can be increased by establishing a secret key shared by the secure device **100** and the website, server or terminal requiring authentication. Such shared secret key can be selected by the website, server or terminal requiring authentication and sent to the secure device **100** through the images that embed such information. The shared secret key may be encrypted by the public key of the secure device **100** and signed by the private key of the website, server or terminal requiring information. The secure device **100**, upon receiving the information related to the shared secret key, may confirm the validity by verifying the digital signature associated with the information. Upon verification, the secure device **100** may store the shared secret key in a secure fashion. Any interaction with the website, server or terminal requiring authentication can use the shared secret key to create shorter signatures. Furthermore, such signatures can be created and verified faster than the digital signatures created using asymmetric encryption algorithms.

In another illustrative application, the secure device **100** can be used to effect authentication in an alternative manner, as shown in FIG. **4**. Similarly, the user uses the secure device **100** to derive the authentication code **410** and other relevant information **420** from the scanned image or video **400**. The secure device **100** then further prompts the user to enter his/her personal identification number (PIN) **430** and/or other identification information. The PIN **430** and/or identification information may then be forwarded by the secure device **100** in the form of a message to the website server **440** via, for example, a wide area network (such as, a cellular or wireless network), SMS (Short Message Service), EMS (Extended Message Service), or other types of message delivery services or protocols. The message may include identity of the user and secure device **100**, a unique value generated by the secure device **100**, and a unique number, nonce, a transaction number or a random number embedded in the image. The message might be digitally signed and encrypted to protect and prove the identity of the user and the secure device **100** and also to prevent eavesdropping. If a shared secret key has been established previously, the shared secret key can also be used to increase the speed of the encryption and signature generation and shorten the message length.

The server **440**, by using the unique number, the nonce, the transaction number or the random number transmitted with the message, may identify the session that the user is using to authenticate his or her identity and may then deem the session as authenticated, thereby allowing the user to conduct any desired transactions on the website. In one

US 7,314,167 B1

**9**

embodiment, the secure device **100** may be implemented as part of a cell phone or a personal digital assistant.

In another illustrative application, the secure device **100** can be used to effect authorization, as shown in FIG. **5**. Initially, the user may be authenticated for permission to enter a website, terminal, server or device using the secure device **100** as described above or through other mechanisms. It is also possible that no prior authentication took place. After the user successfully logs in to the website, terminal, server or device, the user may perform a desired transaction, such as, transferring money between accounts. Such desired transaction may need to be further authorized to provide additional security. For example, as shown in FIG. **5**, the user may complete a form **500** to effect transfer of money between accounts. Upon hitting the "transfer" button **510**, the website, terminal, server or device displays an image or stream of images **520** and a blank designated entry **530** for a confirmation signature. The image or stream of images **520** include embedded information relating to the transfer transaction and possibly a unique transaction number. The embedded information might be encrypted and digitally signed for authentication purposes to prevent eavesdropping. The correct confirmation signature has to be provided in order to effect the transfer. The correct confirmation signature can be derived from the information embedded in **25** the image or stream of images **520** using the secure device **100**. More specifically, the user may use the secure device **100** to scan the image or stream of images **520**. The secure device **100** may then decode the scanned image or stream of images **520** and derive the embedded information. The **30** derived information relating to the transfer transaction may then be shown on a display **540** by the secure device **100** for viewing by the user. The user may then verify the information. The user may optionally be asked to enter his or her personal identification number for authentication.

Upon completion of the authentication process, the secure device **100** may generate the corresponding confirmation signature **550**. The confirmation signature may be a digital signature generated based on embedded information contained in the image or stream of images **520** and, optionally, **40** other types of information, such as, an identification code that uniquely identifies the user and the secure device **100**. If a shared secret key has been established beforehand, the generated confirmation signature may also be an authentication code derived from the identity of the user and secure **45** device **100**, the transaction information and the shared secret key. The user may then input the generated confirmation signature or authorization code into the designated entry **530**. The website, terminal, server or device may then check the generated confirmation signature or authorization code **50** relative to the information embedded in the image or stream of images **520**. If the generated confirmation signature is correct for a specific user and/or secure device **100**, the transfer transaction will be completed. Furthermore, the generated confirmation signature may be used as undisputed **55** proof that the user has authorized the transfer transaction, thereby preventing the user from denying having performed the transaction.

In a similar illustrative application, the secure device **100** can be used to effect authorization in an alternative manner, **60** as shown in FIG. **6**. The authorization process is similar to that described in connection with FIG. **5** above. Alternatively, upon the secure device **100** generating the confirmation signature or authorization code, the secure device **100** may transmit the generated confirmation signature or authorization code to a transaction server **600** handling the transaction. The generated confirmation signature or autho-

**10**

rization code may be transmitted in the form of a message in a number of ways including, for example, a wide area network (such as, a cellular or wireless network), email, SMS and EMS. The message may also include the unique transaction number embedded in the image or stream of images. In response, upon receiving the generated confirmation signature or authorization code, the transaction server **600** may then use the transaction number to identify the session and check the generated confirmation signature or authorization code relative to the information embedded in the image or stream of images and, if appropriate, effect the transaction and display the confirmation information **610** to the user.

Authorization involving multiple parties, such as credit and debit card transactions, can also be achieved. For example, the authorization can be achieved by embedding values derived from the transaction with secret information shared by the user of the secure device **100** and the other parties. The secrets shared by the user of the secure device **100** and the other parties can be credit card numbers, the expiration date of the card, the registered address of the user, and a password established by the user. The other parties can be merchants, banks, credit card issuers, and service providers that may need to be involved with the transaction. A party receiving a user response can forward the response to any of the other parties for verification purposes. Such authorization may be used in connection with an online e-commerce transaction, as will be further described below.

In another illustrative application, the secure device **100** can be used to provide offline digital signature to effect authorization, as shown in FIG. **7**. A sender seeking authorization for a transaction forwards a printed form **700** to a user. The printed form **700** includes certain transaction information as well as an image **710**, such as a barcode, or a set of images, such as a set of barcodes. The image **710** includes embedded information relating to the transaction. The user using the secure device **100** scans the image **710**. The secure device **100** may then prompt the user to enter his/her personal identification number (PIN) **720** for authentication purposes. Once the correct PIN **720** is entered, the secure device **100** decodes the scanned image **710** and derives the embedded transaction information. The transaction information is then shown via a display **730** on the secure device **100** to the user. The user may then provide approval of the transaction by entering the corresponding command into the secure device **100**. The secure device **100** may then generate the corresponding confirmation signature or authorization code **740** based on the information embedded in the image **710** and optionally the PIN **720** of the user and display the generated confirmation signature or authorization code **740** to the user. In response, the user may then provide the generated confirmation signature or authorization code **740** to the sender to confirm authorization via, for example, a telephone, a wide area network (such as, cellular or wireless network), an email, SMS message, EMS message or facsimile **750**. Since the sender initially provides the image **710**, the sender also has knowledge with respect to the corresponding confirmation signature or authorization code. As a result, by receiving the generated confirmation signature or authorization code **740** from the user, the sender may verify whether the user is authorized to provide approval for the transaction.

In another illustrative application, the secure device **100** can be used to provide secure document distribution. FIG. **8** illustrates the logic flow with respect to using the secure device **100** to provide secure document distribution. At block **800**, a document is created and secured using a

US 7,314,167 B1

**11**

password. The password can be viewed as the correct answer to a challenge. The challenge is presented to someone who attempts to access the secured document. At block **810**, a message, such as an email, instant message (IM), SMS or EMS message, is created for a recipient with the secured document being included as an attachment. At block **820**, an image or a stream of images is created. The image or stream of images includes embedded information relating to the password used to secure the document. The information embedded in the image or stream of images can be created using public keys that are stored locally or centrally managed. In one implementation, creation of the image or stream of images may be automated. For example, using the Microsoft Office application, a plug-in can be added to allow the image or stream of images containing the password to be inserted automatically into a message, such as an email; alternatively, the image or stream of images may also be created for S/MIME compatibility on an automated basis by generating a one-time certificate and attaching the certificate to the image or stream of images or encrypting the certificate with a randomly generated password, storing the certificate at a server and providing the password and the location of the certificate to the user through the image or stream of images.

At block **830**, the image or stream of images is also included as part of the message. At block **840**, the message including the secured document and the image or stream of images is delivered to the recipient. At block **850**, upon opening the message, the recipient may use the secure device **100** to scan the image or stream of images. At block **860**, upon retrieving the images or stream of images, the secure device **100** may then derive the embedded information from the images or stream of images including information relating to the password. Such information is then displayed to the user. At block **870**, the user uses such information to access the secured document. For example, a challenge may be presented to the user when the user attempts to access the secured document. Upon providing the password, the challenge is satisfied and the secured document can be accessed by the user. It can be seen that the secure device **100** provides a number of benefits with respect to secure document distribution. For example, the secure device **100** enables secure document distribution without incurring any additional software resources on the recipient. Furthermore, the recipient does not have to manage any digital certificates, nor does the recipient have to install any drivers for hardware tokens. Finally, the recipient may use distrusted terminals to retrieve secured documents.

In a similar illustrative application, the secure device **100** can be used to effect digital rights management. The document may contain an access control list to limit the users to certain operations. For example, only certain users might be allowed to open, modify, change, copy and/or print the information embedded in a document or media, such as, music or video. Furthermore, the digital certificates of the users might be embedded in the document or media directly. When a user tries to open, modify, change, print and/or copy the document or media through a program, the program might generate a challenge for a specific user dynamically. The challenge might be embedded in an image or stream of images which, for example, contain barcodes. In response to the challenge, the user scans the image or stream of images using the secure device **100**. The user might be optionally asked to provide a password to either the secure device **100** or the program. The secure device **100** might use the private key of the certificate associated with the user or secure device **100** to generate an authentication code in response to

**12**

the challenge. The user may then provide the authentication code by entering it manually on a terminal. The secure device **100** might also generate radio or sonic signals that might be captured by the terminal. The secure device **100** might also send a message, such as email, SMS or EMS message, to a server to provide the authentication code. The program upon receiving the authentication code confirms the identity of the user by comparing the response received. If the identity of the user is confirmed and the operation that the user is trying to accomplish is allowed, the program performs the operation.

In a further illustrative application, the secure device **100** can be used to conduct transactions using images displayed on printed materials, such as books, signs and catalogs, or transmitted to computers or television screens, as shown in FIG. **9**. An image **900** or stream of images can be displayed on a catalog, book or sign. The image **900** or stream of images may also be shown on a television or computer screen. The image **900** or stream of images may include embedded information relating to a particular product or service (such as, product or service description and transaction identification), information related to a merchant providing the product or service, a public key assigned to the merchant, a digital signature of the public key, a digital signature for the transaction, the Internet address of the merchant, etc. Using the secure device **100**, a user may scan the image **900** or stream of images. The secure device **100** may then derive the relevant information relating to the product or service and display such information to the user as shown in block **910**. The secure device **100** may further allow the user to conduct a transaction as shown in blocks **920**-**960**. For example, as shown in block **920**, the user may use the secure device **100** to enter selection and purchase information. Upon receiving the selection and purchase information, the secure device **100** may then display the summarized transaction information to the user, as shown in block **930**. If the user agrees with the summarized transaction information, the user may then authorize the transaction. As shown in block **940**, the secure device **100** may require the user to provide a PIN to ensure that the user is authorized to order the transaction. Upon verifying the PIN provided by the user, the secure device **100** may then proceed with the transaction, for example, by allowing the user to select a shipping address and displaying the final transaction information to the user, as shown in block **950**-**960**. In addition, the secure device **100** may also allow the user to designate how the transaction is to be paid for, as shown in blocks **970**-**980**. The secure device **100** may then forward the relevant transactional information to a server associated with the merchant for further processing, as shown in block **990**. Such information may be forwarded to the merchant using a number of different methods including, for example, a wide area network (such as, a cellular or wireless network), SMS, EMS or other types of message delivery services. The information may be encrypted. In addition, the secure device **100** may also forward a digital signature or authorization code associated with the transaction and generated by the secure device **100** to the server. The digital signature or authorization code may be used to prove that the transaction was legitimately ordered by the secure device **100**. Upon the server completing the transaction, confirmation information can be sent by the merchant to the secure device **100** for viewing by the user, as shown in block **992**.

Alternatively, the transaction can be handled via a third party service provider. The image or stream of images can be generated by the third party service provider. In this case, the

**13**

public key and the server address of the third party service provider can be embedded in the secure device **100**. The server of the third party service provider can conduct the transaction on behalf of the user of the secure device **100**. The secure device **100** upon deciphering the image or stream of images can send a confirmation to the third party service provider through, for example, a wide area network (such as, a cellular or wireless network). The third party service provider can then cooperate with the server associated with the merchant to complete the transaction including, for example, transferring the information required to complete the transaction, such as payment and shipping information, to the server associated with the merchant. The third party service provider may also bill the user of the secure device **100** directly for the transaction amount.

In the situation where there is no communication channel between the secure device **100** and the third party service provider or the merchant, the secure device **100** and the third party service provider or merchant can utilize a shared secret key and identification information assigned to the secure device **100** or to the user of the secure device **100**. The shared secret key and the identification information are previously provided to the secure device **100** and the service provider. The secure device **100** can capture the image or stream of images and decode its embedded information. The secure device **100** can then combine the decoded information and the identification information and encode the combination using the shared secret key. The encoded value, including a portion of the identification information, can be displayed on the secure device **100**. The user may then provide the encoded value to the terminal, device, or website or may call the merchant or third party service provider to provide the encoded information. The third party service provider, upon receiving the encoded value, can send the information to the merchant for identification and verification purposes. The merchant, upon receiving the encoded value, can derive the identity of the user and verify that the secure device **100** has been in legitimate possession of the user.

In another illustrative application, the secure device **100** can be used in a checkout process, as shown in FIG. **10**. At block **1000**, upon checkout, a register generates an image or a stream of images for a transaction. The image or stream of images includes embedded information relating to the transaction. The image or stream of images is presented to the user. The user then uses the secure device **100** to scan the image or stream of images. The secure device **100** then derives the relevant information relating to the transaction from the barcode and displays such information to the user, as shown in block **1010**. The user may then authorize the transaction. The secure device **100** may further require the user to provide a PIN, as shown in block **1020**, to ensure that the user is indeed authorized to approve the transaction. If the correct PIN is provided, the secure device **100** generates its own image or stream of images, as shown in block **1030**. The image or stream of images generated by the secure device **100** may include relevant transaction and payment information including, for example, credit card or other payment account information. The image or stream of images is then provided to the register, as shown in block **1040**. The register may include a scanning device capable of scanning the image or stream of images displayed on the secure device **100**. Upon retrieving the image or stream of images from the secure device **100**, the register may then derive the relevant information and use such information to contact a payment server to obtain payment for the transaction, as shown in block **1050**. Depending on the informa-

**14**

tion received from the register, the payment server may then provide the appropriate response to the register accordingly, as shown in block **1060**.

In a further illustrative application, the secure device **100** can be used in a checkout process in an alternative manner, as shown in FIG. **11**. At block **1100**, upon checkout, a register generates an image or a stream of images for a transaction. The image or stream of images includes embedded information relating to the transaction. The image or stream of images is presented to the user. The user than uses the secure device **100** to scan the image or stream of images. The secure device **100** then derives the relevant information relating to the transaction from the image or stream of images and displays such information to the user, as shown in block **1110**. The user may then further provide any additional information, such as, the transaction amount, and authorize the transaction, as shown in block **1120**. The secure device **100** may further require the user to provide a PIN, as shown in block **1130**, to ensure that the user is indeed authorized to order the transaction. If the correct PIN is provided, the secure device **100** may then contact a payment server to complete payment for the transaction, as shown in block **1140**. Upon successfully completing payment for the transaction, the payment server may then forward the appropriate confirmation information to the secure device **100**, as shown in block **1150**. The confirmation information may be forwarded to the secure device **100** in a number of ways including, for example, a wide area network (such as, a cellular or wireless network), SMS, EMS and other types of message delivery services. Upon receiving the confirmation information, the secure device **100** may then generate its own image or stream of images, as shown in block **1160**. The image or stream of images generated by the secure device **100** may include relevant information relating to the transaction including, for example, the confirmation information. The image or stream of images may then be presented to the register for scanning. Upon retrieving the image or stream of images from the secure device **100**, the register may then derive the relevant information and confirm that the transaction has been paid for and proceed to conclude the transaction, as shown in block **1170**.

In yet another illustrative application, the secure device **100** can be used to defend against real-time phishing attacks, as shown in FIG. **12**. Phishing attacks involve fraudulently capturing information from a user, for example, via a fake website, and then using such information to conduct unauthorized transactions. At **1230**, a user **1200** unknowingly provides information to a fake website **1210**, thinking that s/he is dealing with the legitimate website **1220**. At **1240**, the fake website **1210**, upon capturing the information, then uses such information to contact the legitimate website **1220** and attempts to conduct an unauthorized transaction. At **1250**, in order to confirm the transaction, the legitimate website **1220** generates an image or a stream of images that requires confirmation by the secure device **100**. The image or stream of images may include confirmation information relating to the transaction. If the image or stream of images is forwarded to the secure device **100**, as shown in **1260**, the secure device **100** may then derive the confirmation information and display such information to the user, thereby allowing the user to detect that an unauthorized transaction has been attempted. The user may then terminate any connection to the fake website **1210**. Alternatively, the legitimate website **1220** may include warning information in the image or stream of images, such as, information alerting the user to disconnect from the website **1210** and re-connect to the legitimate website **1220** directly. To guarantee only the

US 7,314,167 B1

15

legitimate user visits the legitimate website **1220**, the information embedded in the image or stream of images may include a unique but randomly generated number. Such a number may be combined with the URL of the website to form a unique URL for a specific user for a specific period of time. Upon deriving the relevant information from the image or stream of images, the secure device **100** may then display such information to the user, thereby alerting the user to potential fraud and unauthorized transactions and also providing the user the unique URL that the user has to enter in a browser.

The legitimate website **1220** may also detect a legitimate user by using a cookie stored at the computer associated with the user. A cookie is a message stored in a text file and given to a Web browser by a Web server. The message is then sent back to the server each time the browser requests a page from the server. The main purpose of cookies is to identify users and possibly prepare customized Web pages for such users. A website can detect that a user has never used a particular computer to visit that website by requesting cookies stored in a browser associated with that computer. The cookie stored by the browser can uniquely identify a user. In the absence of the cookie, the website may request the user to visit the unique URL as described above.

In addition to the applications described above, the present invention can also be deployed in various other types of applications including, for example, digital signatures, encryption, secure ATM cards and secure credit cards, etc. Based on the disclosure and teachings provided herein, a person of ordinary skill in the art should know how to deploy the present invention in many other types of applications.

The various illustrative logical blocks, modules, circuits, elements, and/or components described in connection with the embodiments disclosed herein may be implemented or performed with a general purpose processor, a digital signal processor (DSP), an application specific integrated circuit (ASIC), a field programmable gate array (FPGA) or other programmable logic component, discrete gate or transistor logic, discrete hardware components, or any combination thereof designed to perform the functions described herein. A general purpose processor may be a microprocessor, but in the alternative, the processor may be any conventional processor, controller, microcontroller, or state machine. A processor may also be implemented as a combination of computing components, e.g., a combination of a DSP and a microprocessor, a number of microprocessors, one or more microprocessors in conjunction with a DSP core, or any other such configuration.

The methods or algorithms described in connection with the embodiments disclosed herein may be embodied directly in hardware, in a software module executable by a processor, or in a combination of both, in the form of control logic, programming instructions, or other directions, and may be contained in a single device or distributed across multiple devices. A software module may reside in RAM memory, flash memory, ROM memory, EPROM memory, EEPROM memory, registers, hard disk, a removable disk, a CD-ROM, or any other form of storage medium known in the art. A storage medium may be coupled to the processor such that the processor can read information from, and write information to, the storage medium. In the alternative, the storage medium may be integral to the processor.

The previous description of the disclosed embodiments is provided to enable any person skilled in the art to make or use the present invention. Various modifications to these embodiments will be readily apparent to those skilled in the art, and the generic principles defined herein may be applied

16

to other embodiments without departing from the spirit of scope of the invention. Thus, the present invention is not intended to be limited to the embodiments shown herein, but is to be accorded the full scope consistent with the claims, wherein reference to an element in the singular is not intended to mean "one and only one" unless specifically so stated, but rather "one or more". All structural and functional equivalents to the elements of the various embodiments described throughout this disclosure that are known or later come to be known to those of ordinary skill in the art are expressly incorporated herein by reference and are intended to be encompassed by the claims. Moreover, nothing disclosed herein is intended to be dedicated to the public regardless of whether such disclosure is explicitly recited in the claims. No claim element is to be constructed under the provisions of 35 U.S.C. §112, sixth paragraph, unless the element is expressly recited using the phrase "means for" or, in the case of a method claim, the element is recited using the phrase "step for".

What is claimed is:

**1**. An apparatus for providing a secure transaction, the apparatus comprising:

an image capture device configured to capture an image, the image having information embedded therein including information relating to a transaction;

a memory configured to store predetermined information;

an input unit configured to receive input information provided by a user; a processor configured to:

verify the user based on the input information to ensure that the user is authorized to use the apparatus; and

generate an output based on the information embedded in the image and the predetermined information; and

an output unit configured to forward the output generated by the processor, wherein

the output includes a digital signature to be used to signify authorization by the user with respect to the transaction.

**2**. The apparatus of claim **1** wherein the processor is further configured to generate the output using the input information.

**3**. The apparatus of claim **1** wherein the processor is further configured to decode the information embedded in the image for use in generating the output by using a decryption algorithm.

**4**. The apparatus of claim **1** wherein the input information includes one of a personal identification number and biometric information.

**5**. The apparatus of claim **1** wherein the output unit is a display.

**6**. The apparatus of claim **1** wherein the output is provided to a verifier, the verifier having access to the information embedded in the image.

**7**. The apparatus of claim **1** wherein the image includes a barcode.

**8**. The apparatus of claim **7** wherein the barcode includes a multi-dimensional barcode.

**9**. The apparatus of claim **1** wherein the image includes a set of barcodes.

**10**. The apparatus of claim **9** wherein the set of barcodes includes a set of multi-dimensional barcodes.

**11**. The apparatus of claim **1** wherein the output includes an authentication code to be used to authenticate the user with respect to the transaction.

**12**. The apparatus of claim **1** wherein the transaction includes an online transaction.

US 7,314,167 B1

17

**13**. The apparatus of claim **1** wherein the predetermined information includes information relating to a payment card account; and

wherein the output further includes some or all of the information relating to the payment card account to be used for payment with respect to the transaction.

**14**. The apparatus of claim **1** wherein the information embedded in the image includes information relating to a password to be used to unlock a secured document; and

wherein the output includes the password to be used to unlock the secured document.

**15**. The apparatus of claim **1** wherein the information embedded in the image includes information relating to a challenge; and

wherein the output includes a password to be used to satisfy the challenge and unlock a secured document.

**16**. The apparatus of claim **1** wherein the information embedded in the image includes information provided by a vendor relating to a pending transaction; and

wherein the output includes some or all of the information provided by the vendor to be used to alert the user with respect to the pending transaction.

**17**. The apparatus of claim **1**, wherein the apparatus is a cellphone.

**18**. The apparatus of claim **1**, wherein the apparatus includes a smartcard claim **1**.

**19**. An apparatus for providing a secure transaction, the apparatus comprising:

an image capture device configured to capture an image, the image having information embedded therein;

a memory configured to store predetermined location;

an input unit configured to receive input information provided by a user; a processor configured to:

verify the user based on the input information to ensure that the user is authorized to use the apparatus; and

generate an output based on the information embedded in the image and the predetermined information; and

an output unit configured to forward the output generated by the processor, wherein

the output unit includes control logic configured to forward the output using a message delivery protocol.

**20**. The apparatus of claim **19** wherein the message delivery protocol includes the Short Message Service.

**21**. The apparatus of claim **19** wherein the message delivery protocol includes email.

**22**. The apparatus of claim **19** wherein the message delivery protocol includes the Extended Message Service.

**23**. A method of providing secure transaction, the method comprising:

configuring a portable device to:

capture an image, the image having information embedded therein, the information embedded in the image including information relating to a transaction;

store predetermined information;

receive input information provided by a user;

verify the user based on the input information to ensure that the user is authorized to use the portable device;

generate an output based on the information embedded in the image and the predetermined information; and

forward the generated output to the user,

wherein the output includes a digital signature to be used to signify authorization by the user with respect to the transaction.

**24**. The method of claim **23** further comprising:

configuring the portable device to generate the output using the input information.

18

**25**. The method of claim **23** further comprising:

configuring the portable device to decode the information embedded in the image for use in generating the output by using a decryption algorithm.

**26**. The method of claim **23** wherein the input information includes one of a personal identification number and biometric information.

**27**. The method of claim **23** further comprising:

configuring the portable device to display the output.

**28**. The method of claim **23** wherein the output is provided to a verifier, the verifier having access to the information embedded in the image.

**29**. The method of claim **23** wherein the image includes a barcode.

**30**. The method of claim **29** wherein the barcode includes a multi-dimensional barcode.

**31**. The method of claim **23** wherein the image includes a set of barcodes.

**32**. The method of claim **31** wherein the set of barcodes includes a set of multi-dimensional barcodes.

**33**. The method of claim **23** wherein the output represents an authentication code to be used to authenticate the user with respect to the transaction.

**34**. The method of claim **23** wherein the transaction includes an online transaction.

**35**. The method of claim **23** wherein the predetermined information includes information relating to a payment card account; and

wherein the output further includes some or all of the information relating to the payment card account to be used for payment with respect to the transaction.

**36**. The method of claim **23** wherein the information embedded in the image includes information relating to a password to be used to unlock a secured document;

and wherein the output includes the password to be used to unlock the secured document.

**37**. The method of claim **23** wherein the information embedded in the image includes information provided by a vendor relating to a pending transaction; and

wherein the output includes some or all of the information provided by the vendor to be used to alert the user with respect to the pending transaction.

**38**. The method of claim **23** wherein the information embedded in the image includes information relating to a challenge;

wherein the output includes a password to be used to satisfy the challenge and unlock a secured document.

**39**. A method of providing secure transaction, the method comprising:

configuring a portable device to:

capture an image, the image having information embedded therein;

store predetermined information;

receive input information provided by a user;

verify the user based on the input information to ensure that the user is authorized to use the portable device;

generate an output based on the information embedded in the image and the predetermined information; and

forward the generated output to the user using a message delivery protocol.

**40**. The method of claim **30** wherein the message delivery protocol includes the Short Message Service.

**41**. The method of claim **39** wherein the message delivery protocol includes email.

**42**. The method of claim **39** wherein the message delivery protocol includes the 5 Extended Message Service.

US 7,314,167 B1

**19**

**43**. A method of providing secure transaction, the method comprising:

configuring a portable device to:

capture an image, the image having information embedded therein;

store predetermined information;

receive input information provided by a user;

verify the user based on the input information to ensure that the user is authorized to use the portable device;

**20**

generate an output based on the information embedded in the image and the predetermined information; and

forward the generated output to the user, wherein

the portable device includes one of a cell phone, a personal digital assistant, and a smartcard.

* * * * *

# EXHIBIT 4

US007949785B2

## (12) United States Patent
Alkhatib et al.

(10) Patent No.: **US 7,949,785 B2**
(45) Date of Patent: **May 24, 2011**

(54) **SECURE VIRTUAL COMMUNITY NETWORK SYSTEM**

(75) Inventors: **Hasan S. Alkhatib**, Saratoga, CA (US);
**Fouad A. Tobagi**, Los Altos, CA (US);
**Farid F. Elwailly**, San Jose, CA (US)

(73) Assignee: **Inpro Network Facility, LLC**,
Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 685 days.

(21) Appl. No.: **10/403,818**

(22) Filed: **Mar. 31, 2003**

(65) **Prior Publication Data**

US 2004/0249911 A1 Dec. 9, 2004

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** .......................................... **709/245**; 726/15
(58) **Field of Classification Search** .................. 709/245;
726/15
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,159,592 A | 10/1992 | Perkins | |
| 5,361,256 A | 11/1994 | Doeringer | |
| 5,563,878 A | 10/1996 | Blakeley | |
| 5,623,605 A | 4/1997 | Keshav | |
| 5,701,427 A | 12/1997 | Lathrop | |
| 5,717,686 A | 2/1998 | Schiavoni | |
| 5,717,687 A | 2/1998 | Minot | |
| 5,734,651 A | 3/1998 | Blakeley | |
| 5,751,961 A | 5/1998 | Smyk | |
| 5,754,938 A * | 5/1998 | Herz et al. .................... | 725/116 |

| | | |
|---|---|---|
| 5,764,906 A | 6/1998 | Edelstein |
| 5,777,989 A | 7/1998 | McGarvey |
| 5,781,550 A | 7/1998 | Templin |
| 5,790,548 A | 8/1998 | Sistanizadeh |
| 5,793,763 A | 8/1998 | Mayes |
| 5,805,818 A | 9/1998 | Perlman |
| 5,805,820 A | 9/1998 | Bellovin |
| 5,815,664 A | 9/1998 | Asano |
| 5,826,014 A | 10/1998 | Coley |
| 5,856,974 A | 1/1999 | Gervais |
| 5,864,666 A | 1/1999 | Shrader |
| 5,867,667 A | 2/1999 | Butman |
| 5,884,038 A | 3/1999 | Kapoor |

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0 817 444 A2 1/1998

OTHER PUBLICATIONS

Venters, Demystifying Protocols: A comparison of Protocols Suitable for IP Telephony, Sonus Networks, pp. 1-11, 2000.

(Continued)

*Primary Examiner* — Douglas B Blair
(74) *Attorney, Agent, or Firm* — McAndrews, Held & Malloy, Ltd.

(57) **ABSTRACT**

A private virtual dynamic network is provided for computing devices coupled to public networks or private networks. This enables computing devices anywhere in the world to join into private enterprise intranets and communicate with each other. In one embodiment, the present invention provides a separate private virtual address realm, seen to each user as a private network, while seamlessly crossing public and private network boundaries. One implementation of the present invention uses an agent to enable an entity to participate in the network without requiring the member to add new hardware or software.

**90 Claims, 21 Drawing Sheets**



**US 7,949,785 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,884,246 A | 3/1999 | Boucher | |
| 5,889,953 A | 3/1999 | Thebaut | |
| 5,897,662 A | 4/1999 | Corrigan | |
| 5,898,830 A | 4/1999 | Wesinger, Jr. | |
| 5,913,210 A | 6/1999 | Call | |
| 5,937,162 A | 8/1999 | Funk | |
| 5,937,163 A | 8/1999 | Lee | |
| 6,003,084 A | 12/1999 | Green | |
| 6,006,272 A | 12/1999 | Aravamudan | |
| 6,032,196 A | 2/2000 | Monier | |
| 6,047,325 A | 4/2000 | Jain | |
| 6,055,236 A | 4/2000 | Nessett | |
| 6,055,575 A | 4/2000 | Paulsen | |
| 6,058,431 A | 5/2000 | Srisuresh | |
| 6,061,349 A | 5/2000 | Coile | |
| 6,061,738 A | 5/2000 | Osaku | |
| 6,101,543 A | 8/2000 | Alden | |
| 6,119,171 A | 9/2000 | Alkhatib | |
| 6,122,276 A | 9/2000 | Boe | |
| 6,128,664 A | 10/2000 | Yanagidate | |
| 6,137,791 A | 10/2000 | Frid | |
| 6,154,777 A | 11/2000 | Ebrahim | |
| 6,154,839 A | 11/2000 | Arrow | |
| 6,173,399 B1 | 1/2001 | Gilbrech | |
| 6,219,715 B1 | 4/2001 | Ohno | |
| 6,226,751 B1 * | 5/2001 | Arrow et al. ................... 726/15 | |
| 6,243,749 B1 | 6/2001 | Sitaraman | |
| 6,249,801 B1 | 6/2001 | Zisapel | |
| 6,266,707 B1 | 7/2001 | Boden et al. | |
| 6,304,906 B1 | 10/2001 | Bhatti | |
| 6,353,614 B1 | 3/2002 | Borella | |
| 6,353,886 B1 | 3/2002 | Howard | |
| 6,381,638 B1 | 4/2002 | Mahler | |
| 6,421,732 B1 | 7/2002 | Alkhatib | |
| 6,430,622 B1 | 8/2002 | Aiken, Jr. | |
| 6,430,623 B1 | 8/2002 | Alkhatib | |
| 6,438,597 B1 | 8/2002 | Mosberger | |
| 6,438,612 B1 | 8/2002 | Ylonen | |
| 6,452,925 B1 | 9/2002 | Sistanizadeh | |
| 6,457,061 B1 | 9/2002 | Bal | |
| 6,477,565 B1 | 11/2002 | Daswani et al. | |
| 6,480,508 B1 | 11/2002 | Mwikalo | |
| 6,490,289 B1 | 12/2002 | Zhang et al. | |
| 6,496,867 B1 | 12/2002 | Beser | |
| 6,507,873 B1 | 1/2003 | Suzuki | |
| 6,510,154 B1 | 1/2003 | Mayers | |
| 6,523,068 B1 | 2/2003 | Beser | |
| 6,556,584 B1 | 4/2003 | Horsley | |
| 6,557,037 B1 | 4/2003 | Provino | |
| 6,557,306 B1 | 5/2003 | Sekiya | |
| 6,591,306 B1 | 7/2003 | Redlich | |
| 6,594,704 B1 * | 7/2003 | Birenback et al. ............ 709/238 | |
| 6,618,757 B1 | 9/2003 | Babbitt | |
| 6,629,137 B1 | 9/2003 | Wynn | |
| 6,631,416 B2 * | 10/2003 | Bendinelli et al. ............ 709/227 | |
| 6,651,101 B1 | 11/2003 | Gai | |
| 6,657,991 B1 | 12/2003 | Akgun | |
| 6,662,223 B1 | 12/2003 | Zhang | |
| 6,697,377 B1 | 2/2004 | Ju | |
| 6,701,437 B1 * | 3/2004 | Hoke et al. ...................... 726/15 | |
| 6,708,219 B1 | 3/2004 | Borella et al. | |
| 6,722,210 B2 | 4/2004 | Armstrong | |
| 6,731,642 B1 | 5/2004 | Borella | |
| 6,742,045 B1 | 5/2004 | Jordan | |
| 6,747,979 B1 | 6/2004 | Banks | |
| 6,754,706 B1 | 6/2004 | Swildens | |
| 6,772,210 B1 | 8/2004 | Edholm | |
| 6,778,528 B1 | 8/2004 | Blair | |
| 6,779,035 B1 | 8/2004 | Gbadegesin | |
| 6,781,982 B1 | 8/2004 | Borella | |
| 6,832,322 B1 * | 12/2004 | Boden et al. .................. 726/15 | |
| 6,948,001 B1 | 9/2005 | Newman | |
| 6,961,783 B1 * | 11/2005 | Cook et al. ................. 709/245 | |
| 6,970,941 B1 * | 11/2005 | Caronni et al. ............. 709/238 | |
| 6,973,485 B2 | 12/2005 | Ebata | |
| 6,981,020 B2 | 12/2005 | Miloslavsky | |
| 6,982,953 B1 | 1/2006 | Swales | |
| 6,983,319 B1 | 1/2006 | Lu | |

| | | | |
|---|---|---|---|
| 6,993,012 B2 | 1/2006 | Liu | |
| 6,993,595 B1 | 1/2006 | Luptowski | |
| 6,996,628 B2 | 2/2006 | Keane | |
| 6,996,631 B1 | 2/2006 | Aiken | |
| 7,003,481 B2 | 2/2006 | Banka | |
| 7,010,702 B1 * | 3/2006 | Bots et al. ....................... 726/13 | |
| 7,028,333 B2 | 4/2006 | Tuomenoksa et al. | |
| 7,028,334 B2 | 4/2006 | Tuomenoksa et al. | |
| 7,032,242 B1 | 4/2006 | Grabelsky | |
| 7,054,322 B2 | 5/2006 | D'Annunzio | |
| 7,058,052 B2 | 6/2006 | Westphal | |
| 7,068,655 B2 | 6/2006 | March et al. | |
| 7,072,337 B1 | 7/2006 | Arutyunov et al. | |
| 7,072,935 B2 | 7/2006 | Kehoe et al. | |
| 7,085,854 B2 | 8/2006 | Keane et al. | |
| 7,092,390 B2 * | 8/2006 | Wan .............................. 370/392 | |
| 7,107,464 B2 * | 9/2006 | Shapira et al. ................. 709/200 | |
| 7,107,614 B1 * | 9/2006 | Boden et al. .................. 726/15 | |
| 7,110,375 B2 | 9/2006 | Khalil et al. | |
| 7,120,676 B2 | 10/2006 | Nelson et al. | |
| 7,133,368 B2 | 11/2006 | Zhang et al. | |
| 7,139,828 B2 | 11/2006 | Alkhatib | |
| 7,181,542 B2 * | 2/2007 | Tuomenoksa et al. ........ 709/250 | |
| 7,194,553 B2 * | 3/2007 | Lucco et al. .................. 709/245 | |
| 7,227,864 B2 | 6/2007 | Collins et al. | |
| 7,263,719 B2 * | 8/2007 | Jemes et al. ................... 726/12 | |
| 7,327,721 B2 * | 2/2008 | Balasaygun et al. ......... 370/352 | |
| 7,424,737 B2 * | 9/2008 | Wesinger et al. .............. 726/11 | |
| 7,490,151 B2 * | 2/2009 | Munger et al. ................. 709/225 | |
| 7,653,747 B2 * | 1/2010 | Lucco et al. .................. 709/245 | |
| 7,787,428 B2 * | 8/2010 | Furukawa et al. ............ 370/338 | |
| 7,814,228 B2 * | 10/2010 | Caronni et al. ............... 709/245 | |
| 7,827,304 B2 * | 11/2010 | Park et al. ..................... 709/238 | |
| 7,844,718 B2 * | 11/2010 | Polcha et al. ................. 709/229 | |
| 7,853,714 B1 * | 12/2010 | Moberg et al. ................. 709/238 | |
| 2001/0027474 A1 | 10/2001 | Nachman et al. | |
| 2001/0050914 A1 * | 12/2001 | Akahane et al. ............... 370/382 | |
| 2002/0013848 A1 * | 1/2002 | Rene Salle ..................... 709/226 | |
| 2002/0026525 A1 | 2/2002 | Armitage | |
| 2002/0053031 A1 * | 5/2002 | Bendinelli et al. ............ 713/201 | |
| 2002/0056008 A1 * | 5/2002 | Keane et al. ................. 709/245 | |
| 2002/0078198 A1 | 6/2002 | Buchbinder et al. | |
| 2002/0091859 A1 * | 7/2002 | Tuomenoksa et al. ........ 709/245 | |
| 2002/0099937 A1 * | 7/2002 | Tuomenoksa ................. 713/153 | |
| 2002/0103931 A1 * | 8/2002 | Mott ............................. 709/245 | |
| 2002/0133534 A1 * | 9/2002 | Forslow ......................... 709/200 | |
| 2003/0018912 A1 | 1/2003 | Boyle et al. | |
| 2003/0041091 A1 * | 2/2003 | Cheline et al. ................. 709/200 | |
| 2003/0041136 A1 * | 2/2003 | Cheline et al. ................. 709/223 | |
| 2003/0055978 A1 | 3/2003 | Collins | |
| 2003/0065785 A1 | 4/2003 | Jain | |
| 2003/0074472 A1 * | 4/2003 | Lucco et al. .................. 709/245 | |
| 2003/0084162 A1 | 5/2003 | Johnson et al. | |
| 2003/0123421 A1 | 7/2003 | Feige | |
| 2003/0131131 A1 * | 7/2003 | Yamada et al. ................. 709/238 | |
| 2003/0152068 A1 * | 8/2003 | Balasaygun et al. .......... 370/356 | |
| 2003/0208554 A1 | 11/2003 | Holder | |
| 2003/0212795 A1 | 11/2003 | Harris et al. | |
| 2003/0219000 A1 | 11/2003 | Magret | |
| 2004/0006708 A1 * | 1/2004 | Mukherjee et al. ........... 713/201 | |
| 2004/0088542 A1 * | 5/2004 | Daude et al. .................. 713/156 | |
| 2004/0111612 A1 * | 6/2004 | Choi et al. ..................... 713/163 | |
| 2004/0148439 A1 * | 7/2004 | Harvey et al. ................. 709/249 | |
| 2006/0190607 A1 * | 8/2006 | Lowery et al. ................. 709/226 | |
| 2006/0195524 A1 * | 8/2006 | Nichols et al. ................ 709/204 | |
| 2006/0195539 A1 * | 8/2006 | Nichols et al. ................ 709/206 | |
| 2006/0212545 A1 * | 9/2006 | Nichols et al. ................ 709/219 | |
| 2006/0212599 A1 * | 9/2006 | Lucco et al. .................. 709/245 | |
| 2007/0286189 A1 * | 12/2007 | Kreiner et al. ................. 370/389 | |
| 2008/0232295 A1 * | 9/2008 | Kreiner et al. ................. 370/313 | |
| 2009/0116487 A1 * | 5/2009 | Read ............................. 370/392 | |

### OTHER PUBLICATIONS

Tsuchiya, et al., Extending the IP Internet Through Address Reuse, ACM SIGCOMM Computer Communication Review, pp. 16-33, Jan. 1993.

Francis, et al., IPNL: A NAT-Extended Internet Architecture, SIGCOMM'01, Aug. 27-31, 2001, pp. 69-79.

**US 7,949,785 B2**

Page 3

Yalagandula, et al., Transparent Mobility with Minimal Infrastructure, University of Texas at Austin, pp. 1-14, Jul. 2001.

Teraoka, et al., VIP: A Protocol Providing Host Mobility, Communications of the ACM, Aug. 1994/vol. 37, No. 8, pp. 67-75, 113.

Egevang, et al., The IP Network Address Translator (NAT), Network Working Group, RFC 1631, May 1994, pp. 1-10.

Chatel, Classical Versus Transparent IP Proxies, Network Working Group, RFC 1919, Mar. 1996, pp. 1-35.

Finseth, An Access Control Protocol, Sometimes Called TACACS, Network Working Group, Jul. 1993, pp. 1-18.

Computer Nelowrks. Third Edition, by Andrew S. Tanenbaum, 1996, pp. 643-670, 685-691.

Perkins, Mobile IP, IEEE Communications Magazine, May 1997, pp. 84-99.

"Non-Final Office Action", U.S. Appl. No. 10/233,288, (Dec. 21, 2009), 13 pages.

"Final Office Action", U.S. Appl. No. 10/403,518, (Feb. 2, 2010), 26 pages.

"Final Office Action", U.S. Appl. No. 10/403,829, (Feb. 23, 2010), 15 pages.

"Advisory Action", U.S. Appl. No. 10/403,829, (May 14, 2010), 2 pages.

"Non Final Office Action", U.S. Appl. No. 10/161,573, (May 26, 2009), 39 pages.

"Non Final Office Action", U.S. Appl. No. 10/403,829, (Jun. 22, 2009), 26 pages.

Francis, Gummadi "IPNL: A NAT-Extended Internet Architecture", SIGCOMM '01, (Aug. 2001), 69-79.

"Final Office Action", U.S. Appl. No. 10/161,573, (Jul. 23, 2010), 21 pages.

"Final Office Action", U.S. Appl. No. 10/233,288, (Aug. 3, 2010), 15 pages.

"Non Final Office Action", U.S. Appl. No. 10/403,518, (Aug. 3, 2010), 30 pages.

"Advisory Action", U.S. Appl. No. 10/233,288, (Oct. 15, 2010), 3 pages.

Tanenbaum, Andrew S., "Computer Networks", Third Edition,(1996),1-37.

Chatel, M "Classical versus Transparent IP Proxies", Network Working Group Request for Comments, (Mar. 1996),1-35.

Finseth, C "An Access Control Protocol , Sometimes Called TACACS", Network Working Group Request for Comments, (Jul. 1993),1-18.

Francis, Paul et al., "IPNL: A NAT-Extended Internet Architecture", SIGCOMM'01, (Aug. 1, 2008),69-79.

Perkins, Charles E., "Mobile IP", IEEE Communications Magazine, Sun Microsystems,(May 1997),84-99.

Teraoka, Fumio et al., "VIP: A Protocol Providing Host Mobility", Communications of the ACM, vol. 37, No. 8,(Aug. 1994),67-75, 113.

Tsuchiya, Paul F., et al., "Extending the IP Internet Through Address Reuse", ACM SIGCOMM Computer Communication Review, (January 1993),16-33.

Venters, Tracy "Demystifying Protocols: A Comparison of Protocols Suitable for IP Telephony", Sonus Networks, (2000),1-11.

Yalagandula, Praveen et al., "Transparent Mobility with Minimal Infrastucture", University of Texas at Austin, (Jul. 2001),1-14.

Kessler, Gary C., "Mobile IP: Harbiner of Untethered Computing," http://www.garykessler.net/librarymobileip.htm, Jan. 20, 2004.

Rekhter, "Cisco Systems' Tag Switching Architecture overview," Network Working Group, Feb. 1997.

Kent, "Security Architecture for the Internet Protocol," Network Working Group, Nov. 1998.

Computer Dictionary; Microsoft Press; 3rd Edition; 1997; p. 264.

K. Egevang and P. Francis, RFC 1631, The IP Network Address Translator (NAT), May 1994.

"Non Final Office Action", U.S. Appl. No. 10/403,829, (Nov. 19, 2010),19 pages.

* cited by examiner

## Fig. 1



Prior Art

## Fig. 2A



Prior Art

## Fig. 2B



Prior Art



Fig. 3

Prior Art



Fig. 4

Fig. 5a



Fig. 5b

Legend

| | |
|---|---|
| ———— | TCP |
| ·········· | UDP Encapsulated |
| – – – – | UDP Encrypted $M_x$ - $M_a$ |
| –·–·–· | UDP Encrypted $M_b$ - $M_c$ |



Fig. 6A          600

| IP Header (20) | UDP Header (8) | System Shim (20) | Virtual IP Packet |
|---|---|---|---|

602          604          606          608

Fig. 6B          606

| Field Name | Description |
|---|---|
| Protocol Version | Version information |
| Data Type | Type of data following Shim |
| Header Option Flags | Option Flag Information |
| Source RD Public IP | Source Route Director gIP |
| Dest RD Public IP | Destination Route Director gIP |
| Source Member pIP | Source Member Private IP |
| Dest Member pIP | Destination Member Private IP |



Agent joins VCN and receives virtual IP address
650
Application on source to send message to Application destination
652
DNS request sent to VCN Manager for domain name of destination
654
VCN Manager returns publid IP address for RD, private IP address for destination and virtual IP address for destination
656
Agent stores information from VCN Manager
658
Agent returns virtual IP address for destination to Application
660
Application sends message to virtual IP address
662
virtual IP packet created and subject to IPsec
664
virtual IP packet encapsulated
670
encapsutated packet sent to NAT for destination
672
encapsutated packet sent to NRD for destination
673
encapsutated packet sent from NAT to PRD for destination
674
NRD removes virtual IP packet and shim, and re-encapsulates for transmission via persistent connection
675
PRD removes virtual IP packet and shim, re-encapsulates in new packet with private IP address for destination
676
encapsutated packet sent to NAT for destination
677
encapsulated packet sent to Agent for destination
678
Agent removes virtual packet from encapsulation and IPsec
680
Agent stores information from shim
682
contents of virtual packet presented to Application on destination
684

Fig. 7

Fig. 8

User space
810
Acquire Digital Certificates
IKE
Messenger Apps Of Member Agent:
Join/Leave
HA
DHCP request, Name Query, ping
825
Applications
830
IP Stack
835
852
820
Kernel
DNS
854
860
DNE
850
IPSEC
Manages Ph 2 SA's
Security Policy Enforcement
Virtual Adapter Manager:
Set up adapters, create DHCP packets
856
Domain Name Router
858

## Fig. 9



## Fig. 10



## Fig. 11

| <HTTP Header><XML Header><P-Length> |
| --- |

## Fig. 12A



Fig. 12B

| Field Name | Type | Description |
|---|---|---|
| Manager Seed | Array (32) | From Init Ack |
| Init Ack Time | Uint (8) | From Init Ack |
| Join Flags | Uint (2) | Indicates if rejoin and/or Group |
| Member Local IP | Uint (4) | The machine's local IP address |
| RD Local IP | Uint (4) | The Route Director local IP address |
| RD Global IP | Uint (4) | The Route Director Global IP |
| <Unused> | Uint (4) | |
| Member AH SPI | Uint (4) | For IPsec |
| Member ESP SPI | Uint (4) | For IPsec |
| Member Listen Port | Uint (2) | For Heartbeat Protocol |
| Token Timestamp | Uint (8) | The UTC time Token Key was created |
| Member Run ID | Array (16) | GUID Identifying current client run |
| Member Netbios Name | Array (16) | Microsoft NetBios support |
| SP Version | Uint (4) | Security Policy version |
| HA Version | Uint (4) | High availability version |
| Password Hash | Uint (20) | SHA1 of the user password string |
| Padding | Uint (.) | End on a multiple of 16 octets |

# Fig. 13



Fig. 14

510
VCN Manager
565
Member Agent
1414
If packet abnormal, Drop
1412
Leave Request
Member attempts to Leave
1410
1416
If member fails authentication or is not Joined, Send Leave Nack
1418
Leave Nack
1420
If member passes authentication, was Joined and successfully left, Send Leave Ack
1430
Leave Ack
Member successfully Leaves
1440

Fig. 20

510
VCN Manager
565
Member Agent
2012
If packet abnormal, Drop
2010
Query Request
2002
Member Attempts to Query
2014
If member fails authentication or is not Joined, Send Query Nack
2016
Query Nack
2020
If member passes authentication and was Joined, Send Query Ack
2030
Query Ack
2040
Member receives response



Fig. 15

510
VCN Manager
565
Member Agent
1522
If not a DNS query, Drop
1520
Standard DNS Request on port 53
in the virtual link over IPsec
Member does DNS Lookup
1510
1524
If not a standard query or if CLASS = IN , or if TYPE = PTR or A, send "not implemented"
1530
"Not Implemented" DNS response
in the virtual link over IPsec
1540
If Source IP not active virtual IP or lookup failed (ex. Out of Memory) or type PTR query and in-addr does not match the manager's in-addr, or QNAME domain not a valid VCN domain or src VCN <> dst VCN, Send Server Failure
1545
"Server Failure" DNS response
in the virtual link over IPsec
1550
If no question section or format error with packet, Send Format Error
1555
"Format Error" DNS response
in the virtual link over IPsec
1560
If QNAME member not joined, Send Name Error
1565
"Name Error" DNS response
in the virtual link over IPsec
Otherwise lookup name on Type A or in-addr on Type PTR and add extra data to TXT field, Send Normal Response.
1570
1575
Normal DNS Response
in the virtual link over IPsec
1580
Member receives response



# Fig. 16A



# Fig. 16B



## Fig. 17



| 1710 | 1720 | 1730 | 1740 |
|---|---|---|---|
| IP Header (20) | UDP Header (8) | IPDTP Shim (20) | Virtual IKE Phase 1 UDP/IP packet |

## Fig. 18



IKE Ticket Payload in first IKE packet 1740

| Field Name | Field Type (Octets) | Description |
|---|---|---|
| Next Payload | Uint (1) | Type of payload following ours[1] |
| Reserved | Uint (1) | = 0, Part of ISAKMP |
| Payload Length (x) | Uint (2) | In octets |
| Payload Data | Array (x) | Payload in Network Byte Order |

IKE Ticket Payload Data 1750

| Field Name | Field Type (Octets) | Description |
|---|---|---|
| Total Size | Uint (2) | Size of Payload |
| Number of Payload Items (x) | Uint (2) | Number of Items in the Item List |
| Item List | Array (.) * x | List of items in payload |

IKE Ticket Item (one of Item List in Payload Data)

| Field Name | Field Type (Octets) | Description |
|---|---|---|
| Item Type | Uint (2) | One of the types shown below |
| Item Size (x) | Uint (2) | Size of this item in octets |
| Item | Array (x) | Item in packed network byte order |

1760

*IKE Ticket Payload Item Types*

| Item Name | Description |
|---|---|
| My FQDN | The Initiator's FQDN |
| My Ticket | A Ticket created by Initiator for Target |
| Peer FQDN | The Target's FQDN |
| Peer Ticket | A Ticket created by Manager for Target |

1770

Fig. 19



| Field Name | Description |
|---|---|
| Protocol Version | Version |
| Data Type | = 1 for Information Ping to RD |
| Header Option Flags | None |
| Source RD Public IP | Source Route Director gIP = 0 |
| Dest RD Public IP | Destination RD gIP = 0 |
| Source member pIP | Source member private IP = 0 |
| Dest member pIP | Destination member private IP = 0 |

| Field Name | Description |
|---|---|
| Type | IPDTP Ping Type |
| Sequence | Arbitrary Sequence Number |

# Fig. 21



510
VCN Manager

565
Member Agent

520
NRD

1304
Init Request

1302
Member Authenticates

2120
Member behind NAT detected. No PRD available to serve member. Find an available NRD, Send Init ACK with NRD indicated.

1314'
Init Ack

2132
Member establishes session with NRD

2130
Address Request

2140
Address Response

2135
NRD gives member a Pseudo Address.

2142
If connection is TCP an NRD Init is sent

2145
NRD Init (TCP only)

NRD Init Ack (TCP only)

2150

1318
Join Request

Join Ack

1328

Member now Joined

2170

# Fig. 22



## Fig. 23



Fig. 24

Application on source to send message to Application destination
2402
DNS request sent to VCN Manager for domain name of destination
2404
VCN Manager returns global IP address for RD, private IP address for destination and virtual IP address for destination
2406
Agent stores information from VCN Manager
2408
Agent returns virtual IP address for destination to Application
2410
Application sends message to virtual IP address
2412
virtual IP packet created and subject to IPsec
2414
virtual IP packet encapsulated
2416
enccapsutated packet sent to NAT for destination
2418
encapsulated packet sent from NAT to RD for destination
2420
RD removes virtual IP packet and shim, and presents to Group Agent
2422
Group Agent stores info from shim
2424
Group Agent removes virtual packet from IPsec
2426
Group Agent chooses private IP address for source
2428
Group Agent changes source addres in virtual packet
2430
Group Agent changes destination addres in virtual packet
2432
Group Agent send packet to destination machine
2434





Fig. 25

packet created using private addresses
2502
packet sent to Group Agent
2504
Group Agent replaces private addresses with virtual addresses
2506
Group Agent applies IPsec
2508
Group Agent encapsulates packet
2510
Group Agent sends packet
2512

Fig. 26

application sends DNS request
2602
Group Agent receives DNS Request
2604
Group Agent sends DNS Request to VCN Manager
2606
Group Agent receives response form VCN Manager
2608
Group Agent maps virtual IP address for target to private address in local LAN
2610
Group Agent returns private address to application
2612
application sends commmunication
2614

US 7,949,785 B2

**1**

## SECURE VIRTUAL COMMUNITY NETWORK SYSTEM

### CROSS-REFERENCE TO RELATED APPLICATIONS

This Application is related to the following Applications: U.S. Pat. No. 7,139,828 issued Nov. 21, 2006; U.S. patent application Ser. No. 10/161,573, "Creating A Public Identity For An Entity On A Network," filed on Jun. 3, 2002; U.S. patent application Ser. No. 10/233,288, "Communicating With An Entity Inside A Private Network Using An Existing Connection To Initiate Communication," filed on Aug. 30, 2002; U.S. patent application Ser. No. 10/403,829 "Secure Virtual Address Realm," filed on Mar. 31, 2003; and U.S. patent application Ser. No. 10/403,518 "Group Agent," filed on Mar. 31, 2003. All of these related applications are incorporated herein by reference in their entirety.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention is directed to a network services system.

2. Description of the Related Art

Networked data devices provide users with efficient means for communication and collaboration. In recent years, the Internet has played a central role in allowing different types of networked devices to connect and share information across a myriad of networks. As technology advances and more organizations and people rely on the Internet, new challenges are presented for enhancing the ability to communicate. One such challenge is to enable the rapid creation of a secure means that allows local and remote specified entities to communicate and collaborate from any location via a standard Internet connection. For any solution to be widely accepted, it must take into account the realities and limitations currently existing.

For communication on the Internet, the Internet Protocol (IP) has become the default protocol used by most hosts and to which communication applications are now written. To transmit data from a source to a destination, the Internet Protocol uses an IP address. An IP address is four bytes long and consists of a network number and a host number. When written out, IP version 4 addresses are specified as four numbers separated by dots (e.g. 198.68.70.1). Users and software applications do not always refer to hosts or other resources by their numerical IP address. Instead of using numbers, they use ASCII strings called domain names. The Internet uses a Domain Name System (DNS) to convert a domain name to an IP address.

The Internet Protocol has been in use for over two decades. It has worked extremely well, as demonstrated by the exponential growth of the Internet. Unfortunately, the Internet is rapidly becoming a victim of its own popularity, it is running out of addresses.

One popular solution to the depleting address problem is Network Address Translation (NAT). This concept includes predefining a number of network addresses to be private addresses and public addresses. Public addresses are unique addresses that should only be used by one entity having access to the Internet. That is, no two entities on the Internet should have the same public address. Private addresses are not unique and are typically used for entities not having direct access to the Internet. Private addresses are used in private networks. Private addresses can be used by more than one organization or network. NAT assumes that all of the machines on a network will not need to access the Internet at all times. Therefore, there is no need for each machine to have a public address. A local network can function with a small number of one or more public addresses assigned to a NAT device. The remainder of the machines on the network will be assigned private addresses. Since entities on the network have private addresses, the network is considered to be a private network.

When a particular machine having a private address on the private network attempts to initiate a communication to a machine outside of the private network (e.g. via the Internet), the NAT device will intercept the communication, change the source machine's private address to a public address and set up a table for translation between public addresses and private addresses. The table can contain the destination address, port numbers, sequencing information, byte counts and internal flags for each connection associated with a host address. Inbound packets are compared against entries in the table and permitted through the NAT device only if an appropriate connection exists to validate their passage. One problem with a many NAT implementations is that it only works for communication initiated by a host within the private network to a host on the Internet that has a public IP address. Many NAT implementations will not work if the communication is initiated by a host outside of the private network and is directed to a host with a private address in the private network.

For most organizations, the security of devices coupled to the Internet is a concern. As a result, not all devices are directly connected to or accessible via the Internet. Rather, many devices are placed in private networks for security concerns (in addition to the address usage issue described above). Many private networks are secured by placing a firewall device between the private network and the Internet.

Another problem with many current communication schemes is that mobile computing devices can be moved to new and different networks, including private networks. These mobile computing devices may need to be reachable so that a host outside of the private network can initiate communication with the mobile computing device. However, in this case the problem is two-fold. First, there is no means for allowing the host outside of the private network to initiate communication with the mobile computing device. Second, the host outside the private network does not know the address for the mobile computing device or the network that the mobile computing device is currently connected to.

Thus, there is a need for a system that provides for local and remote entities to communicate and collaborate using the Internet, can work with existing NAT devices and firewalls, and allows for devices to move to different physical networks. To increase the ability of such a system to be accepted by the Internet community, it is desirable for such a system to not require changes to existing applications, allow peer-to-peer applications to communicate directly across the Internet and to not require changes to existing protocols. Each of these issues will be discussed below.

Large amounts of resources have been used to purchase and deploy existing applications currently running on the millions of computing devices. Organizations and individuals are not likely to want to adopt new communications solutions that require them to absorb the additional cost of replacing all of their applications.

To provide efficient and secure communication, it is desirable for devices to have the ability to allow their IP based applications to communicate directly with each other. By allowing peer-to-peer applications to communicate directly across the Internet, security is enhanced since the recipient is specifically identified and communication is passed directly between the applications on two or more respective machines.

US 7,949,785 B2

**3**

Most machines on the Internet use the TCP/IP (Transmission Control Protocol/Internet Protocol) reference model to send data to other machines on the Internet. The TCP/IP reference model includes four layers: the physical and data link layer, the network layer, the transport layer, and the application layer. The physical layer portion of the physical and data link layer is concerned with transmitting raw bits over a communication channel. The data link portion of the Physical and Data Link layer takes the raw transmission facility and transforms it into a line that appears to be relatively free of transmission errors. It accomplishes this task by having the sender break the input data up into frames, transmit the frames and process the acknowledgment frames sent back by the receiver.

The network layer permits a host to inject packets into a network and have them travel independently to the destination. On the Internet, the protocol used for the network layer is the Internet Protocol (IP).

The transport layer is designed to allow peer entities on the source and destination to carry on a "conversation." On the Internet, two protocols are used. The first one, the Transmission Control Protocol (TCP), is a reliable connection-oriented protocol that allows a byte stream originating on one machine to be delivered without error to another machine on the Internet. It fragments the incoming byte stream into discrete segments and passes each one to the network layer. At the destination, the receiving TCP process reassembles the received segments into the output stream. TCP also handles flow control to make sure a fast sender cannot swamp a slow receiver with more segments than it can handle. The second protocol used in the transport layer on the Internet is the User Datagram Protocol (UDP), which does not provide the TCP sequencing or flow control. UDP is typically used for one-shot, client server type requests-reply queries for applications in which prompt delivery is more important than accurate delivery.

The transport layer is typically thought of as being above the network layer to indicate that the network layer provides a service to the transport layer. Similarly, the transport layer is typically thought of as being below the application layer to indicate that the transport layer provides a service to the application layer.

The application layer contains the high level protocols, for example, Telnet, File Transfer Protocol (FTP), Electronic Mail-Simple Mail Transfer Protocol (SMTP), and Hypertext Transfer Protocol (HTTP).

FIG. **1** depicts the basic structure of an IP version 4 packet **10** used at the Network Layer. IP packet **10** consists of header **12** and payload **14**. Payload **14** stores the data received from the Transport Layer in the TCP/IP model. FIG. **2**A depicts the format of a header of an IP packet. The header is depicted to include six rows. The first five rows are 32 bits wide. The first five rows of the header comprise a 20 byte fixed portion of the header. The last row of the header provides a variable sized options field **22**. Version field **24** keeps track of which version of the protocol the packet belongs to. The current version used on the Internet is version 4. IHL field **26** describes the length of the header in 32 bit words. Type field **28** indicates the type of service requested. Various combinations of reliability and speed are possible. Length field **30** contains the size of the packet, including both the header and the data. Identification field **32** is needed to allow the destination host to determine which packet the received fragment belongs to. All fragments of a packet contain the same identification value. Next comes three flags, which include an unused bit **33** and two 1 bit fields **34** and **36**. DF field **34** stands for don=t fragment. It is an order to the routers not to fragment the packet because the

**4**

destination is incapable of putting the pieces back together again. MF field **36** stands for more fragments. All fragments except for the last one have this bit set. Fragment offset field **38** indicates where in the current segment this fragment belongs. Time to Live field **40** is used to limit packet lifetime. It is supposed to count time in seconds, allowing a maximum life time of 255 seconds. In practice, it may count hops (or hops and seconds). The time is decremented on each hop by a router. When the time to live hits 0, the packet is discarded and a warning is sent back to the source using an Internet Control Messaging Protocol (ICMP) packet. This feature prevents packets from wandering around forever. Protocol Field **42** indicates which transport layer type is to receive the segment. TCP is one possibility, UDP is another. Checksum field **44** verifies the header. One method for implementing a checksum is to add up all 16 bit half words constituting the header and take the ones compliment of the result. Note that the checksum must be recomputed at each hop because the Time to Live field **40** changes or the content of the options field changes. Source field **46** indicates the IP address for the source of the packet and destination field **48** indicates the IP address for the destination of the packet. Options field **22** is a variable length field designed to hold other information. Currently, options used on the Internet indicate security, suggested routing path, previous routing path and time.

UDP is an alternative to TCP. FIG. **2**B depicts the structure of a packet that uses UDP. Like the TCP, UDP uses the Internet Protocol to actually send a data unit from one computer to another. Unlike TCP, however, UDP does not provide the service of dividing a message into packets (datagrams) and reassembling it at the other end. Specifically, UDP does not provide sequencing of the packets that the data arrives in. Hence, application programs using UDP must ensure that the entire message has arrived and is in the right order. As shown in FIG. **2**B, the packet includes an IP header **12**a and IP payload **14**a. The payload **14**a comprises the UDP header **50** and UDP data **60**. UDP header **50** consists of a 16 bit source port identifier, a 16 bit destination port identifier, a length field and checksum field. In FIG. **2**B, the Destination Port has a meaning within the context of a particular Internet destination address, and the Length field is the length in octets of this user datagram, including its header and the data. The checksum is the 16-bit one's complement of the sum of consecutive two octaves of a pseudo header of information from the IP header, the UDP header, and the data (padded with zero octets at the end, if necessary, to make a multiple of two octets).

In addition to using the existing Internet infrastructure, another issue in allowing public-to-private, or private-to-private, communications lies in the addressing of the devices. Where a system is coupled to the public Internet with an IP address, communication packets can be routed directly to the machine. However, many devices couple to the Internet via service providers which provide them with a dynamic IP address. Thus, those wishing to communicate with this type of user must know the constantly changing address of the user in order to communicate with them. Still other hosts may be coupled to networks that use technologies other than IP.

One solution currently in use that provides for local and remote specified entities to communicate and collaborate using the Internet is the Virtual Private Network ("VPN"). The VPN uses additional network software layers to increase security between users in the public realm and those in private realms. For example, some VPNs encrypt packets using IPsec (or other protocols). The encrypted packets are then encapsulated within a standard packet and transmitted across the Internet to the destination. At the destination, the encrypted packet is decrypted. While the existing VPN provides remote

US 7,949,785 B2

5

users with secure access to a network, via the Internet, many existing VPNs have various shortcomings that prevent them from satisfying the needs of many users. For example, many VPNs do not provide for peer-to-peer communication with IPsec (or other security measures), do not work though NAT devices in all cases, are difficult to set up and maintain, do not provide for full mobility of entities communicating on the VPN, and do not always provide for communication with entities in the various private network configurations discussed herein.

One method of overcoming the mobility problem includes the use of Dynamic DNS. More information about Dynamic DNS can be found in RFC 2136 incorporated herein by reference.

Dynamic DNS is illustrated in FIG. 3. FIG. 3 shows a first computer or device B having a host name of B.COb.com having a dynamic or static private IP address IPb and a second computer or device A having a host name of A.COa.com and having a dynamic or static private IP address IPa. Devices B and A are coupled to the Internet 506 via firewall devices 302, 304 incorporating NAT. The addresses of B and A, as seen by devices on the Internet, are public IP addresses GIPb and GIPa, respectively. Also shown is device D, having a publicly address IPd and a host name of d.COd.com.

Also shown is a Dynamic DNS server, DDNS, residing on the Internet. In essence, the DDNS server is a DNS server supporting the dynamic DNS protocol of RFC 2136, and in this example is an authoritative name server containing records for B, A and D. The DDNS server will update it's records of B, A and D in real time, so that if or when D's address IPd changes, any query by other devices (B, A, for example) based on D's host name, will result in the response being the correct IP-IPd. Any DNS records for devices B and A will always reflect the public IP addresses (GIPa and GIPb) of the firewall/NAT devices.

Unfortunately, DDNS technology is complex and difficult to implement securely—two factors that have dramatically slowed the rate of deployment of Dynamic DNS. As a result, VPNs have not been able to adopt DDNS to solve all of the problems discussed herein.

Hence, a system is desired that allows local and remote entities to communicate and collaborate from any location via a standard Internet connection and which solves the problems discussed above.

SUMMARY OF THE INVENTION

A system is disclosed that allows local and remote entities to communicate and collaborate from various locations. In one embodiment, the system makes use of a virtual subnet with a virtual address realm. The virtual address realm allows two or more users to communicate securely via at least one public network, whether the users are both coupled directly to the public network, both coupled directly to separate private networks or whether one is in a public network and one is in a private network. The virtual address realm uses virtual addresses to identify the devices on the virtual subnet. Although the devices are in different physical subnets, from the point of view of the applications the devices of the virtual subnet appear to be in one local subnet.

In one embodiment, the virtual address realm comprises a virtual address realm definition including at least a set of users. Each user accessing the virtual address realm may have at least one virtual address in the virtual address realm and at least one physical address.

Another embodiment of the present invention comprises a virtual community network for transmitting communications

6

via at least one physical network. The virtual community network comprises a virtual address realm including a logical name assignment, a set of users capable of communicating in the virtual address realm, and a secure communication channel. In a further aspect, the virtual community network logical name is a domain name, and the domain name may be a fully qualified domain name or a virtual domain name. In another aspect, the set of users includes at least a first user coupled to a first private physical network and a second user coupled to a second private physical network, and the first private physical network and the second private physical network may have at least one common private physical subnet address. The physical addresses may be dynamic or static.

Yet another embodiment of the invention is a method comprising the steps of: defining a virtual address realm overlying a public address realm, the virtual address realm including at least a user set and a logical name for said user set; and routing communications between users in the user set by means of virtual address realm addresses. In a further aspect, this method includes the step of registering users in the user set as members of the virtual address realm. Further, the method may include the step of assigning each registered user a unique virtual address in the virtual address realm. The method may further include the steps of encrypting communications between devices in the realm, and/or applying at least one address realm group policy.

A further embodiment of the invention is a method for providing secure communications between two devices. The method comprises the steps of: providing a virtual realm identifier; defining a set of users for the virtual realm; registering users in the realm; assigning virtual addresses; and routing information between users in said virtual address realm.

A still further embodiment of the invention comprises one or more processor readable storage devices having processor readable code embodied on said processor readable storage devices. In this embodiment, said processor readable code is for programming one or more processors to perform a method comprising the steps of: providing a virtual address realm configuration including a user set and a domain name for said user set; and routing communications between users in said virtual address realm.

Another embodiment of the invention comprises a method for providing a secure virtual network. The method may include the steps of: providing a virtual network manager coupled to a public network; defining a member set of users entitled to communicate in the virtual network; registering members with the manager; assigning members a virtual address; and routing network traffic between the members in the virtual community.

An additional further embodiment of the invention may comprise one or more processor readable storage devices having processor readable code embodied on said processor readable storage devices. The processor readable code may be for programming one or more processors to perform a method comprising the steps of: managing a virtual community network realm; defining a member set of users entitled to communicate in the virtual community; registering users with the virtual community; assigning each user a virtual address; and routing network traffic between the users in the virtual community.

Another embodiment of the invention is a virtual community network system. The system includes a virtual network manager including at least one virtual community definition comprising at least a domain name and a user set; and at least one route director capable of communicating with users in the user set.

US 7,949,785 B2

7

In a further aspect, the virtual community network includes a communication agent installed on a device. The agent may comprise a virtual network adapter interfacing with the device and applications on the device to route traffic to members of the virtual community via their virtual address.

For some devices, additional software or hardware cannot be installed on a member device or it is not desirable to install such additional software or hardware on the device. For such devices, a Group Agent can be used. The Group Agent acts as a proxy for one or more members of a virtual community without requiring installation of member agent software on the client devices.

One embodiment of a system that uses a Group Agent includes communicating with a first client and acting as an intermediary between the first client and members in a first virtual address realm so that the first client can communicate in the first virtual address realm. Note that in this embodiment the first client is not configured to communicate in the first virtual address realm. For example, no software is installed on the client to add drivers, layers or interfaces specific to the first virtual address realm.

Another embodiment of a system using a Group Agent includes communicating messages with a first client and communicating the messages with members in a virtual address realm on behalf of the first client. While communicating with the first client, the messages do not use virtual addresses. During the communication process, the messages are transformed so that the messages include virtual addresses when communicating with members in the virtual address realm and the messages do not include virtual addresses when communicating with the first client.

In one implementation, the first entity resides in a first physical address realm and the second entity resides in a second physical address realm, where the first physical address realm overlaps with the second physical address realm. For example, consider the situation where the first physical address realm is a first private network using a first set of private addresses and the second physical address realm is a second private network using a second set of private addresses, where there are private addresses that exist in both the first set of private addresses and the second set of private addresses.

The present invention can be accomplished using hardware, software, or a combination of both hardware and software. The software used for the present invention is stored on one or more processor readable storage media including hard disk drives, CD-ROMs, DVDs, optical disks, floppy disks, tape drives, RAM, ROM or other suitable storage devices. In alternative embodiments, some or all of the software can be replaced by dedicated hardware including custom integrated circuits, gate arrays, FPGAs, PLDs, and special purpose computers. In one embodiment, software implementing the present invention is used to program one or more processors. The processors can be in communication with one or more storage devices, peripherals and/or one or more communication interfaces.

These and other objects and advantages of the present invention will appear more clearly from the following description in which the preferred embodiment of the invention has been set forth in conjunction with the drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described with respect to the particular embodiments thereof. Other objects, features, and advantages of the invention will become apparent with reference to the specification and drawings in which:

8

FIG. **1** depicts an IP packet.

FIG. **2A** depicts the format of a header of an IP packet.

FIG. 2B depicts the format of a UDP packet.

FIG. **3** depicts a print-out implementation of a dynamic routing system.

FIG. **4** depicts a block diagram of an implementation of the system of the present invention.

FIG. **5A** is a structural network block diagram illustrating elements used in the system of the present invention.

FIG. **5B** is a logical block diagram depicting communication types in an implementation of the system of the present invention

FIG. **6A** depicts a packet structure for a communication packet in accordance with the present invention.

FIG. **6B** is a table depicting the shim configuration of the packet in FIG. **6A**.

FIG. **7** is a flow chart describing the overall process for communicating.

FIG. **8** is a block diagram illustrating the structure of the Member Agent application in the system of the present invention.

FIG. **9** is a flowchart illustrating the steps which occur in the creation of a virtual community.

FIG. **10** is a flowchart illustrating the process of configuring a virtual community.

FIG. **11** depicts an HTTP wrapper structure.

FIG. **12A** is a flow diagram depicting a user registration process of the present invention.

FIG. **12B** is a table illustrating the structure of the registration file information structure.

FIG. **13** is a flowchart depicting a member join process in accordance with the present invention.

FIG. **14** is a flowchart depicting a member leave request in accordance with the present invention.

FIG. **15** is a flow diagram depicting DNS request for a member in the virtual community in accordance with the present invention.

FIG. **16A** depicts the commonly used IKE phase one aggressive mode exchange.

FIG. **16B** depicts the IKE phase one aggressive mode exchange used in accordance with the present invention.

FIG. **17** depicts a packet structure of the virtual IKE phase 1 packet.

FIG. **18** depicts the IKE ticket payload data structure.

FIG. **19** is a representation of a system ping sequence in accordance with the present invention.

FIG. **20** is a flow diagram depicting a query request in the system of the present invention.

FIG. **21** depicts a flow structure for addressing and routing conducted by a Route director.

FIG. **22** is a block diagram depicting one embodiment of various components of the present invention utilizing a Group Agent.

FIG. **23** is a flow chart describing one embodiment of the process for Group Agent initialization.

FIG. **24** is a flow chart describing one embodiment of a process for initiating communication with a member that is using a Group Agent.

FIG. **25** is a flow chart describing one embodiment of a process for communicating using a Group Agent.

FIG. **26** is a flow chart describing one embodiment of a process for initiating communication by a member that is using a Group Agent.

DETAILED DESCRIPTION

One embodiment of the present invention provides for a secure Virtual Community Network or "VCN." In essence, a

US 7,949,785 B2

9

VCN is a private dynamic network which acts as a private LAN for computing devices coupled to public networks or private networks. This enables computing devices anywhere in the world to join into private enterprise intranets and communicate with each other. Thus, the invention provides a separate private virtual address realm, seen to each user as a private network while seamlessly crossing public and private network boundaries.

A basic overview of the system is shown in FIG. 4. FIG. 4 shows a computer or device B (host name—b.COb.com) in a first private domain and computer or device A (host name—a.COa.com) in a second private domain, both of which are coupled to the Internet by firewall devices 402, 404. The firewall devices are configured to implement Network Address Translation (NAT). A and B have dynamic or static private IP addresses. Computer or device X is coupled directly to the public Internet and has a public IP address.

In the present invention, a virtual community network (VCN) X.VCN is formed. Machines A, B and X can join the VCN, leave the VCN, or allow other machines in the VCN to communicate with them. More than simply a virtual private network (VPN), all members of the VCN are accessible as if they were part of a physical local network. The application running on the members of the VCN can accomplish what they would be able to accomplish if they were on the same physical routed network (e.g. all in the same private network). Membership in the VCN is controlled by an administrator via an administrative interface. In general, the administrator defines certain aspects of the VCN and then invites members into the VCN by specifying the domain name for each member. Members then register themselves with a VCN Manager, and notify the Manager via join and leave requests when they are available to participate in the community. Once registered and joined, members can communicate with other members as though connected via a local LAN.

As shown in FIG. 4, A, B and X may all make direct connections to each other through communications within the virtual domain. In FIG. 4, dashed lines represent direct communication paths seen to applications running on A, B and X, all "seeing" the virtual addresses of each other and communicating with each other using the application's IP interface.

A hardware architecture for the machines, server or other devices used to implement the present invention should be well understood to one of average skill in the art. Suitable hardware includes one or more processors, a memory, a mass storage device, a portable storage device, a first network interface, a second network interface and I/O devices, in communication with each other. The choice of processor is not critical as long as a suitable processor with sufficient speed is chosen. The memory can be any conventional computer memory. The mass storage device can include a hard drive, CD-ROM or any other mass storage device. The portable storage can include a floppy disk drive or other portable storage device. If the computer is acting as a router, it includes two or more network interfaces. In other embodiments, the computer may include only one network interface. The network interface can include a network card for connecting to an Ethernet or other type of LAN. In addition, one or more of the network interfaces can include or be connected to a firewall. For a gateway, one of the network interfaces will typically be connected to the Internet and the other network interface will typically be connected to a LAN. However, a gateway can exist physically inside a network. I/O devices can include one or more of the following: keyboard, mouse, monitor, display, printer etc. Software used to perform the methods of the present invention are likely to be stored in mass storage (or any form of non-volatile memory), a por-

10

table storage media (e.g. floppy disk or tape) and/or, at some point, in memory. The above described hardware architecture is just one suitable example depicted in a generalized and simplified form. The present invention could include dedicated hardware, a dedicated router with software to implement the invention or other software and/or hardware architectures that are suitable.

A more detailed overview of one embodiment of the present invention is depicted in FIGS. 5A and 5B. FIG. 5A illustrates various embodiments of devices coupled to public and private networks in a manner which allows use of the present invention, and is a representation of a physical connection of such devices. FIG. 5B illustrates a logical representation of elements used to create a VCN and of the various formats of communication traffic between those elements shown in FIG. 5A.

Specifically, FIGS. 5A and 5B illustrate various user machines $M_n$ coupled to the Internet 506, as well as other devices, described below, which implement a virtual community in accordance with the present invention. Devices $M_n$ can be personal computers, servers or other computing devices (mobile or non-mobile). Each machine may have different communication connectivity with the Internet.

In general, an exemplary system for implementing a VCN in accordance with the invention comprises a VCN Manager 510, a Network Route Director 520 and/or Private Route Director 530, and a number of Member Agents 565. Communication between systems in various protocols is illustrated by dashed lines (UDP) and solid lines (TCP). The VCN manager and Network Route Director are shown in FIG. 5A as being coupled directly to Internet 506.

User devices $M_A$ and $M_E$ are connected to the Internet and have public IP addresses. These addresses may be dynamic or static. If static, $M_A$ and $M_E$ can easily communicate with each other in a manner well known in the art by simply addressing IP packets directly to each other. If the addresses are dynamic, then $M_A$ and $M_E$ require some means of knowing when the IP address of the other changes in order to communicate. As described below, the VCN system provides such a means.

Device $M_B$ is in a private domain (e.g. private network)) 540 and connected to a NAT Device 515 to access the Internet 506 by a private network path 540a. Device $M_B$ may use have a dynamic or static IP address specific to the private domain 540. Generally, such addresses are part of the private received IP classes which are not routable via the Internet. For example, 10.0.0.0-10.255.255.255, 172.16.0.0-172.31.255.255, 192.168.0.0-192.168.255.255 are network addresses classified for private networks. Firewall/NAT device 515 translates Machine $M_B$'s private IP address to a routable public IP address. NAT device 515 may include other security functions as well. $M_B$ communicates with other non-VCN devices on the Internet via the NAT device 515, and with other members of the VCN via Private Route Director (PRD) 530, which is coupled to the private network path 540a and is a member of the private network 540. Device $M_X$ is also shown as connected to and a member of the private domain 540 but has a static, routable public IP addresses. As such it may communicate with devices coupled to Internet 506 in a different manner, as illustrated in FIG. 5B.

Devices $M_C$ and $M_D$ are part of a second private domain (e.g. private network) 550 coupled to a second private network path 550a. Again, these machines have static or dynamic private IP addresses and are coupled to the Internet via a firewall/NAT device 517, which is itself coupled to network path 550a.

The VCN Manager 510 is a central server or server cluster providing management services, connection services and

**11**

security services for the VCN. Each Member Agent **565** includes client agent software (or, in some embodiments, hardware) that runs on end machines and provides virtual network services. It enables the machine to be reached from public and private networks, and implements the security aspects of the system. In FIG. **5**B, machines $M_A$, $M_B$, $M_C$, $M_D$, $M_E$ and $M_X$ all include Member Agents and, therefore, can be members of a particular VCN.

The Network Route Director (NRD) **520** is a stand-alone unit that runs on the public side of the Internet enabling Member Agents and Group Agents (discussed below) to be reached inside one or more private networks from the public network. Private Route Director ("PRD") **530** is an element that runs inside a private network enabling access to machines inside the private network from machines outside the private network. It can run as a service on a platform offering other services such as a Windows Server.

Generally, VCNs are defined and managed by the VCN Manager **510**. Clients utilize Member Agents or Group Agents to access other client machines ($M_n$), in private or public realms. The NRD or PRD routes communications to Member Agents.

As described herein, three forms of communication are used in creating and implementing the VCN. TCP is used in the registration and joining processes; encapsulated UDP packets are used between elements in establishing communication between joined devices and for management traffic, and Encrypted UDP packets are used for agent-to-agent communications.

FIG. **5**B shows exemplary traffic between elements of the VCN. A first type of traffic is TCP traffic. TCP traffic is used between member agents to establish membership in the VCN (the registration process), and make the VCN manager aware they are available to communicate with other members of the VCN (the join process). In FIG. **5**B, this is represented by solid lines **513**b, **511**b, **523**b and **543**b. TCP is also used: by the PRD **530** to establish communications with the VCN (lines **527**b, **527**d); and by the member agent of device $M_B$ to communicate with the PRD **530** (line **533**b). TCP may also be used by devices $M_C$ and $M_D$ on private network **550** to communicate with each other.

Encapsulated UDP traffic is used by elements of the VCN once membership has been established and the elements are joined in the VCN for management and administrative communications. This is represented in FIG. **5**B by lines **511**a, **513**a, **523**a, **527**a, **527**c, **523**c, **527**e, **521**, **543**a, **541**, and **519**. Encrypted UDP communications are used between devices, shown in FIG. **5**B between device $M_X$ and $M_A$ at **525** and device $M_B$ and $M_C$ at **537**.

In one embodiment, secure connections are built dynamically using IPsec tunnels based on a virtual IP space that can traverse from private networks, across the Internet and into other private networks. Strong authentication and the establishment of IPsec policies at the time members join the community offers privacy and security to the members of the virtual community. This facilitates the introduction of a variety of policy-based network services with centralized management such as Virtual Private Networks for intranets and extranets, IP-telephony domains, and IP-based PDA communities.

Communication Protocol

In the present invention, an encapsulation routing protocol allows packets to traverse addressing boundaries and identifies routing endpoints by unique DNS domain names. It employs an address virtualization scheme that accomplishes backwards compatibility with IPv4 applications. With certain

**12**

optional exceptions, UDP encapsulation is used between elements of the Virtual Community.

One example of an encapsulated packet **600** is depicted in FIG. **6**A. It includes a 20 octet IP header **602**, an 8 octet UDP header **604**, a 20 octet system shim **606**, and a variable size virtual IP packet **608**. A virtual IP packet has the same format as a standard IP packet.

Members of a VCN communicate to other members of that VCN by means of virtual IP Packets **608**. Virtual IP addressing is used to establish unique connection identities for community connected devices. IPsec can optionally be applied to the Virtual IP Packet for end-to-end security. Virtual IP addresses are used to identify members in the community in the virtual packet and are not directly routable. Rather, they are unique identifiers of a given connection to the upper layer application. In one embodiment, virtual IP addresses are in IPV4 format.

In general, the UDP header is set for a default port. System shim **606** carries enough addressing information to allow the Route Directors to forward the tunneled packet through the various address realms on its way to the destination. Such a routing methodology is often referred to as source routing.

In order to route packets to a peer in a different addressing realm, the protocol stack knows the address of the appropriate Route Director that serves the peer's realm, the private address of the peer or a NAT address. The Member Agent obtains the information by using the VCN Manager as a DNS authority for DNS lookup operations as described below (FIGS. **13** and **21**). The DNS response from the VCN Manager will include the above-identified information in an optional text field of the response to the Member Agent.

TCP/IP connections require IP addresses to be used as connection identifiers at the user level. If an application wishes to make a connection to "m3.abcdef.com" and another to "m4.abcdef.com", it resolves both DNS identifiers into IPv4 addresses. The system cannot assign the private IP addresses of the members to be unique connection identifiers, because two members might have the same private address in different private address realms.

Assigning a virtual address to each peer designated by a DNS string solves the problem of ambiguous endpoints. These virtual addresses may be any legal IPv4 addresses, but conflicts will occur if the same addresses are used to designate a peer in an IPv4 network application. For instance, if 10.0.0.10 is used as a virtual address, and is also used on a member's network as the mail server, packets that are ordinarily destined to the mail server may be redirected to a random peer. In general, when choosing virtual addresses it is best to choose addresses that will not be routable to address member. Hence, each member is assigned a virtual IP address unique in the context of the virtual community and that will not conflict with any local addresses on its LAN or any public IP addresses on the Internet.

By having each member of a VCN use a virtual address, a virtual address realm is created. The virtual address realm is the set of addresses that can be used to identify and send communications to other members of the VCN. The virtual address realm is different from a physical address realm because the physical address realm is actually used to route on a physical network. The members of a VCN will all be in the virtual address ream of that VCN, but may be in different physical address realms. For example, looking at FIGS. **5**A and **5**B, $M_B$ and $M_C$ are in different physical address realms (e.g. **540** and **550**); however, they are both in the virtual address realm of the VCN. Another example can be seen with FIG. **4**, where A and B are in different physical address realms (Cob.com and Coa.com); however, they are both in the same

US 7,949,785 B2

13

virtual address realm. Applications on members of a VCN will see the VCN as the local subnet; therefore, the VCN can be thought of as a virtual subnet. Each member of the VCN will appear to the application as an entity connected to the local subnet.

Route Directors **530** and **520** facilitate routing UDP encapsulated traffic to private address domains **540**, **550**. In general, Route Directors either have public IP addresses or addresses that are statically remapped to a public IP address. The static translation of a Route Director's IP must leave the port in the UDP header unchanged to allow the UDP encapsulated destination port number to be directly used by public members, by other Route Directors, and by private members. Route Directors **520**, **530** and VCN Manager **510** may be configured to use a non-default UDP encapsulation port. In one embodiment, all outgoing messages are sent to this port on the next destination node and all incoming messages are read from this port. As discussed below, information in a "join" packet tells Member Agents the UDP encapsulation port to use in communications to Route Directors, network managers, and other members of the community.

System Shim **606** (see FIG. **6**A) has a format given by way of example in FIG. **6**B. Protocol Version information, data type, header option flags, and Router Information are potentially stored in the Shim. (The abbreviation "gIP" stands for "global" or public IP address, indicating an Internet routable IP address. The Data Type field indicates the meaning of the optional data that may follow the Shim. This may include a Virtual IP Packet **608**, a ping to a Route Director, a request for a Network Route Director virtual address, a Route Director response with a virtual address, a member leaving and releasing a virtual address, and a member-to-Route Director packet. The shim also includes the public IP address for the source machine's Route Director, the public IP address for the destination machine's Route Director, the private IP address for the source machine and the private IP address for the destination machine. In the case where the source or destination use a public IP address, then the shim will not need to include the private addresses of the source/destination or a route director.

The system can optionally use TCP encapsulation between a member and a Route Director. If the VCN Manager determines that a Member Agent (e.g., Agent software on a member machine) and a Route Director are both able to support a TCP connection, then it may instruct the member to initiate a TCP connection with the Route Director. TCP port **80** may be used as the destination port for all TCP encapsulated messages to the Route Director, and TCP port **20202** may be used as the source port for all TCP encapsulated messages from a private member to the Route Director.

As noted above, Network Route Directors (NRDs) **520** facilitate routing traffic into and out of private address domains without requiring reconfiguration of a firewall **517** protecting the domain **550**. As in UDP encapsulation, a special field in the system join packet (explained below) tells the Member Agent which TCP encapsulation port to use as the source port. The NRD will then re-encapsulate virtual-traffic in UDP-encapsulation before passing it on to other elements of the virtual network.

Note that more than one user can use the same device, with each such user having different virtual addresses in the same or different address realms. Additionally, regardless of the number of users, one device can be in multiple virtual address realms. In some embodiments, a user can have multiple identities, each in a different address realm.

FIG. **7** is a flow chart describing the overall process for communicating between members of a VCN. Any member of

14

a VCN can communicate with any other member of a VCN regardless of whether either of the members are behind a firewall, behind a NAT device, directly accessible via the public Internet, in a private network, etc. From the point of view of an application on a member device, all the other members appear to be on the same LAN. Thus all applications running on a member's device will think that all other members of the VCN are on the same LAN and in the same address realm (e.g. the virtual address realm of the VCN).

In step **650** of FIG. **7**, the Agent for the potential member joins the VCN and receives a virtual IP address. In order to establish or participate in communication within the VCN, a device must register with and join the VCN, thereby becoming a member of the VCN. The Agent will send a message to VCN Manager **510** and receive a virtual IP address back. The virtual IP address received is used to identify the member in the VCN. More details of step **650** as well as other portions of FIG. **7** will be discussed below. Note that there is a dotted line between step **650** and step **652**. This dotted line signifies that a lot of time can pass between step **650** and step **652**. Additionally, after step **650** is performed, it does not need to be repeated.

In step **652** of FIG. **7**, an application on the source machine (the member initiating communication) intends to send a message to an application on the destination machine (another member of the VCN). Examples of applications that can communicate on the VCN include instant messaging, email, FTP, browsers, data transfer programs, and other applications that can communicate. Consider an example when application on device $M_A$ intends to initiate communication with an application on device $M_B$. Thus, $M_A$ is the source device and $M_B$ is the destination device. In step **654**, the application on $M_A$ will initiate a DNS request using the domain name for $M_B$. This DNS request is sent to VCN Manager **510**. In step **656**, VCN Manager **510** returns the public address of the Route Director for the destination, the private address for the destination device and a virtual IP address for the destination device. In the example described above, step **656** includes returning the public IP address for private Route Director **530**, the private address for $M_B$ and a virtual IP address for $M_B$. If the destination machine has a public IP address (and, thus, does not use a routing director) then step **656** will only include returning the public IP address for the destination. If the destination machine is in a private network that uses a Network Route Director (e.g., NRD **520**), then step **656** will return the public IP address for the Network Route Director.

In step **658**, the Agent for the source device, which received the information in step **656**, will store that received information. This information can be stored in a table, or any other data structure. In step **660**, the Agent for the source device will return the virtual IP address of the destination device to the application on the source device. In step **662**, the application on the source device will initiate the sending of a message/data using the virtual IP address for the destination device. In step **664**, a virtual IP packet will be created. The source IP address for the virtual IP packet will be the virtual IP address for the source device. The destination IP address for the virtual packet will be the virtual IP address for the destination device. The virtual IP packet will be in the same format as a standard IP packet. In step **664**, the newly created virtual IP packet will be subjected to IPsec (or another security means). In some embodiments, IPsec is not used. In step **670**, the virtual IP packet is encapsulated. For example, in one embodiment, the virtual IP packet is encapsulated as described above with respect to FIGS. **6**A and **6**B. This encapsulation will include shim **630**. As described above, shim **630** will include the public IP addresses for the Route Directors

US 7,949,785 B2

15

for the source and destination, and the private IP addresses for the source and destination devices. If either the source or destination do not have a Route Director, the shim will not need to include that information. For example, when the source machine is $M_A$, there is no Route Director for the source. If the source machine was $M_C$, then the shim would include the public IP address for Network Route Director **520**. If the source is $M_B$, the shim would include the public IP address for Private Route Director **530**.

At this point, the path of the packet will depend on whether the destination is using a Private Route Director **530**, Network Route Director **520** or has a public IP address. If the destination has a public IP address, the process moves to step **678** where the encapsulated packet is forwarded to the destination agent.

If the destination is in a private network that has a PRD, then in step **672** the encapsulated packet is sent to the NAT device for the destination. For example, the encapsulated packet is sent from $M_A$ to NAT **515**. In step **674**, the encapsulated packet is sent from the NAT device for the LAN that includes the destination to the Route Director for the destination. For example, the encapsulated packet is sent from NAT **515** to private Route Director **530**. In step **676**, the Route Director which received the encapsulated packet will remove the virtual IP packet and the shim from the encapsulation. The Route Director will read the shim to learn the local IP address to send the packet to. The shim and virtual IP address will then be re-encapsulated into a new packet with the original virtual packet. The new outer packet includes a destination IP address equal to the private IP address of the destination device. The encapsulated packet received in step **674** will include a source IP address equal to the public IP address for $M_A$ (or the source's Route Director) and a destination IP address equal to the public IP address for the Route Director of the destination (e.g., PRD **530**). In step **678**, the new encapsulated packet will be sent from the Route Director to the Agent for the destination device.

If the destination agent is in a private network and is using a Network Route Director, then following encapsulation the encapsulated packet is sent to the Network Route Director for the destination agent in step **673**. At step **675**, the NRD will remove the virtual IP Packet and shim and re-encapsulate them in a UDP packet for transmission through a NAT device to the destination via a persistent UDP connection between the NRD and the destination. At step **677**, the encapsulated packet is forwarded to the NAT device (via the persistent UDP connection) behind which the destination Agent resides, which will perform its own routing of the encapsulated packet to the destination Agent in step **678**.

In step **680**, the Agent will remove the shim and the virtual IP packet from the encapsulation. The virtual IP packet will be removed from IPsec (e.g. decrypted). In step **682**, the information from the shim will be stored by the Agent. In step **684**, the contents of the virtual packet will be presented to the application on the destination device. That is, the application on the destination device will receive the contents of the data payload, or at least a portion of the data payload

When the destination wishes to respond to the source or the source wishes to send additional information, the process of FIG. **7** can be repeated. However, when repeating the process of FIG. **7** between two machines where communication is already established, the steps of performing the DNS request do not need to be performed again. That is, when the destination wishes to respond, the destination will perform the steps in FIG. **7** starting at step **662**. The Agent for the destination device will already know all the information to put in the shim. Additionally, when the source device wishes to send

16

additional information to the destination device, the source device can start FIG. **7** at step **662**. In some embodiments, however, the steps of performing the DNS request will be performed again.

Member Agent

As noted above, devices in the VCN utilize a member agent installed on the device to communicate. One unique aspect of the system of the present invention is the integration of the agent software in a typical device.

FIG. **8** illustrates the functional flow diagram of an installed agent on a device such as a computer, server or other device. Region **810** illustrates the "user space," and region **820** represents the kernel area of the components interacting with the host device.

Applications **830** interact directly with an IP stack **835** which is built on a deterministic network extender or DNE **850**. The deterministic network extender is provided by Deterministic Networks, Inc. The network extender allows one to implement any driver level functions such as IPsec, browsers, traffic redirectors, and the like, through a series of plug-ins. As shown in FIG. **8**, a number of plug-ins, including a DNS plug-in **852**, an IPsec plug-in **854**, a virtual adapter manager **856** and a domain name router **858** (see U.S. Pat. No. 6,119,171, incorporated herein by reference) interact with the deterministic network extender **850**. The DNS plug-in processes DNS queries by applications via the stack. The virtual adapter manager allows for additional adapters to co-exist in the same device.

The DNE is an NDIS compliant module (in Windows environments) which appears as a network device spire to the protocol stack **835**. The DNE supports the TCP/IP and UDP protocols and various adaptor types. In essence, this forms a virtual network adaptor in device installations. This means that various configurations for each virtual community can be provided for each DNE. This provides the advantage that a number of members or users can utilize the same device, with the device installing a different virtual adaptor using plug-ins for the deterministic network enhancer and each user does not need to reconfigure the network settings of the machine to join each community. Each plug-in is constructed in accordance with standards promulgated by the DNE provider.

As shown in FIG. **8**, user applications interact directly with the IP stack of the virtual adapter. Each adapter provides its own stack to the device's applications. To the applications, each stack appears separate, and no separate routing of the application is required. For example, the IKE user application **825** can interact with the domain name plug-in, the IPsec plug-in, the virtual area management communicator **856**, and the security policy manager **860**. The Adapter Manager **856** allows parallel stacks for each VCN to be implemented and used on each machine. This means a user and device can belong to several VCNs without needing to re-configure IP settings to access each VCN.

VCN Definition

FIG. **9** shows the steps which occur at the VCN Manager to define and establish a virtual community. At step **902**, an administrator sets up a virtual community by providing information to the VCN Manager via a user interface (not shown). It will be understood that the user interface and the method of providing information to the VCN Manager is not critical to the system of the present invention. One particularly advantageous interface is implemented in a World Wide Web browser. The interface may be implemented using HTML, XML, Java Applets, Java Server, Active Server Pager or any of a number of well-known Web technologies. The particular information required to set up the community network is illustrated in FIG. **10**. Next, at step **904**, users who are desig-

nated by the administrator as being allowed access to the virtual community defined in step **902** are notified by any number of appropriate means. In one implementation, the users are notified by e-mail, although other forms of notification, such as verbal or personal notification, may be used. The e-mail may contain an invitation to join the community, community authentication information, a link to a location to download the Member Agent, and/or a link to the Group Agent. Next, at step **906**, using information contained in the e-mail, users register with the VCN Manager. Registration in this context means registering a machine using a Member Agent or a Group Agent with the VCN Manager. Users may be required to install the Member Agent software. The link in the notification e-mail may provide the user with a location for downloading the Member Agent software as well as instructions for installing the software. Other information, such as system password information, is provided in the e-mail. Finally, at step **908**, management of the community is handled by the VCN Manager. This includes monitoring which registered users have joined and left the system, answering DNS requests, and applying security policies, as described herein. This may include notifying new users and registering those users as the definition of the VCN changes.

FIG. **10** is a flowchart illustrating the process of setting up a virtual community which is performed by an Administrator. Initially, the Administrator sets up a virtual domain name and address domain at step **1002**. This information is used by the VCN Manager and Route Directors to allow members to communicate. Next, users are defined at step **1004**. In one embodiment, the users are defined by providing the domain names of each of the users who will be invited to participate in the VCN. At step **1006**, default passwords are set. This is the password a user first uses to access the system. The user may be forced to change the password for security reasons at a later date. Finally, at step **1008**, polices may be defined at the domain level, the user level, or for individual machines in the domain. Policies are used to allow or deny access to individual machines, services, or other users.

Member Registration

The registration process is the first step that a user and machine go through with the VCN Manager before becoming a member of a virtual community. There are two phases to member registration: a registration request and a registration file request. Registration happens outside of the IPsec tunnels because at registration time no IPsec tunnel exists for the user registering.

In one implementation, all traffic between Member Agents and the VCN Manager (with the exception of Registration and Join function traffic is encapsulated using UDP encapsulation, represented by lines **511***a*, **513***a*, **523***a*, **519**, **521**, **527***a*, **527***c*, **537**, **523***c*, **527***e*, **541**, **543***a*, **533***a* of FIG. **5**B). This encapsulated traffic will carry management traffic between the members and the VCN Manager. A service port is reserved at the VCN Manager in the virtual network for the establishment of a TCP connection between a member and the VCN Manager. A member that joins a VCN is informed of the service port as part of the join protocol. A DNS port is also open on the virtual side of the VCN Manager. In one embodiment, the VCN Manager virtual ports are TCP Port **9001** and DNS UDP Port **53**. The packets used for the initial Registration and the subsequent Join operations use TCP port **80** outside the virtual network. This is represented in FIG. **5** by the solid lines **513***b*, **511***b*, **523***b* and **543***b*.

VCN system protocol packets that are sent outside the system tunneling are HTTP wrapped and sent to the VCN Manager on TCP port **80** to facilitate NAT traversal. More information about NAT traversal will be provided below.

Each packet includes a header and payload. For compatibility with firewalls, the HTTP wrapper makes the packet a SOAP-compatible XML document. Including a binary data portion after XML is consistent with Direct Internet Message Encapsulation (DIME), a proposed lightweight, binary message format that can be used to encapsulate one or more application-defined payloads of arbitrary type and size into a single message construct.

The format of the HTTP wrapper from the Member Agent to the VCN Manager is shown in FIG. **11**. The wrapper includes an HTTP HEADER, XML HEADER and P-LENGTH fields. The HTTP header includes a POST HTTP field, an Identity field, a Content Type field, and a Content Length field. The XML header includes version information and packet type information. The Header includes error codes and explanations, as well as the content type and length.

The Registration exchange between the member agent and the VCN Manager is shown in FIG. **12**A. When a Member Agent **565** attempts to register at step **1200**, Member Agent **565** will send a registration request packet **1202** to the VCN Manager **510** to start registration. The packet is included in an HTTP wrapper as illustrated at **1204**. The registration packet will carry the client Fully Qualified Domain Name (FQDN) and a Diffe-Hellman Key Exchange request to the VCN Manager. The packet further includes packet version information, type and length information, a user authenticator, the length of FQDN in octets, a VCN name offset, the member's FQDN in DNS format, the length of Diffe-Hellman value in octets, and the member's initial Diffe-Hellman value.

An Initial Password is passed to the user through an outside channel, such as e-mail (or other channel). In a setting where security is a concern, an alternative method such as personal communication or encrypted e-mail may be used.

The registration authenticator is computed using the first sixteen bytes of the HMAC-SHA-1 applied to the packet data with the password hash as the key. (Normally, the HMAC-SHA-1 algorithm generates a 20-byte result; in one embodiment of the system only the first (leftmost) 16 octets are used in the MAC.) The formulas are as follows:

$$HMAC\text{-}Key\text{-}Field = SHA\text{-}1(Initial\ Password)$$

$$Authenticator = HMAC\text{-}SHA\text{-}1_{16}(HMAC\text{-}Key\text{-}Field, Data)$$

The VCN Manager will respond in one of three ways **1206**, **1208**, **1212**, to the registration packet **1202**. VCN Manager **510** will acknowledge (ACK) the packet at step **1212** with the Registration Acknowledge (ACK) packet **1214** if the member belongs to a community but its status is "not registered." The VCN Manager also sends a phase-2 confirmation code to the member's e-mail address and changes the member status to "registering." The packet will transfer a "Time To Live" value to the member which is a timeout period in seconds for hearing back from the member with the confirmation code. Phase two of registration must be completed in this time period.

If the packet is abnormal (in size, FQDN length, bad type, etc.), the authenticator check fails, the member does not exist in the database, or the VCN server is not running, the VCN Manager drops the packet in step **1206**. The packet will be not-acknowledged (NACK) **1210** if the member is already in the "registered" state, the send e-mail operation fails, the process of updating the member to the "registering" state fails, or the random generator fails in attempting to generate a confirmation code in step **208**.

Upon receiving the Registration ACK **1214**, the user will send Registration File Request Packet **1220** to the VCN Man-

US 7,949,785 B2

**19**

ager **510** to start registration. This packet will transfer the following information to the VCN Manager: a registration file User Authenticator, the length of FQDN in octets, a VCN name Offset, and the member's FQDN in DNS format.

The registration file user Authenticator contained in the File Request packet **1220** is slightly different from the Registration Request Authenticator in packet **1202**, in that the Initial Password, passed to the user through an outside channel (e-mail for example), and the Confirmation Code, a temporary code sent in the second e-mail with a timeout to the user, are used:

HMAC-Key-Field=SHA-1(Initial Password)

User Authenticator=HMAC-SHA-116(HMAC-Key-
Field,SHA-1(Confirmation Code)+Data)

The VCN Manager will send a Registration File acknowledge Packet **1230** to the member **565** in response to the Registration File Request packet **1220** in step **1228** if it is determined that the member belongs to a community. The Acknowledge Packet **1230** will transfer the following information to the member:

   Crypto Type—a code indicating how the rest of the packet is encrypted. This is provided in a crypto type field preceding the registration file.

   Registration File—a structure with a number of fields containing the information required by the member to successfully perform a join. It is sent encrypted using the key generated via the Diffie-Hellman key exchange.

A table representing the Registration File structure is shown in FIG. **12**B. As shown therein, the Registration File contains an Authentication Type, a File Type, a File Length definition, a Token Key, a Key Timestamp, a Key Type, a Key Length, a High Availability (HA) Version, a HA Number, Server Information and Padding. The Token key is the shared secret with the server. The Token Key is identified by the Key Type, which is normally a Diffie-Hellman type in one embodiment. The VCN Manager also changes the member status to "registered."

If at step **1224**, the member agent status is not set at "registering," or the timeout for phase 2 has expired, a NACK packet **1226** is sent. If the packet is abnormal (in size, FQDN length, bad type, etc.), the authenticator check fails, or the user does not exist in the database, or the VCN server is not running, the packet is dropped in step **1222**. While current encrypting method for the file is to generate a key/IV pair from the combined Diffie-Hellman value using a Key Derivation Function, any number of suitable substitutes may be used.

In addition to the registration authentication described above, the system uses a packet authenticator to verify communications between the VCN Manager and Agents. The Authenticator is a cryptographically strong hash of the packet keyed by a shared secret between the source and destination. The authenticator is calculated over the entire packet using the HMAC-SHA-1 algorithm. The inputs to this Authenticator are not available until after Registration. As illustrated above, during registration an Authenticator based on the user password is used. The fields used in the calculation are a Diffie-Hellman Key comprising a multi-octet random string that is the result of the Diffie-Hellman key exchange protocol, and the entire packet data, with the Authentication field zeroed out.

The Authorization Key, AuthKey, described above, is derived from Diffie-Hellman using the KDF2 function, and is used for general packet Authentication. AuthKey=KDF2 (Diffie-Hellman     Key)MAC=HMAC-SHA-116(AuthKey,

**20**

Data). The AuthKey need be calculated only once per registration from the KDF2 of the DH key and then stored for later use. It is known as the Authentication key and is 20 octets long.

Member Join/Leave

Once a user is registered, the user can join the VCN. Once joined, the user is a member of the VCN. Joining allows the user to let the VCN Manager and other members know that the user/member is on-line and available to communicate. The Join protocol runs between a Member Agent and the VCN Manager to establish a session key with the Manager, authenticate to the Manager, and make use of connections via the Route Directors in the community.

The Member Join process is illustrated in FIG. **13**. There are two phases to the Join operation: phase one is an Initialize Request and phase two is the actual Join. At join time, the IPSec tunnel for secure communication is not established, so the first few join packets are sent outside the IPSec tunnel.

Initially, at **1302**, the Member Agent **565** will send an Init Request Packet **1304** to the VCN Manager **510** to start authentication. The packet will carry the following information to the VCN Manager:

   Version Variant Mask—used to indicate optional variations of the protocol from the member to the VCN;

   Token Timestamp—identifying when a Token Key was created (in seconds);

   Member seed—a random number to thwart so called "man-in-the-middle" attacks;

   Member Local IP—the member's Local LAN IP address; and

   Client FQDN—the client's fully qualified domain name.

Again, three responses **1306**, **1308**, **1312** are possible. At step **1306**, if the packet is abnormal, it will be dropped. Similarly, if the member fails authentication, at step **1308** a NACK packet **1310** will be sent.

If the member passes authentication at **1312**, the Manager will send an acknowledgement packet **1314** to Member **565**. An AuthKey is also transmitted as part of the INIT Request Packet, and the Manager authenticates the packet by checking this against a secure key digest. The acknowledgement packet **1314** packet will transfer the following information to the member:

   Version Variant Mask—version information;

   Member Seed—from the Init Request to protect against playback attacks;

   Manager Seed—a unique seed used to thwart man in the middle attacks;

   Session AH Key—used in IPsec;

   Session ESP Key—used in IPsec;

   Ink ACK Time—a time stamp used to tie this packet to the following Join Request. There is a timeout if the Join is delayed too long;

   Authentication Method—the method used for authentication;

   Route Director Private IP—if member is in a private network, this is the private IP address of the Private Route Director. The value is zero if no Route Director is used;

   Route Public Public IP—if member is in a private network, this is the public IP address of the Private Route Director. The value is zero if no Route Director is used;

   Tunneling Port—used for UDP encapsulation Route Director Flags. Only Bits **0** and **1** currently used to direct the agent to a Private Route Director, Network Route Director with UDP, or a Network Route Director with TCP.

At step **1312** of the join process, the VCN Manager will also determine whether the Member Agent attempting to join

**21**

is behind a NAT device. The method by which this occurs is discussed below with respect to FIG. **21** and the results of this determination may force the Agent to negotiate a session with a Network Route Director which will provide a pseudo address value used as the Agent's local IP value in the Join request, discussed below. This process is discussed in depth with respect to FIG. **21**.

Following receipt of the acknowledgement packet, at step **1316**, the member will send Join Request Packet **1318**. The packet's payload includes a manager seed, the initial ACK time, join flags, the member machine's local IP address (or pseudo address), the Route Director's private IP address, the Route Director's public IP, the member AH SPI and ESP SPI, the member listen port, a token timestamp, a GUID identifying the current client run, NetBIOS name support, a password hash, version information for high availability and security policy information.

In step **1320**, the VCN Manager will drop this packet if it is abnormal. In step **1322**, the VCN Manager will send a NACK packet **1324** if the member is not in the registered state, the timeout for Join from INIT ACK has expired, or updating the member to the Joined state fails.

If the join action succeeds, then in step **1326** the VCN Manager will send an acknowledge packet **1328**. The acknowledge packet payload includes the RMI Port at the VCN Manager, the Tunneling Port, VCN Manager Authentication Header (AH), Security Parameters Index (SPI) for IPsec, VCN Manager Encapsulating Security Payload (ESP) SPI for IPsec, the UTC Time (in seconds) when the member joined, VCN Manager Heartbeat interval (in seconds), the Member Heartbeat interval (in seconds), the VCN Manager's Virtual IP address, the Manager Subnet Prefix Length, the VCN Member Subnet Prefix Length, the Route Director's private IP address, the Route Director's public IP address, an indication of the updates that follow, an update of the Token Key, an update of the Security Policies, an update of High Availability indication, and padding. The member has now joined the community at **1330**. Once the member has joined, all communications can be encrypted using IPsec.

The system of the present invention also includes RADIUS authentication support. Generally, if a member attempts to authenticate using a RADIUS server, the VCN Manager will perform the same steps as when it receives the Join Request packet except for having a RADIUS server authenticate the member. The payload for this packet is similar to the Join Request packet except that it has an additional field for RADIUS password that is used by the RADIUS server to authenticate the member.

FIG. **14** shows the sequence for leaving a VCN. Initially, at step **1410** when a Member Agent is prepared to leave the community, a Leave Request Packet **1412** will be sent to the VCN Manager **510** to start the leave process. The Leave Request Packet will carry a Leave Flag, the FQDN Length, FQDN VCN Offset and Member FQDN. Unless dropped at step **1414** or a problem exists at **1416** which would generate a NACK packet **1418**, the VCN Manager will send the Leave ACK Packet **1430** to the member in step **1420**. This packet has no payload. At step **1440**, the member has successfully left the community.

DNS/Lookups

For one member to communicate with another member, the initiating member's agent will perform a query or DNS lookup (step **654** in FIG. **7**) to determine the address of the other member, and then establish a secure communication channel between them.

The Member Agent utilizes the VCN Manager to perform lookups of other virtual members in the virtual community

**22**

using DNS. The DNS operation is conducted using the DNS protocol with the VCN Manager. The member software sends a DNS query to the VCN Manager, and the manager returns information about the target member. Besides the target member's virtual IP address, the DNS response also contains additional information about the target member. While the VCN Manager accepts all DNS requests, it will only acknowledge the DNS requests of type A, which are targeted to virtual domain names in the secure virtual communities of the VCN Manager. The VCN Manager is the authoritative name server for those virtual domain names; other requests will simply be responded to with a "Server Failure."

The DNS query and response sequence is illustrated in FIG. **15**. At step **1510**, a member will request a DNS lookup by sending a DNS request **1520** to port **53** of the VCN Manager. The DNS request **1520** will result in a normal DNS response **1575** unless any of a number of failure conditions are met, shown at steps **1522**, **1540**, **1550**, and **1560**.

If the Manager receives a query on port **53** that is not a DNS query, then at step **1522**, it is dropped. If, at step **1524**, the query is not a standard query, such as a DNS STATUS (a status lookup) or IQUERY (inverse DNS), or the class of the DNS query indicates an Internet (IN) query, or if the TYPE value of the request is a pointer (PTR) or host address (A), then, a "Not implemented" DNS response **1530** is sent over the virtual link to the Member Agent **565**.

At step **1540**, the VCN checks to see if the source IP address is for a member of the VCN. If the source IP address is not for a member of the VCN, the virtual IP look up fails or the type PTR query does not match, a "server failed" response **1545** is returned. At step **1550**, if there is no DNS Question section or there is another type of format error with the packet, a "format error" response **1555** is sent. The VCN determines whether the member has joined the VCN, at step **1560**. If not, a name error response is sent at **1565**.

If the name is a successful lookup (step **1570**), then the VCN Manager will send a DNS Response Packet **1575** to the member **565**. The response includes the following information: the target member FQDN; the target member virtual IP address; a source Route Director flag, the source member virtual IP address; the target member join time; the target member agent version; the target member private IP address; the target Route Director public IP address; the target member NetBIOS name; the shared key, shared by the two members; a target Ticket length; a target member Ticket encrypted for target member only and containing a Ticket issue time, Ticket expiration time, and shared key; the target member virtual IP address, the source member virtual IP address, the source member private IP address; the source Route Director public IP address, the source member FQDN; and padding (to obtain a multiple of 16 octets). The Ticket provided by the DNS request is detailed further in the description of FIG. **16**B.

The target member's virtual IP address will be presented using an A-type resource record in the answer section of the normal DNS response packet. All the remaining information will be transferred using a TXT-type resource record in an additional section of the DNS Response.

Encapsulation

Traffic between Member Agents in the VCN is encapsulated using UDP encapsulation. Encapsulated traffic between members can carry any IP traffic from any standard IPv4 compliant application. However, one port is set aside in the virtual network at the application layer to establish a connection between two members in the community. In one embodiment, this is UDP port **500**, which is set aside for Internet Key Exchange (IKE), allowing negotiation of an IPsec tunnel between the two members.

US 7,949,785 B2

**23**

When an application on a member device wishes to open a connection to a peer on a target member device, a protocol is followed for the establishment of the IPsec session between the two. Member Agents are configured to listen on the UDP tunneling port (which defaults to port **20202**) for virtual traffic. As an accepted procedure non-IPsec traffic on the virtual IKE port **500** is accepted and passed to an IKE and Security Policy Module to allow for the possibility of initiating, an IKE exchange and the establishment of an IPsec session between the two members.

IKE is fully described in RFC-2409. IKE provides a key exchange with a peer and creates a security association (SA) for the IPsec module. IKE access between peers occurs in two phases: phase 1 establishes a secure, authenticated, channel with which to communicate, and phase 2, which negotiates a Security Association on behalf of IPsec. Phase 1 is generally referred to as the ISAKMP Security Association (SA) and includes a "Main Mode" and "Aggressive Mode." In one implementation, Aggressive Mode is used for phase 1. One of the allowed phase 2 exchanges is "Quick Mode" and in one implementation, Quick Mode is used in the system for phase 2.

FIG. **16**B shows the aggressive mode IKE phase one exchange utilized in the present invention. FIG. **16**A shows the standard aggressive mode IKE phase one exchange for comparison. In these figures, in accordance with standard IKE parlance, one device is considered an exchange "initiator" and the other a "responder".

In general, in phase one of the IKE exchange, peers are authenticated, an IKE Security Association (SA) policy between peers is established, a Diffie-Hellman exchange is performed to produce matching shared secret keys and a secure tunnel to negotiate IKE phase two parameters is established.

In FIG. **16**A, an initiator exchanges a header (HDR), SA negotiation payload, Key Exchange (KE), nonce payload (Ni, where "i" indicates an "initiator" payload) and identity of the party (IDii). The key exchange payload contains the public information exchanged in a Diffie-Hellman exchange. The responder returns the HDR, SA, KE, a responder nonce payload (Nr), its identity (IDir) and the HASH responder (HASH_R) payload, which is generally a hash of the ID payload and is used to authenticate the exchange. The initiator returns the HDR and HASH initiator (HASH_I) payload, and the initial secure tunnel is established.

In accordance with the present invention, FIG. **16**B illustrates the use of an extension to aggressive mode exchange. This is performed by adding a ticket payload (TKT*) to distribute a shared-key to remote peers.

The Ticket is the means by which one Agent can identify whether another Agent is a trusted member of the virtual community. Essentially, the Ticket includes information identifying the initiating member to the receiving member.

The ticket is issued by the VCN Manager and encrypted for the receiving member with a member-server shared secret; only the receiving member can open it. The ticket contains a time-stamp, a sequence number and a shared-secret used for IPSEC between the two members. To communicate with the receiving member, the initiating member obtains the ticket from the VCN Manager (through, for example, the DNS sequence, described above) and passes it to the receiving member in a payload that can ride on an IKE packet. The receiving member receives the Ticket, decrypts the Ticket using the member-server shared secret, and uses the information in the Ticket to establish secure communication with the initiating member.

**24**

This payload, TKT, is formatted as shown in FIG. **17**. The packet **1700** contains an IP header **1710**, UDP header **1720**, System shim **1730**, and Virtual IKE Phase 1 UDP/IP packet **1740**. FIG. **18** illustrates the structure and data of an exemplary first packet **1740**. The IKE Ticket Payload in the first IKE packet contains information on the payload and the payload data, including the type of payload following next and the ticket payload data **1756**. The payload data **1750** includes the size, number and item list **1766**. The item list **1760** includes type, size and item information. The IKE ticket payload data **1740** contains the item types

The item types **1770** are shown in the last table of FIG. **18**: "My FQDN"—a null terminated FQDN in label dot format. (For example, a human readable FQDN "bob.system.com" is encoded as "bob.system.com\0x00.") My Ticket data which includes a Manager Current Time (UTC of Manager as known by initiator); and an Initiator Virtual IP (Obtained at Join time) Target Virtual IP (Obtained from Manager) and Padding. The Peer FQDN Format is a null terminated FQDN in label dot format. For example, a human readable FQDN "bob.system.com" is encoded as "bob.system.com\0x00". Finally, the Peer Ticket data includes: a Ticket Issue Time (UTC (seconds) on VCN Manager); a Ticket Expiration (UTC (seconds) for ticket expiration); a Shared Key used by the two Members for IKE; a Target Virtual IP Address; the Initiator NAT Port; the Initiator Subnet; the Initiator Virtual IP Address; Initiator Private IP Address, the Initiator Public IP Address, the Initiator FQDN and padding.

The Diffie-Hellman key exchange protocol is utilized in the Internet Key Exchange (IKE) protocol that precedes IPsec. The prime and generator value are taken from a well-known Internet Draft entitled, "More Diffie-Hellman groups for IKE," Kivinen et al., IP Security Protocol Working Group (IPSE) Internal Draft, Dec. 13, 2001, for proposed use within the Internet Key Exchange (IKE) protocol.

Administrative Functions

The system can simulate pings to any of the Route Directors (NRD or PRD). This ping is sent inside a packet generated from an application used to trouble-shoot the virtual network by touching the Route Directors and insuring that they are alive.

An exemplary ping process is illustrated in FIG. **19**. As shown therein a pinging application **1902** at step **1904** sends a ping request packet **1906** to the Route Director **560**. The Route Director receives the ping at **1910** and generates a response at step **1912**. The ping response packet **1914** is returned to the application **902** at step **1916**.

The ping request packet is sent and returned on the default tunneling UDP port (which in FIG. **5**B is UDP Port **20202**). The Ping Request **1906** packet is formatted as shown in FIG. **19**, with the content of the shim and the ping packets exploded in further detail. In the shim **1930**, the source and destination Route Director public IP addresses (gIP) and private IP addresses (pIP) are all set to 0. In the system ping field **1960**, the ping type field may be a ping request or a ping response. The Sequence field in the response is set to the same value as the Sequence field in the request packet.

Another function which may be performed is an Agent Query. FIG. **20** illustrates a query request from a Member Agent requiring system/status information of another member. The first Member Agent **565** at step **1802** will send a Query Request Packet **1810** to the VCN Manager **510**. The Packet contains definitions for the Maximum Number of Records to return, a status Mask indicating whether the members are registered and/or joined, a platform Mask, indicating the platform (desktop, server, laptop, mail server, etc) of the member, the FQDN Length, FQDN VCN Offset, Search

US 7,949,785 B2

25

String Length, Member FQDN and a Search String for pattern matching. This packet is sent over the IPsec tunnel between the VCN Manager and the Member Agent.

If the packet is abnormal it is dropped at step **2012** if there is an error in the query authentication file or the member is not joined, NACK **2016** is sent in step **2014**. If the packet is not abnormal, no error is present, the member passes authentication and was joined, then the VCN Manager sends a query acknowledgement Packet **2030** to the member. The packet payload includes a number of records with the following fields: the status of the member, the platform type of the member, and the member's FQDN String. Note that the FQDN is null-terminated and consistent with the FQDN in DNS format definitions. Here, a human readable FQDN "www.abcdefg.com" is encoded as "www.abcdefg.com\0x00".

Each joined member will periodically send a heartbeat packet to the VCN Manager so that the VCN Manager can determine if the member is alive. In addition, the member's heartbeat packet is used to determine how long the member is actually joined. This information can be used to allow a provider of the infrastructure for the system to generate revenue from users on a per-use time basis. Conversely, the VCN Manager periodically sends its heartbeat packet to joined members so that the joined members can know if the Manager is alive. This can be used by the member to determine if it should switch to a backup VCN Manager. Heartbeat packets are sent inside the system tunnel on the default tunneling port (UDP port **20202**) and are IPsec protected.

Route Directors

Route directors allow communication to a member that is in a private network. The PRD resides within a private network, behind the NAT device. The NRD resides on the public side of the NAT device. The NAT device can be a Network Address Port Translation (NAPT) NAT device or a basic NAT where only addresses are translated.

Note that devices with public addresses do not require Route Directors (RDs). In the context of FIG. **5**B, devices $M_A$ and $M_E$ do not require either a PRD or NRD, since they reside in the public address space. Likewise, $M_X$ does not require the PRD for its domain **540**, since it has a public address (or is statically mapped to a public address at the NAT device **515**).

The NRD implements a NAT traversal architecture that allows System packets to enter and exit a private network. The NRD maintains persistent connections/sessions with members that are behind NAT devices. Member Agents initiate a TCP or UDP persistent connection/session with the NRD and use keep-alive messages to ensure that the NAT device does not drop the member's connection/session. The use of TCP or UDP is based on a bit set by the VCN Manager in the INIT ACK packet of the Join Protocol. Communication to a member uses NRD tunnels between the NRD and the Member Agent through the persistent connection/session. More information about a suitable NAT traversal architecture is found in U.S. Pat. No. 7,139,828 and U.S. patent application Ser. No. 10/233,288, "Communicating With An Entity Inside a Private Network Using an Existing Connection to Initiate Communication," both of which are incorporated herein by reference.

When a member behind NAT attempts to join a virtual network by contacting the VCN Manager as discussed above, the VCN Manager will detect the presence of the NAT device, direct the member to a specific NRD and indicate the use of TCP or UDP. The presence of the NAT device must be detected during the initialize Init message portion of the join sequence so the VCN Manager can inform the member that it needs to setup a session with the assigned NRD prior to the Join message sequence.

26

In one embodiment, the NRD uses a pseudo address. The pseudo address is different than the virtual address and is used solely for NRD routing. The pseudo address assigned by the NRD will allow the NRD to map a packet to the member's post-NAT IP address and UDP port.

The process for establishing a session with a NRD and obtaining an address therefrom is shown in FIG. **21**. Initially (as described in FIG. **13**), a member behind a firewall will send an init request **1304** to VCN Manager **510**. In addition to the functions performed with respect to step **1306**, **1308**, and **1311** (of FIG. **13**), the VCN Manager will detect that the member is behind a NAT device and whether it is served by a PRD in step **2120**.

The detection of a NAT device is accomplished using a field with the member's local IP address in the Init packet sent to the VCN Manager. The VCN Manager detects the fact that Agent **565** is behind a NAT device by comparing the member's private IP address in the INIT message payload with the source address in the TCP/IP headers. If the addresses differ, then a NAT device is present. At step **2120**, the VCN Manager must next check if the member's NAT device is associated with a known PRD (Premises Route Director). If no PRD is found, then the VCN Manager will check if the member can use a known NRD. If an NRD is found then the INIT ACK **1314'** will indicate that the member must establish a session with the NRD prior to joining the VCN. If the NRD can support TCP tunneling, the INIT ACK will also indicate to the member to start a TCP connection rather than a UDP connection. If neither a PRD nor an NRD is found for the private member, an Init NACK will be returned. The VCN Manager will find an available NRD and send an INIT ACK **1314'** with the NRD info data contained therein. The contents of an INIT ACK packet **1314** are discussed above with respect to FIG. **13**.

At step **2132**, the member will seek to establish a session with the NRD and will send address request **2130** to the NRD. The member sends the Address Request Packet **2130** to the NRD. The packet includes an IP Header, UDP Header or TCP header, and Shim. In this case, the shim includes the NRD's public address. At step **2135**, the NRD assigns the member a pseudo address. This is used as the member's private address in the Shim when external members send packets to the NRD for forwarding to the private member. The NRD will store the association of the pseudo address with the Member's NAT device public address and port number. When other members of the VCN perform a DNS request on the member behind the NRD, as part of the DNS response, they will receive the public address of the NRD and they will receive the pseudo address as the private address for the member behind the NRD. When sending a communication to the member behind the NRD, the outer packet will be addressed to the public address of the NRD. The NRD will access the shim to identify the pseudo address. The NRD uses the pseudo address as a handle to the persistent connection/session when sending packets through a NAT to the member. Once identifying the appropriate persistent connection/session, the shim and virtual packet are encapsulated and sent to the destination, via the NAT device, using the identified persistent connection/session. When the NAT device receives the message, it will do the address and port translation, and forward the message to the member agent's real local address and port on the private network.

In one aspect, the pseudo address comprises portions of the public IP address space in IP version 4 that had been reserved for special purposes. This ensures that no machine within a private realm will have the same pseudo IP address as the private address of a machine in any separate and distinct

27

private realm. In order to prevent this from happening, the system of the present invention uses addresses that are otherwise not used or reserved. Examples include the 0.0.0.0, the 10.0.0.0, 14.0.0.0, 127.0.0.0, 169.2454.0.0, 172.16.0.0 and the like.

The NRD provides the pseudo address to the Agent **565** in a NAT Traversal Address Response Packet **2140**. The packet includes a shim having an indicator that the response is a pseudo address response, as well as the source Route Director public IP address and Destination Route Director public IP address, (which is equal to the NRD address), the Source member private IP address (0) and the Destination member private IP address, which is the Virtual IP. Hence all communications for the Member Agent will be routed to the NRD **520**. After acquiring the pseudo address from the NRD, the member designates that pseudo address to the VCN Manager as its local address in Join packet **1318**.

Note that there is an extra packet exchange **2145**, **2150** when establishing a TCP connection that is not required when establishing a UDP connection with the NRD. This packet is the NRD Init Request Packet **2145**. The previous TCP session for the Address Request and Address Response must be closed and a new TCP session opened which will remain open for the duration of the tunnel session. The member sends the Init Request message as the first message in this TCP session. This message only has a TCP header and System Shim preamble, and has no data following the Shim.

After receiving the pseudo address, the join process completes with the join request packet **1318**, and join ack packets **1328**. After the join processing is complete, TCP/UDP encapsulated traffic flows between the member and the NRD through the NAT. The member is now ready to establish connections with other members.

When outbound System traffic from a member behind a NAT device to the NRD is not frequent enough to keep the NAT device's mappings active, the member may to send keep alive messages to the NRD's TCP port **80** or UDP encapsulation port to ensure that the NAT device does not drop the TCP/UDP encapsulation session. The member sends this message to the NRD to ensure that the NAT device does not drop the TCP/UDP port mapping. The keep-alive messages do not need to be sent when other messages were sent out during the keep-alive interval.

The member sends this NAT Traversal Leave Packet message to the NRD to release the session and pseudo address when the member is leaving the VCN. The NAT traversal switch will verify that the receive-from socket address this message came from matches the lookup table entry before deleting the member's address.

Group Agent

For some devices, member client software cannot be installed on the device or it is not desirable to install member client software on the device. For example, a printer or other networked devices may not be able to load software. For various reasons, some entities may not desire to add network software onto their machines. Additionally, some devices may use operating systems that do not support running the member agent software. For those devices that cannot or choose not to use member agent software, a Group Agent can be used. The Group Agent acts as a proxy for one or more members of a VCN without requiring installation of member agent software on the client devices. Thus, a device can become a member of a VCN without changing any of the software on the device by using the Group Agent.

FIG. **22** is a block diagram depicting various components of the present invention utilizing a Group Agent. Note that some of the members of a VCN can use a Group Agent while

28

other members do not use a Group Agent. FIG. **22** shows ten devices $M_1$-$M_{10}$. Devices $M_1$, $M_2$, $M_3$, $M_4$ and $M_{10}$ are devices that are participating in the VCN without using member agent software. Rather, they will use a Group Agent. Devices $M_5$, $M_6$, $M_7$, $M_8$ and $M_9$ are devices which include member agent software and, therefore, do not need to use a Group Agent. FIG. **22** shows some of the many varieties of permutations of using Group Agents, Network Route Directors and Private Route Directors. Other permutations can also be used with the present invention. Also note that FIG. **22** is more of a structural view of additional components of the present invention, as compared to FIG. **5**B which is more of a symbolic/logical view.

FIG. **22** includes a first private network which connects to the Internet (or other network) via NAT device **2202**. In addition to NAT **2202**, the private network includes device $M_1$, device $M_2$ and Group Agent **2204**. In one embodiment, the Group Agent runs on the same machine as a Private Route Director. Devices $M_1$ and $M_2$ do not include agent software. Rather, they participate in the VCN using Group Agent **2204**.

A second private network allows devices to communicate to the Internet (or other network) via NAT device **2210**. That private network also includes Group Agent **2212**, device $M_3$ and device $M_4$. Note that Group Agent **2212** does not include a Private Route Director. Thus, for devices $M_3$ and $M_4$ to be reached by other members of the VCN, communication is performed via Network Route Director **520**. In one embodiment, each of the private networks are different physical address realms. That is each uses a different set of private IP addresses. The present invention will also work if the private networks have overlapping addresses. That is, one or more private IP addresses are used by more than one private network involved in a VCN.

A third private network, which includes devices $M_5$ and $M_6$, provides for communication on the Internet via NAT device **2220**. A fourth private network, which includes devices $M_7$ and $M_8$, allows its components to communicate on the Internet (or other network) via NAT device **2230**. This fourth private network includes Private Route Director **2232**. Because devices $M_7$ and $M_8$ include member agent software, there is no need for a Group Agent on this network. Device $M_9$ has a public IP address and includes member agent software; therefore, it communicates and participates in the VCN as described above. Device $M_{10}$ has a public IP address; however, device $M_{10}$ does not include member agent software. For device $M_{10}$ to participate in the VCN, it must make use of Group Agent **2234**, which has a public IP address.

In one embodiment, a Group Agent includes software running on a computing device, including (but not limited to) a server, router, personal computer, minicomputer, mainframe, mobile computing device, or other suitable computing device. In other embodiments, the Group Agent, or any other of the software components described above, can be performed by its special purpose computing device.

A Group Agent acts as a proxy for one or more members which do not have member agent software. For example, Group Agent **2204** is a proxy for devices $M_1$ and $M_2$; and Group Agent **2212** is a proxy for devices $M_3$ and $M_4$. Group Agent **2234** is a proxy for device $M_{10}$. Although FIG. **22** shows the Group Agents being proxies for one or two members, a Group Agent can be a proxy for more than two members.

Communication between two members of a VCN can pass through two NAT devices, one NAT device for each member. For example, communication between device $M_1$ and device $M_4$ will pass through NAT device **2202** and NAT device **2210**. Additionally, communication between device $M_1$ and another

US 7,949,785 B2

29

entity in a private network configured like the private network of device M₁ will require communication to pass through two NAT devices.

Note that a single Group Agent can participate in more than one VCN. For example, Group Agent **2204** can be used to allow device M₁ participate in a first VCN and concurrently (for all or part of the time) allow device M₂ to participate in a second VCN. Because there can be multiple virtual community networks, the VCN Manager is able to create and maintain, the multiple virtual community networks. As described herein, the VCN Manager identifies which entities can communicate on each VCN by maintaining a list of domain names for each VCN. For example, one list may include the domain names for devices M₁-M₁₀.

The Group Agent requires initialization so it may know which members it is a proxy for. Group Agent initialization cannot occur until after the Group Agent has joined the VCN Manager as a member. The join prior to Group Agent initialization is for a pseudo-member so the proxy initialization messages can use virtual IP addresses and the tunneling protocols described above to travel on an IPsec tunnel between VCN Manager **510** and the particular Group Agent. Separate member specific tunnels will be created when the Group Agent later joins for the proxied members. The Group Agent join will require the Group Agent to be registered with the VCN Manager. In one embodiment, this registration will be done during the installation of the Group Agent.

FIG. **23** provides a flowchart describing one embodiment of the process for Group Agent initialization. In step **2302**, the Group Agent joins as a pseudo-member. This process of step **2302** is performed as described above. In step **2304**, the Group Agent will send an initialization request to the VCN Manager. The initialization request is a packet that includes the fully qualified domain name for the Group Agent, a packet version indication, a packet type indicating that it is an initialization request, a packet length, and an authentication code. If the received initialization request is abnormal (step **2306**), then the initialization request is dropped in step **2308**. If the packet was normal but authentication failed (step **2312**), then the VCN Manager sends a NACK to the Group Agent in step **2314**. If authentication was successful and the initialization request was normal, then the VCN Manager sends an acknowledgement to the Group Agent in step **2320**.

After completion of step **2320**, the Group Agent is initialized and now must join each of the members it is proxying. To do so, the Group Agent will perform a loop where each iteration will include joining for one of the members that is being proxied. In step **2322**, it is determined whether there are any more members being proxied that have to be joined. If there are more members to join, then the Group Agent will join for one member being proxied in step **2324** and the method will loop back to step **2322**. When there are no more proxied members to be joined, the process of FIG. **23** is complete (step **2330**). The process of joining for a proxy member is the same as the process of joining described above; however, the process is performed for the member by the Group Agent rather than by the member agent. The virtual IP address received by the Group Agent is for the member being proxied. The Group Agent stores that virtual IP address in a data structure for the member. In one embodiment, there is a separate data structure for each member being proxied. In another embodiment, there is one data structure which has separate records for each member being proxied. This data stored will include the member's virtual IP address and private address in the local LAN, as well as other information that will be described below.

30

The acknowledgement sent from the VCN Manager to the Group Agent in step **2320** contains all of the member information required so the Group Agent can send the appropriate join requests for each member being proxied. The following information is in the acknowledgement sent from the VCN Manager to the Group Agent: packet version indicating the version of the header, packet type indicating that it is a acknowledgement, packet length, authentication code, subnet IP address, subnet prefix, public IP address of the Private Route Director (when the Group Agent also includes a Private Route Director), Private Route Director ping flag (1 if PRD responds to pings), the number of members being proxied, the number of permanent connections from proxied members to other members that the proxy must make, the member record list and the connect record list. The member record list is a set of records for each member being proxied. The following information is stored in each record: member password (password SHA1 digest), member's local private IP address, the length of the member's fully qualified domain name, the member's fully qualified domain name, offset to the VCN name, authentication type (0=preshared 1=certificate), time stamp indicating when the token key was created, token length in bytes, token key (member shared secret with VCN Manager), HA version number, number of HA records, HA record list and authentication key (generated by server for the proxy). Each HA record in the HA record list includes a VCN Manager IP address for the next VCN Manager, a join port for the next VCN Manager and a service port for the next VCN Manager in case the current VCN Manager goes down. The connect record list includes the following three fields: proxy member index (zero based index into member list), DNS request length and a DNS request.

Once the Group Agent joins for all of its members, then any of its members can receive communication from other members of the VCN or can initiate communication to other members in the VCN. Members that are being proxied by a Group Agent can communicate with other members being proxied by the Group Agent, with other members proxied by a different Group Agent (regardless of whether they are in a private network or available on the public Internet), and members that do not use a Group Agent (regardless of whether those other members are in a private network or available on the Internet with a public IP address), as long as they are all members of the same VCN. From the point of view of an application on a member being proxied by the Group Agent, the VCN appears as a local subnet (or LAN) and all of the members of the VCN appear to be on the local subnet (or LAN). However, the VCN is not a local subnet (or LAN); rather it is a virtual subnet (or LAN). Each of the members of the VCN will have a Virtual IP Address on the virtual subnet.

Because members of a VCN register with the VCN Manager, the VCN Manager will know how to find the members (e.g. it will know its public and private addresses). Thus, a Group Agent acting as a proxy for a first member will be able to act as an intermediary for that first member when talking to a second member of a VCN even if the second member moves to a different or new private network and/or changes its IP address. That is, when the second member makes the move or change, the second member will so inform the VCN Manager. The VCN Manager will inform the Group Agent of the change so that the Group Agent can continue to act as an intermediary between the first member and the group member. More information about communicating with mobile entities can be found in U.S. Pat. No. 7,139,828; U.S. patent application Ser. No. 10/161,573, "Creating A Public Identity For An Entity On A Network," filed on Jun. 3, 2002; and U.S. patent application Ser. No. 10/233,288, "Communicating With An Entity

US 7,949,785 B2

31

Inside A Private Network Using An Existing Connection To Initiate Communication," filed on Aug. 30, 2002, all three applications are incorporated herein by reference in their entirety.

FIG. **24** is a flowchart describing one embodiment of a process for initiating communication with a member that is being proxied by a Group Agent. In FIG. **24**, the communication is being initiated by a member that is not being proxied by a Group Agent. That is, the member initiating communication is a member that has agent software loaded on it. That member is initiating communication with a member that does not have agent software. Prior to the process of FIG. **24** being performed, the Group Agent has joined the member into the VCN and the member initiating communication has already joined the VCN. For example purposes, looking at FIG. **22**, the process of FIG. **24** can be performed by $M_5$, $M_6$, $M_7$, $M_8$ or $M_9$ initiating communication with any of devices $M_1$, $M_2$, $M_3$, $M_4$ or $M_{10}$. Assume, for example purposes, that device $M_9$ is initiating communication with device $M_1$. The destination device is also assumed to be served by a Private Route Director.

In step **2402**, an application on the source device (e.g., device $M_9$) is intending to send a message to an application on the destination device (e.g., device $M_1$). In step **2404**, the application on the source device sends a DNS request to the VCN Manager using the domain name of the destination. For example, the application on $M_9$ will send a DNS request using the domain name for $M_1$. In step **2406**, the VCN Manager returns a response to the DNS request. This response includes the public IP address for private Route Director **2204**, the private IP address for member $M_1$ and the virtual IP address for member $M_1$. In some embodiments, the DNS response also includes a token key (as described above). The Agent on the source device (e.g., $M_9$) stores the information it received from the VCN Manager. In step **2410**, the Agent on the source device returns the virtual IP address for the destination to the application which initiated the DNS request. In step **2412**, the application on the source device initiates the sending of a message to $M_1$ using the virtual IP address. That is, a virtual IP packet is created where the source address is the virtual IP address for the source machine ($M_9$) and the destination address in the virtual IP packet is the virtual IP address for the destination device (device $M_1$). The virtual IP packet is created in step **2414** and subject to IPsec (or other security means). In step **2416**, the virtual IP packet is encapsulated. Encapsulation includes adding a shim, a UDP header and an IP header, all as described above. The shim includes the public IP address for the Private Route Director associated with the destination member (e.g., PRD **2204**) and the private IP address for destination (e.g. member $M_1$). If the source, the member initiating communication was in a private network, then the shim would also include the public IP address for the Route Director associated with the source and the private IP address for the source. In step **2418**, the encapsulated packet is sent to the NAT for the destination's private network. That is, in the example above, the newly created packet is sent to NAT **2202** via the Internet (or other network). In step **2420**, the encapsulated packet is sent from the NAT (e.g., NAT **2202**) to the Route Director for the destination (e.g., PRD **2204**).

In step **2422** of FIG. **24**, the Route Director removes the virtual IP packet and the shim from the encapsulation and presents both the virtual IP address and the shim to the Group Agent (e.g., Group Agent **2204**). The Group Agent stores the information from the shim, as described above with respect to the member agent software. In one embodiment, the Group Agent includes the necessary logic to received the communi-

32

cation so that no route director is necessary. In step **2426**, the Group Agent extracts the virtual IP packet from IPsec. In step **2428**, the Group Agent chooses a private IP address for the source entity. In the above example, the source entity is device $M_9$. Group Agent **2204** will pick a private IP address that is routable in the private network associated with device $M_1$ and NAT **2202**. This private address will be used by device $M_1$ to identify $M_9$. In step **2430**, the Group Agent will change the source address in the virtual packet. That is, the virtual packet originally had a source address equal to the virtual IP address for the source device (e.g., $M_g$) and a destination address equal to the virtual IP address for the destination device (e.g., $M_1$). In step **2430**, the source address in the virtual IP packet is changed to be equal to the private IP address chosen by the Group Agent for $M_9$ in step **2428**. In step **2432**, the Group Agent changes the destination address in the virtual IP packet to be equal to the private IP address in the local LAN for $M_1$. In step **2434**, the packet is sent by the Group Agent to the destination machine (e.g., sent to $M_1$).

The above discussion of FIG. **24** was made with respect to the example that the communication has been initiated by device $M_9$ which is a member having a public IP address and member agent software. The process of FIG. **24** can also be performed by a member which does not have a public IP address, including members using a Private Route Director and/or a Network Route Director. When the process of FIG. **24** is being performed by members using Route Directors, the shim that is added to the encapsulated packet in step **2416** includes the private IP address for the member and the public IP address for the Route Director. The example used in discussing FIG. **24** also assumes that the destination was a device in a private network where the private network included a Group Agent and a Private Route Director. The process of FIG. **24** can also be adapted to work with a member using a Group Agent where the member has a public IP address and/or a member in a private network that uses a Network Route Director.

When sending communication to an entity with a public IP address that uses a Group Agent, the shim will include the public IP address for the Group Agent and the public IP address for the member in step **2416**. The packet will not be sent to a NAT or to a Route Director. Rather, the packet will be sent directly to the Group Agent. The Group Agent will access the virtual IP packet in step **2426**. Rather than choosing a private IP address to identify the source, the Group Agent will choose a public IP address for the destination to use to refer to the source. The virtual IP packet will be changed so that the source address is equal to the public IP address chosen by the Group Agent to represent the source and the destination address will become the public IP address for the destination. The virtual IP packet (which is no longer virtual) will be sent to the destination.

If the destination member participates in a VCN using a Network Route Director (e.g., device $M_3$ using NRD **520**), then the encapsulated packet is sent to the Network Route Director in step **2418**. The Network Route Director will communicate the shim and virtual IP packet to the Group Agent (e.g., Group Agent **2212**) via a persistent connection as described above in FIG. **7**, steps **673-675**, **677**, except that the packet is forwarded to the Group Agent rather than the NAT device. The Group Agent will then perform steps **2424-2434**, as described above.

FIG. **25** is a flowchart describing one embodiment of a process for the destination device responding to the initiation of communication from the source device. In the example discussed above, this process would include device $M_1$ responding to device $M_9$. In step **2502**, the application on

US 7,949,785 B2

33

device $M_1$ attempts to send a communication. A packet is then created using the private addresses. The packet would include a source address equal to the private IP address in the LAN for device $M_1$. The destination address would be equal to the private IP address in the LAN that is used to identify device $M_9$. That packet is sent to the Group Agent in step **2504**. In step **2506**, the Group Agent changes the packet by replacing the private addresses with virtual addresses. The source address is replaced with the virtual IP address in the VCN used to identify device $M_1$. The destination address in the packet is replaced with the virtual IP address in the VCN used to identify device $M_9$. In step **2508**, this packet is subject to IPsec, and encapsulated as described above.

In step **2512** of FIG. **25**, the Group Agent sends the packet. In the example above, the Group Agent would send the encapsulated packet to device $M_9$ using the public IP address for device $M_9$. If the Group Agent is sending the packet to a member that is in a private network, then the encapsulated packet would be sent to the Group Agent/Private Route Director for the member or to the Network Route Director for that member. If the responding device (e.g. $M_1$) is using a Network Route Director, then the Group Agent can still send the reply packet directly to the original source without going through the Network Route Director. If the replying device (e.g. $M_1$) has a public IP address, then the packet sent to the Group Agent would include the public IP addresses for the responding device and the public IP address that the Group Agent told the replying device to use to identify the original source device. In one embodiment, when the member using the Group Agent has a public IP address, an IPsec tunnel can be created between the Group Agent and the member device.

FIG. **24** contemplates communication being initiated by a device that has member software loaded on it. FIG. **26**, on the other hand, describes a process that is performed when communication is initiated by a device that does not have member software and, therefore, uses Group Agent software. In step **2602**, the application on the initiating member will send a DNS request. This DNS request will be sent to the Group Agent. The Group Agent receives the DNS request in step **2604**. In step **2606**, the Group Agent sends its own DNS request for the same domain name to the VCN Manager. In step **2608**, the Group Agent receives a response from the VCN Manager. This response will include the virtual IP address for the target, the public IP address of the Route Director for the target (if any) and the private IP address for the target (if any). If the target has a public IP address, then the public IP address will be returned. In step **2610**, the Group Agent will choose a private IP address in the local LAN to be used to identify the target. The virtual IP address returned from the DNS request will be mapped to this private IP address in the local LAN. In step **2612**, the Group Agent will return that chosen private IP address to the application as a response to the application's DNS request. In step **2614**, the application will initiate the communication. In one embodiment, the process of **2614** includes performing the steps of FIG. **25**. Note that if the member who is initiating the communication in the process of FIG. **26** has a public IP address, rather than being in a private network, then in step **2610** the Group Agent will map the virtual IP address to a public IP address that the Group Agent and member will use to identify the target. It is this mapped public IP address that is returned to the application in response to the DNS request. The mapped public IP address is routable to the Group Agent.

Although the Group Agent is described above with respect to use with a VCN, the technology of the Group Agent is broader than a VCN. Thus, the Group Agent can be used to

34

allow entities to participate in other types of networks, communities, groups, organizations, communications, etc.

Note that in one embodiment, the member being serviced by the Group Agent must be in the same physical address realm as the Group Agent. In this manner, the Group Agent is used to bridge that physical address realm with the virtual space. The Group Agent contains the functionality to allow the member to participate in the virtual community; however, all the protocols of the virtual community terminate at the Group Agent. This way, the member receives a normal IP packet. From the point of view of the member, the Group Agent works like a router which connects the member to the subnet of virtual nodes.

The foregoing detailed description of the invention has been presented for purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching. For example, any number of VCN Managers may be used. Any combination of NRDs and PRDs may be used to improve network efficiency. Any combination of Member Agents and Group Agents may be used, and the Virtual Community may be of any size. Additionally, while the above description provided an example using the protocols and addressing currently used on the Internet, the present invention can be used with other protocols and addressing schemes. The described embodiments were chosen in order to best explain the principles of the invention and its practical application to thereby enable others skilled in the art to best utilize the invention in various embodiments and with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention be defined by the claims appended hereto.

We claim:

**1**. A virtual network system, comprising:

    a virtual network manager implemented with a first device memory and a first device processor of a first computing device, the virtual network manager configured to register devices in a virtual network that is defined by a domain name, each device in the virtual network being identified to the other devices by a virtual network address that is unique for each device and not directly routable via a public network, the virtual network manager further configured to distribute a virtual network address to a device when the device is registered in the virtual network;

    a route director implemented with a second device memory and a second device processor of a second computing device, the route director configured to communicate data between the devices that are registered in the virtual network, the data being communicated as encapsulated packets from a source device to a destination device, an encapsulated packet including a first virtual network address that corresponds to the source device and a second virtual network address that corresponds to the destination device; and

    the virtual network manager further configured to receive a DNS request from the source device, and return a public network address of the route director, a private network address for the destination device, and the second virtual network address that corresponds to the destination device.

**2**. The system of claim **1** wherein each of the devices communicate with the virtual network manager and the other devices in the virtual network via an associated agent.

**3**. The system of claim **2** wherein the associated agent is installed on a proxy device which is a proxy agent for one or

US 7,949,785 B2

35

more of the devices in the virtual network with respect to the virtual network manager and the route director.

**4**. The system of claim **2** wherein the virtual network manager is further configured to:

receive a request from the agent associated with a device in a private network to register the device in the virtual network; and

detect a presence of a NAT device via which the request is routed from the agent to the virtual network manager.

**5**. The system of claim **4** wherein the virtual network manager is further configured to receive the request from the agent as a message, and detect the presence of the NAT device by comparing a field in a payload of the message with a source address in a header of the message.

**6**. The system of claim **1** wherein each of the devices include an agent configured to communicate with the virtual network manager and agents of the other devices in the virtual network.

**7**. The system of claim **1** wherein the virtual network manager is coupled to the public network and has an associated public network address.

**8**. The system of claim **1** wherein the route director is further configured to receive the encapsulated packets when routed to a public network address corresponding to the route director.

**9**. The system of claim **1** wherein each of the devices in the virtual network are further identified by at least one physical network address.

**10**. The system of claim **9** wherein the physical network addresses that are associated with the devices in the virtual network are dynamic.

**11**. The system of claim **9** wherein the physical network addresses that are associated with the devices in the virtual network are static.

**12**. The system of claim **9** wherein the physical network addresses that are associated with the devices in the virtual network are private network addresses, and wherein the virtual network addresses are unique in the virtual network so as not to conflict with the private network addresses.

**13**. The system of claim **9** wherein the source device is coupled to a first private network and accesses a public network via a first NAT device configured to transmit the encapsulated packets, an encapsulated packet further including the physical network address of the source device as a private network address in the first private network.

**14**. The system of claim **13** wherein the physical network address of the source device is dynamic.

**15**. The system of claim **13** wherein the physical network address of the source device is static.

**16**. The system of claim **13** wherein the destination device is coupled to a second private network and accesses the public network via a second NAT device, the encapsulated packet further including the physical network address of the destination device as a private network address in the second private network.

**17**. The system of claim **16** wherein the physical network address of the destination device is dynamic.

**18**. The system of claim **16** wherein the physical network address of the destination device is static.

**19**. The system of claim **16** wherein said first private network and said second private network share at least one network address.

**20**. The system of claim **1** wherein the route director is further configured to:

provide a device-specific pseudo address assignment for the device in the virtual network when the device communicates with the route director via a NAT device; and

36

store an association of the device-specific pseudo address with a public network address of the NAT device and a port number of the NAT device.

**21**. The system of claim **1** wherein the route director includes a translator for virtual network address information for a device in the virtual network that is implemented in a private network.

**22**. The system of claim **1** wherein the virtual network manager is coupled to the public network and includes a public network address.

**23**. The system of claim **22** wherein the route director is coupled to the public network and includes a different public network address than the public network address of the virtual network manager.

**24**. The system of claim **22** wherein the route director is coupled to a private network and includes a private network address.

**25**. The system of claim **1** wherein the encapsulated packets further include virtual IP packets configured for communication of the data, the virtual IP packets being encrypted prior to being encapsulated.

**26**. The system of claim **25** wherein the virtual IP packets are encrypted using IPSEC.

**27**. The system of claim **25** wherein the virtual IP packets are encrypted using DES or triple DES.

**28**. The system of claim **1** wherein the virtual network manager includes a virtual community definition that is defined by the domain name, and includes one or more of the devices that are registered in the virtual network.

**29**. The system of claim **1** wherein the route director is a public route director in the public network, the system further comprising a private route director in a private network configured to enable access to devices of the private network that are also in the virtual network from devices of the public network that are also in the virtual network.

**30**. A virtual network manager, comprising:

a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public network address;

a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to:

receive a registration request from an agent associated with a device;

distribute a virtual network address to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual network address; and

a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device.

**31**. The virtual network manager of claim **30** further comprising an additional network interface configured for data communication via a public network.

**32**. The virtual network manager of claim **31** wherein the network interface is a UDP port configured for data communication via the virtual network, and wherein the additional network interface is a TCP port configured for registration communications via the public network.

**33**. The virtual network manager of claim **30** wherein the network interface is a UDP port configured for data communication via the virtual network.

US 7,949,785 B2

**37**

**34**. The virtual network manager of claim **30** wherein the register module is further configured to receive the registration request from the agent that is installed on the device for data communication via the virtual network.

**35**. The virtual network manager of claim **30** further comprising a join module configured to receive a join request from the agent associated with the device to indicate that the device is connected for data communication within the virtual network, the join module further configured to receive a leave request from the agent associated with the device to indicate that the device will be disconnected from data communication within the virtual network.

**36**. The virtual network manager of claim **35** wherein the join module is further configured to provide virtual network addresses to the devices that are registered in the virtual network.

**37**. The virtual network manager of claim **35** wherein the join module is further configured to maintain data to associate a virtual network address with a device in the virtual network.

**38**. A virtual network system, comprising:
   a computing device that includes at least a memory and a processor configured to implement a network manager of a virtual network that is defined by a public domain name, the network manager configured to distribute virtual network addresses to devices that register as members in the virtual network, each device in the virtual network being identified to the other devices by a virtual network address associated with the device;
   a first virtual network agent associated with a first device that is registered as a member in the virtual network;
   at least a second virtual network agent associated with at least a second device that is registered as a member in the virtual network;
   a route director configured to route communications between the first device and the at least second device in the virtual network via the respective first and second virtual network agents, the communications configured for routing as encapsulated packets that include a first virtual network address that is not directly routable corresponding to the first device and a second virtual network address that is not directly routable corresponding to the at least second device; and
   the network manager includes a DNS server configured to provide authoritative responses for DNS queries in the virtual network, the DNS server further configured to receive a DNS query from the first device and return a network address of the route director, a network address of the second device, and the virtual network address of the second device.

**39**. The system of claim **38** wherein the route director is a public network route director that includes a public network interface and the network address is a public network address by which the first and second virtual network agents communicate with the public network route director.

**40**. The system of claim **38** wherein the route director is a private route director that includes a private physical network interface and the network address is a private physical network address.

**41**. The system of claim **38** wherein the first virtual network agent is installed on the first device for data communication via the virtual network.

**42**. The system of claim **41** wherein the first device is in a private physical network, has an associated private network address, and has the associated virtual network address that is not directly routable by which the first device can be identified by the at least second virtual network agent from outside of the private physical network.

**38**

**43**. The system of claim **41** wherein the first device is coupled to a public physical network, has an associated public network address, and has the associated virtual network address by which the first device can be identified by the at least second virtual network agent.

**44**. The system of claim **38** wherein the first virtual network agent is a proxy agent for the first device with respect to the network manager and the route director.

**45**. The system of claim **38** wherein the first and second devices are configured to access the virtual network from separate private address physical realms.

**46**. The system of claim **38** wherein the network manager includes at least a first community definition and a second community definition, the first community definition being defined by the public domain name and includes one or more of the devices that are registered in the virtual network, and the second community definition being defined by a different public domain name and includes one or more different devices that are registered in the virtual network.

**47**. The system of claim **38** wherein the network manager includes a member authenticator configured to authenticate the devices that request to register with the network manager.

**48**. A computer-implemented method, comprising:
   receiving registration requests from devices that request to be registered as members of a virtual network that is defined by a domain name having an associated public network address in a public network, each of the devices having an associated private network address;
   distributing a virtual network address to a device to register the device as a member in the virtual network, each device in the virtual network being identified to the other devices by the virtual network address that is associated with the device;
   routing communications between the devices that are registered in the virtual network, the communications being routed as encapsulated packets from a source device to a destination device, an encapsulated packet including a first virtual network address that corresponds to the source device and a second virtual network address that corresponds to the destination device; and
   transmitting a response to a DNS request received from one of the devices that are the members in the virtual network, the response to the DNS request including a public network address of a route director that registers the devices, a public network address of the destination device, and the second virtual network address that corresponds to the destination device.

**49**. The method of claim **48** further comprising providing the devices in the virtual network with a communication agent.

**50**. The method of claim **49** wherein said providing the devices in the virtual network with a communication agent includes providing a proxy agent.

**51**. The method of claim **48** further comprising authenticating the devices as the members in the virtual network.

**52**. The method of claim **48** further comprising defining a member set of the virtual network that includes one or more of the devices, and assigning the domain name that defines the virtual network.

**53**. The method of claim **48** further comprising defining at least two member sets of the virtual network that each include one or more of the devices, the at least two member sets having at least one different device.

**54**. The method of claim **48** further comprising assigning the virtual network address to the device as an IPV4 compliant address.

US 7,949,785 B2

**39**

**55**. The method of claim **54** wherein the IPV4 compliant address is non-routable.

**56**. The method of claim **48** further comprising routing network traffic via the public network from a first device having a public network address to a second device having a different public network address, the network traffic being routed as data packets having a source address which is the virtual network address of the first device and a destination address which is the virtual network address of the second device, the data packets being encapsulated to include a second source address which is a public network address of the first device and a second destination address which is the different public network address of the second device.

**57**. The method of claim **48** further comprising routing network traffic from a first device in a private physical network having a private network address to a second device having a public network address, the network traffic being routed as data packets having a source address which is the virtual network address of the first device, a destination address which is the virtual network address of the second device, and a shim which includes the private network address, the data packets being encapsulated to include a second destination address which is the public network address of the second device.

**58**. The method of claim **48** further comprising routing network traffic from a first device in a private physical network having a first private network address to a second device in a different private physical network having a second private network address, the network traffic being routed as encapsulated packets having a source address which is the virtual network address of the first device, a destination address which is the virtual network address of the second device, and a shim which includes the first and second private network addresses.

**59**. The method of claim **58** wherein the first private network address and the second private network address are identical.

**60**. The method of claim **48** further comprising:

receiving a join status request from a first device in the virtual network as a query to determine the status of a second device in the virtual network; and

responding to the join status request to indicate whether or not the second device is joined to the virtual network for data communication.

**61**. The method of claim **48** further comprising applying a group policy to the devices that are registered as the members of the virtual network.

**62**. One or more processor readable storage media devices comprising processor readable code that, if executed by a computer device, implements a virtual network manager to:

receive registration requests from devices that request to be registered as members of a virtual network that is defined by a domain name having an associated public network address in a public network, each of the devices having an associated private network address;

distribute a virtual network address to a device to register the device as a member in the virtual network, each device in the virtual network being identified to the other devices by the virtual network address that is associated with the device;

manage communications routed between the devices that are registered in the virtual network, the communications routed as encapsulated packets from a source device to a destination device, an encapsulated packet including a first virtual network address that corresponds to the source device and a second virtual network address that corresponds to the destination device; and

**40**

transmit a response to a DNS request received from one of the devices that are the members in the virtual network, the response to the DNS request including a public network address of the virtual network manager, a public network address of the destination device, and the second virtual network address that corresponds to the destination device.

**63**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to provide the devices in the virtual network with a communication agent.

**64**. One or more processor readable storage media devices as recited in claim **63** wherein the virtual network manager provides the as a proxy agent.

**65**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to define a member set of the virtual network that includes one or more of the devices, and the domain name that defines the virtual network.

**66**. One or more processor readable storage media devices as recited in claim **62** wherein the virtual network address includes a non-routable IPV4 compliant address.

**67**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to route network traffic via the public network from a first device having a public network address to a second device having a different public network address.

**68**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to route network traffic from a first device in a private physical network having a private network address to a second device having a public network address.

**69**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to route network traffic from a first device in a private physical network having a first private network address to a second device in a different private physical network having a second private network address.

**70**. One or more processor readable storage media devices as recited in claim **69** wherein the network traffic is routed to the first or second device via a NAT device.

**71**. One or more processor readable storage media devices as recited in claim **69** wherein the first private network address and the second private network address are identical.

**72**. One or more processor readable storage media devices as recited in claim **67** wherein the network traffic is routed as encapsulated data packets.

**73**. One or more processor readable storage media devices as recited in claim **67** wherein the network traffic is routed as encrypted data traffic.

**74**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to apply a group policy to the devices that are registered as the members of the virtual network.

**75**. A virtual network system, comprising:

a computing device that includes at least a memory and a processor configured to implement a virtual network manager having a network interface coupled to a virtual network, the virtual network manager including at least one virtual community definition that is defined by a domain name having an associated public network

US 7,949,785 B2

41

address and a user set of one or more devices that are registered in the virtual network, each device in the virtual network being identified to the other devices by a virtual network address that is associated with the device, the virtual network manager configured to exchange virtual network information with the one or more devices of the user set, the virtual network being accessible by devices in the user set and devices outside of the user set, and the virtual network manager further configured to receive a DNS request from a source device, and return a public network address of a route director, a private network address for a destination device, and a virtual network address that corresponds to the destination device.

**76**. The system of claim **75** wherein the virtual network manager includes a member register module.

**77**. The system of claim **75** wherein the virtual network manager includes a member join module.

**78**. The system of claim **77** wherein the member join module provides a virtual network address to a device that is registered as a member of the network.

**79**. The system of claim **75** wherein the virtual network manager is further configured to maintain data on an association between at least one virtual network address with at least one device that is registered as a member of the network.

**80**. The system of claim **75** wherein the virtual network manager includes a DNS server for the virtual community network.

**81**. The system of claim **75** wherein the virtual network manager includes a NAT device detector for devices connecting with the virtual network manager behind a NAT device.

42

**82**. The system of claim **75** wherein the virtual network manager includes at least a second virtual community definition.

**83**. The system of claim **75** wherein the virtual network manager includes a member authenticator.

**84**. The system of claim **75** wherein the virtual network manager includes a DNS server configured to provide authoritative responses for DNS queries from devices in the virtual community.

**85**. The system of claim **75** further comprising at least one route director configured to communicate with the one or more devices in the user set.

**86**. The system of claim **75** wherein each device registered in the network is configured to communicate with the virtual network manager and other devices in the user set via at least one agent.

**87**. The system of claim **75** wherein the user set includes at least a first device and a second device, and wherein at least one of said first device and said second device is coupled to a first private network and accesses a public network via a NAT device.

**88**. The system of claim **87** wherein said first device is coupled to said first private network, and said second device is coupled to a second private network and accesses the public network via a second NAT device.

**89**. The system of claim **75** wherein communications between the one or more devices in the user set are encrypted.

**90**. The system of claim **89** wherein the virtual network manager is configured to provide a shared message to the one or more devices in the user set to establish encrypted communications.

\*   \*   \*   \*   \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

Page 1 of 1

| | |
|---|---|
| PATENT NO. | : 7,949,785 B2 |
| APPLICATION NO. | : 10/403818 |
| DATED | : May 24, 2011 |
| INVENTOR(S) | : Alkhatib et al. |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page 3, item (56), under "Other Publications", in Column 1, Line 11, delete "Nelowrks." and insert -- Networks. --.

Title Page 3, item (56), under "Other Publications", in Column 2, Line 22, delete "Infrastucture" and insert -- Infrastructure --.

Column 40, line 15, in Claim 64, delete "the" and insert -- the communication agent --.

Signed and Sealed this
First Day of November, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

# EXHIBIT 5

US007712080B2

(12) **United States Patent**     (10) **Patent No.:**     **US 7,712,080 B2**

Pan et al.     (45) **Date of Patent:**     **May 4, 2010**

(54) **SYSTEMS AND METHODS FOR PARALLEL DISTRIBUTED PROGRAMMING**

(75) Inventors: **Lei Pan**, Irvine, CA (US); **Lubomir R. Bic**, Irvine, CA (US); **Michael B. Dillencourt**, Irvine, CA (US)

(73) Assignee: **The Regents of the University of California**, Oakland, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1013 days.

(21) Appl. No.: **10/850,842**

(22) Filed: **May 21, 2004**

(65) **Prior Publication Data**

US 2005/0039159 A1     Feb. 17, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/472,612, filed on May 21, 2003.

(51) **Int. Cl.**
*G06F 9/44* (2006.01)
*G06F 9/45* (2006.01)
*G06F 15/00* (2006.01)

(52) **U.S. Cl.** ........................ **717/119**; 717/107; 717/108; 717/149; 712/10; 712/23; 712/32

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

OTHER PUBLICATIONS

Pan et al., Distributed Parallel Computing using Navigational programming: Orchestrating Computations Around Data, , IASTED PDCS 2002, pp. 1-6.*
Pan et al., Mobile Agents—The Right Vehicle for Distributed Sequential Computing, Springer-Verlag Berlin Jeidelberg 2002, pp. 575-584.*

Fukuda et al., Messengers: Distributed Programming Using Mobile Agents, Transactions of the SDPS, Dec. 2001, vol .5, No. 4, pp. 95-112.*
Stanislaw Chrobot, Sharing Varaibles in Distributed Memory, Fundamenta Infomaticae 44 (2000) 63-81, IOS Press, pp. 63-81.*
Suzuki et al., Self-Migrating Threads for Multi-Agent Applications, publication data: 1999, published by 1st IEEE computer socitiey international workshop, pp. 1-8.*
Fukuda t al., Messages versus Messengers in Distributed Programming, published by Hournal of Parallel and Distributed Computing vol. 57, Issue 2 May 1999, pp. 1-8.*
Lei Pan, et al., *Distributed Sequential Computing* (pp. 223-239), Applied Parallel and Distributed Computing (Advances in Computation: Theory and Practice, vol. 16), (Y. Pan and L.T. Yang, Eds.), Nova Science Publishers, Inc., New York, 2004.
Lei Pan, et al., *Facilitating Agent Navigation Using DSM—High Level Designs* (11 pages), The 7th Int'l Conf. on Integrated Design & Process Technology (IDPT03), Austin, Texas, Dec. 2003.

(Continued)

*Primary Examiner*—Tuan Q Dam
*Assistant Examiner*—Zheng Wei
(74) *Attorney, Agent, or Firm*—Orrick, Herrington & Sutcliffe LLP

(57) **ABSTRACT**

The present invention relates generally to computer programming, and more particularly to systems and methods for parallel distributed programming. Generally, a parallel distributed program is configured to operate across multiple processors and multiple memories. In one aspect of the invention, a parallel distributed program includes a distributed shared variable located across the multiple memories and distributed programs capable of operating across multiple processors.

**18 Claims, 8 Drawing Sheets**



**US 7,712,080 B2**

Page 2

OTHER PUBLICATIONS

Lei Pan et al., *From Distributed Sequential Computing to Distributed Parallel Computing* (8 pages), The 5th Workshop on High Performance Scientific and Engineering Computing with Applications (HPSECA-03, in conjunction with ICPP-03), Kaohsiung, Taiwan, Oct. 2003.

Lei Pan et al., *NavP Versus SPMD: Two Views of Distributed Computation* (8 pages), Int'l. Conf. on Parallel and Distributed Computing and Systems (PDCS 2003), Marina del Rey, CA, Nov. 2003.

Lei Pan et al., *Distributed Computing Using Navigational Programming* (37 pages), International Journal of Parallel Programming (IJPP), vol. 32, No. 1, pp. 1-37, Feb. 2004, 2004 Plenum Publishing Corporation.

Lei Pan, "*Navigational Programming*", Abstract of the Dissertation, University of California, Irvine (2005), pp. xvii-xx.

* cited by examiner

Fig. 1(a)
(Prior Art)



Processor 1                    Processor 2

Fig. 1(b)
(Prior Art)



Processor 1              Processor 2

Fig. 2



Processor 1                    Processor 2



Fig. 3(a)

Fig. 3(b)



Fig. 4(a)

Fig. 4(b)



Fig. 5(a)     Fig. 5(b)

Fig. 6



100 — Messenger Control Block (MCB)

200 — Agent Variables

300 — Offset Vector

400 — Messenger Heap

Case 1:24-cv-00344-GBW Document 1-1 Filed 03/15/24 Page 126 of 133 PageID #: 154

Fig. 7



Fig. 8



US 7,712,080 B2

**1**

### SYSTEMS AND METHODS FOR PARALLEL DISTRIBUTED PROGRAMMING

#### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority to U.S. Application No. 60/472,612 filed on May 21, 2003, which is incorporated herein by reference.

#### FIELD OF THE INVENTION

The present invention relates generally to computer programming, and more particularly to systems and methods for parallel distributed programming.

#### BACKGROUND OF THE INVENTION

Developing a software application for a system with a single processor and a single memory can be straight forward. When viewing the source code for such an application, the source code is often very similar to its original algorithm that describes the computable operations needed to be executed, and thus is generally not too burdensome to follow or analyze given the original algorithm. On the other hand, a software application for operation on multiple processors that uses multiple memory areas may be more complex. Such applications are often referred to as "parallel distributed programs," and there are generally two approaches to developing such programs.

One approach to developing a parallel distributed program is often referred to as "message passing" ("MP"), which is illustrated in FIG. 1*a*. With this approach, the system is programmed as multiple tasks or threads, X and Y, that operate or execute on multiple processors, Processors **1** and **2**, and handle data residing in multiple memories (not shown). The tasks or threads, X and Y, communicate and cooperate with each other by sending and receiving "messages". This approach allows for the different tasks and threads to operate in parallel and communicate with each other when necessary, which may result in an efficient and high-performing system. However, the source code for such a system may be burdensome to develop because programming the multiple tasks and threads and having them send and receive messages to each other may dramatically change the code structure and data structure of the original algorithm, and hence may be complicated, tedious, and error-prone. The code structure and data structure of the MP-based programs may lose much of their original characteristics. The abilities to preserve these original characteristics are referred to as algorithmic integrity and data structure integrity. MP programs typically do not preserve algorithmic integrity and data structure integrity.

Another approach is often referred to as "distributed shared memory" ("DSM"), which is illustrated in FIG. 1*b*. In this approach, a memory space, which may span across multiple memories indifferent processors, Processors **1** and **2**, is dedicated for multiple threads or tasks to access, i.e., it is a globally accessible memory space built on distributed memories. Thus, a thread, X, on one processor, Processor **1**, can access data in a memory on another processor, Processor **2**, without having to establish another thread. Developing parallel distributed programs using this approach is often easier than using the MP approach, because DSM alleviates the need for major changes in code structure and data structure. However, this approach is generally not as efficient, because it may require a transfer of large amounts of data from the memory on the other processor, Processor **2**, to the processor having

**2**

thread X, Processor **1** and thus may not satisfy the need for high performance parallel computing.

Accordingly, improved systems and methods for parallel distributed programming are desirable.

#### SUMMARY OF THE INVENTION

The present invention is generally directed to parallel distributed programs. Generally, a parallel distributed program is configured to operate across multiple processors/nodes and multiple memories. In one aspect of the invention, a parallel distributed program includes at least one distributed shared variable located across the multiple memories and one or more distributed programs configured to operate across multiple processors.

In another aspect of the invention, the one or more distributed programs include one or more self-migrating threads configured to migrate from one processor to another.

Other systems, methods, features and advantages of the invention will be or will become apparent to one with skill in the art upon examination of the following figures and detailed description. It is intended that all such additional systems, methods, features and advantages be included within this description, be within the scope of the invention, and be protected by the accompanying claims.

#### BRIEF DESCRIPTION OF THE DRAWINGS

A description of the present invention will be rendered by reference to specific embodiments thereof, which are illustrated in the accompanying drawings. It should be noted that the components in the figures are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention. Moreover, in the figures, like reference numerals designate corresponding parts throughout the different views. However, like parts do not always have like reference numerals. Moreover, all illustrations are intended to convey concepts, where relative sizes, shapes and other detailed attributes may be illustrated schematically rather than literally or precisely.

FIG. 1*a* is an illustration of the prior art operation of message passing.

FIG. 1*b* is an illustration of the prior art operation of distributed share memory.

FIG. 2 is an illustration of the operation of a self-migrating thread in accordance with a preferred embodiment of the present invention.

FIGS. 3(*a*)-(*b*) is an illustration of one approach to transform a DSC program to a DPC program in accordance with a preferred embodiment of the present invention.

FIGS. 4(*a*)-(*b*) is an illustration of another approach to transform a DSC program to a DPC program in accordance with a preferred embodiment of the present invention.

FIGS. 5(*a*)-(*b*) is an illustration of another approach to transform a DSC program to a DPC program in accordance with a preferred embodiment of the present invention.

FIG. 6 is an illustration of a Messenger in accordance with a preferred embodiment of the present invention.

FIG. 7 is an illustration of an explicit-navigation mobile agent system in accordance with a preferred embodiment of the present invention.

FIG. 8 is an illustration of an implicit navigation mobile agent system in accordance with a preferred embodiment of the present invention.

US 7,712,080 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

DESCRIPTION OF THE PREFERRED
EMBODIMENTS

Methods and systems for developing sequential or parallel applications, such as high performance numerical computing, bioinformatics, database, transaction-based, and Internet applications, on distributed memory systems, shared memory systems, and systems that incorporate both distributed and shared memory systems, will now be described. Some examples of the systems are multi-processor supercomputers, clusters, networks of workstations ("NOW"), the Grid, and the Internet.

An approach to developing sequential or parallel applications in accordance with a preferred embodiment of the present invention, referred to as "navigational programming," includes the programming and use of self-migrating threads or tasks, which are threads or tasks that can migrate from one processor to another. These self-migrating threads or tasks may be in the form of mobile agents with strong mobility. The approach is illustrated in FIG. **2**. These self-migrating threads may be programmed explicitly, e.g., with "migration statements" or implicitly, e.g., driven by data distribution. With this approach, a thread, M, may perform its computations on one processor, Processor **1**, and if the thread M needs to access memory belonging to another processor, e.g., Processor **2**, it may suspend its computations, migrate, or move, to the other processor, Processor **2**, and then resume its computations.

The source code to handle the explicit migration of threads may be in the form of the hop( ) command. The hop( ) commands may be used as annotations in conventional programming languages such as C.

In one aspect of navigational programming, a distributed shared variable ("DSV") may be used. DSVs and self-migration make shared variable programming possible beyond shared memory that provides single-address memory space. A DSV is logically a single variable that includes several variables that may be physically distributed across multiple memories. An example of a DSV is a global array. A global array, A[.], may include x+1 members, i.e., A[0] to A[x]. These members may be variables that are physically distributed across memories of multiple processors, e.g., members A[0] to A[x/2] may be located in the memory of Processor **1** and A[(x/2)+1] to A[x] may be located in the memory of Processor **2**. In accordance with navigational programming, a self-migrating thread may access all the entries within the DSV. For example, if thread M is located in Processor **1** and needed to access members A[(x/2)+1] to A[x], thread M would migrate to Processor **2**.

Another aspect of navigational programming is distributed sequential computing ("DSC"), which is computing using a single locus of computation over distributed data, possibly stored in a DSV. A self-migrating thread may be utilized to perform DSC. For example, for an algorithm that performs computations on a DSV, e.g., A[.], if the algorithm operates on Processor **1** and needs to access data on Processor **2**, a single thread, M, can migrate to Processor **2** to access the data in the memory of Processor **2** and then continue the computations.

DSC allows a programmer to develop threads that efficiently access multiple memories spanning across multiple processors without having to implement the complicated, tedious, time consuming, and error-prone low-level tasks of message handling in distributed programming. Further, it maintains the original code structure and data structure, i.e., it preserves algorithmic integrity and data structure integrity, in the resulting source code. Moreover, the programmer may

follow the principle of pivot-computes, which is defined as the principle under which a computation takes place on the node that owns the large-sized data. Thus, if the data is distributed over a plurality of nodes, e.g., multiple memory areas associated with separate processors, wherein the distribution is disproportionate, e.g., a large portion of the data resides in one area and a smaller portion resides in a separate area, the computation will take place on the node with the larger portion of data, i.e., the pivot node, instead of having the larger portion of data moved, which may affect performance. If the programmer follows the principle of pivot-computes, as an MP programmer usually would, then an application utilizing DSC may be as efficient and scalable as an application utilizing the MP approach.

To illustrate this feature, consider a program that sets each member of an array, A[i], to the value of the previous member, and then increments that member by one, wherein i is the number of members of A[.]. For a single processor, single memory system, the pseudo-code may be implemented as follows:

```
(1)  for i = 2 to x
(2)  A[i] = A[i−1] + 1
(3)  end for
```

This program will (1) count from 2 to x, i.e., the number of members of array A, and (2) assign each member i the value of the previous member, i−1, and increment that member by 1. These three code lines may be viewed as a code building block, which may be represented by the following notation $B_T(D)$, where B represents the block of code, T represents the type of computation performed by the block of code (T is for in the above code), and D represents the data that the block of code B operates on (D is the loop index i and the array A[.] in the above code). The block may include any type of basic programming constructs, such as a loop, an if statement, a multi-way conditional statement, or a sequence of assignments. In the above code, A[.] resides in a single memory area.

In parallel distributed computing, the array A[.] is distributed, e.g., the array A[.] spans across multiple memory areas on different processors, P**1** and P**2**, where the first half of the array, A[1 to x/2] is on one processor, P**1**, and the other half the array, A[(x/2)+1 to x] is on the other processor, P**2**. A code block required to handle distributed data may be referred to as distributed code building blocks ("DBlocks"). DBlocks cannot be directly taken as implementations in non-shared-memory environments. The essence of implementing distributed memory programs is turning DBlocks into non-DBlocks, defined as "DBlock resolution."

If the prior art Message Passing approach is used to "resolve" the DBlock, then the pseudo-code may be written as follows:

```
(1)   if µ == P1
(2)       for i = 2 to x/2
(3)           A[i] = A[i − 1] + 1
(4)       end for
(5)       t = A[x/2]
(6)       Send (t, P2)
(7)   else if µ == P2
(8)       Recv (t, P1)
(9)       A[1] = t + 1
(10)      for i = 2 to x/2
```

US 7,712,080 B2

<table>
<tr><td>5</td><td></td><td>6</td></tr>
</table>

-continued

```
(11)        A[i] = A[i − 1] + 1
(12)    end for
(13) end if
```

This program may run on both processors, and it will (1) check to see if the current processor, μ, on which the task is running, is P1. If it is, then the program will (2) count from 2 to half of the array x/2, which is the portion of the array A[.] in the memory of P1, and (3) assign each member i the value of the previous member, i−1, and increment that member by 1. Then, the program will (5) assign a variable t to the value of the last member of the array A in the memory of P1, x/2. Subsequently, (6) the program will send a message to P2 that will include the value of t. (7) if the current processor, μ, on which the task is running, is P2, then the program will (8) receive a message from P1 containing the value of the last member of the array A[.] on P1 via value t and (9) assign the first member of the array A[.] on P2 to the value in t+1. Then, the program will (10) count from 2 to half of the array x/2, which is the portion of array A[.] in the memory of P2 and (11) assign each member i the value of the previous member, i−1, and increment that member by 1.

Compare the operation of the pseudo-code using the prior art MP technique with the operation of the pseudo-code using navigational programming, as follows:

```
(1) for i = 2 to x
(2)     t = A[i − 1]
(3)     if i == x/2 + 1
(4)         hop (P2)
(5)     A[i] = t + 1
(6) end for
```

In this program, the task will (1) count from 2 to x, and for each count, the task will (2) assign the value of the member of the previous count i−1 to the variable t. This variable t is referred to as "agent variable," and is accessible by its owner thread from anywhere. (3) If the count reaches one more than half of the array A, then that means the task needs to access the other half of the array A[.] in P2. Thus, the task will (4) "hop" or migrate to P2 and continue its computation. If not, then the task will continue its computation on P1, and (5) assign the value of the previous member and increment it by one. Compared to the implementation done using MP, the DSC program preserves the original code structure (i.e., it does not break the loop into two or more blocks) and the original data structure (i.e., it maintains the global indexing of the array A[.]). DBlock resolution using navigational programming thus preserves the DBlock's code structure and data structure, and the implementation follows the principle of pivot-computes (the pivot node is P1 for the first half of the loop, and P2 for the second).

Another aspect of navigational programming is distributed parallel computing ("DPC"), which is computing using multiple concurrent DSC programs. With this aspect, original code structure and data structure may be preserved by virtue of using DSC programs. The "intersection" between each composing DSC program and the resulting DPC program may be minimal because it may consist of only local synchronizations, which minimizes the code "pollution" among all the composing DSC programs. The composing DSC programs are said to be "orthogonal" to the DPC program, and thus parallel distributed programming using DSC self-mi-

grating threads exhibits "composition orthogonality." Furthermore, a DPC application targeted to multi-processor environments may be utilized on a uni-processor and operates as a multi-threaded application. Since the memory location information is only used in the hop( ) commands used as annotations in the code to indicate migration, ignoring these commands would result in a multi-threaded program that runs on a uni-processor without further changing its code structure and data structure. In contrast, in a program developed using MP, the memory location information is used not only in the Send( ) and Recv( ) commands, but also in restructuring code structure and data structure, therefore such program would look awkward and become unnecessarily difficult to maintain for uni-processors.

To illustrate the feature of DPC, consider a sequential program that performs block-fashion matrix multiplication as follows:

```
(1) for i = 0 to p − 1
(2)     for j = 0 to p − 1
(3)         C_ij = A_i B_j
(4)     end for
(5) end for
```

In a distributed environment, we may use a processor to post-fetch the computed C sub-matrix and pre-fetch the next pair of A and B sub-matrices. The DSC program that performs the computation may be written as follows:

```
(1) for i = 0 to p − 1
(2)     for j = 0 to p − 1
(2.1)       inject (WR (i, j))
(2.2)       waitEvent (IO_b(i,j))
(3)         C_ij = A_i B_j
(3.1)       hop (!μ)
(4)     end for
(5) end for
```

In the program, WR( ) is a separate DSC program that performs fetching. It is "injected," or spawned, by the computing thread, and it hops to the other node to perform fetching, after which it "signals" an event to indicate that the fetching is done. The computing thread will (2.2) wait for the event to make sure that the data is correctly post- and pre-fetched, (3) compute the sub-matrix multiplication, and (3.1) hop to the other node to perform the computation for the next loop. The DSC program WR( ) may be written as follows:

```
(1) WR(int i, int j)
(2)     hop(!μ)
(3)     write (C_i'j')
(4)     read (A_i, B_j)
(5)     signalEvent (IO_b(i',j'))
(6) end
```

The computing DSC program and the fetching DSC program together make a DPC program. The two DSC threads of the DPC program run concurrently to perform parallel or pipelined computing. In this particular example, the computations and the fetching are pipelined.

If the prior art Message Passing approach is used, then the pseudo-code may be written as follows:

US 7,712,080 B2

7

```
(1)   if μ == P1
(2)     for i = 0 to p−1
(3)       for j = 0 to p−1
(4)         if(i*p+j)%2 == 0
(5)           Send("f", (i, j), P2)
(6)           C_ij = A_i B_j
(7)         else
(8)           Send("c", (i, j), P2)
(9)           write(C_rj')
(10)          read(A_r, B_r')
(11)        end if
(12)        Recv(sync, P2)
(13)      end for
(14)    end for
(15)    Send ("stop", (0, 0), P2)
(16)  else if μ == P2
(17)    while (1)
(18)      Recv (s, (i, j), P1)
(19)      if s == "f"
(20)        write(C_ij')
(21)          read(A_r, B_r')
(22)      else if s == "c"
(23)        C_ij = A_i B_j
(24)      else if s == "stop"
(25)        exit
(26)      end if
(27)      Send(sync, P1)
(28)    end while
(29)  end if
```

In the MP implementation, the code for the two different tasks, namely multiplication and fetching, is tangled, polluting each other. In contrast, the two DSC programs in the navigational programming approach are composed into a DPC program with only local events or injections as the intersection between the two. This demonstrates the composition othogonality of the navigational programming.

In yet another aspect of the invention, transformations are provided to convert a DSC application into a DPC application utilizing multiple DSC threads running sequentially or concurrently, thus utilizing parallelization and pipeline opportunities in the sequential computation. To illustrate different approaches for transformation, FIGS. 3(a), 4(a), and 5(a) depict sequential computations running in a two-dimensional space with spatial s and temporal t dimensions. These computations may be executing in loops, which means they could continue to spread along both dimensions (only two nodes are shown in FIGS. 3(a), 4(a), and 5(a)). Each box in the figures represents a computation. A box marked with R means the computation represented by the box produces intermediate result that will be required by the following computation on the next node, whereas a box marked with NR means the computation on the next node is independent of the computation represented by the box.

One approach for transformation is illustrated in FIGS. 3(a) and 3(b). In this approach the computation on the next node is scheduled as soon as the dependency condition allows it. That is, since in the DSC the computation on the next node only depends on the intermediate result from part of the computation on the current node, as shown in FIG. 3(a), the thread can clone itself as soon as the computation of R is done, and have the clone hop to the next node carrying the intermediate result and continue the computation at the same time when it continues the computation of NR on the current node, as shown in FIG. 3(b). A special case is when R=Ø in which case the computations on the two nodes are completely independent of each other and can be performed in parallel.

Another approach for transformation is depicted in FIGS. 4(a) and (b). This approach explores pipeline opportunity.

8

The computation of R1 on the next node only depends on the intermediate result from the computation of R1 on the current node, as shown in FIG. 4(a). The thread is split into two. The first thread would, after performing R1 on the current node, hop to the next node carrying the intermediate result and continue the computation of R1 there. The second thread will be transformed using the first transformation, as shown in FIG. 3(b), or using the second transformation recursively (i.e., to split R2 further). The two threads will be synchronized on the next node. That is, upon finishing its computation, the first thread will signal an event to allow the second thread to move on to its computation on the next node.

Another approach is illustrated in FIGS. 5(a) and (b). This approach illustrates parallel reduction. The computations on the two nodes each compute a partial result which is added to or multiplied by the total result, as shown in FIG. 5(a). If these computations do not depend on each other, they can be performed in parallel, and the total result can be collected by a separate DSC thread, as shown in FIG. 5(b).

Navigational programming may be facilitated by mobile agent systems. Self-migrating threads may be in the form of mobile agents. Such a mobile agent has the ability to halt its execution, encapsulate the values of its variables, move to another node, restore the state, and continue executing. This ability is often referred to as strong mobility.

There may be several ways of building mobile agent systems. One way is to build directly on top of message passing. An example of such a system is MESSENGERS, in which applications are developed as collections of mobile agents, which may be referred to as Messengers. In MESSENGERS, three levels of networks are used. The lowest level is the physical network (e.g., a LAN or WAN), which constitutes the underlying computational processing elements. Superimposed on the physical layer is the daemon network, where each daemon is a server process that receives, executes, and dispatches Messengers. The logical network is an application-specific computation network created on top of the daemon network. Messengers may be injected by a program, which is part of the MESSENGERS system, or by another Messenger into any of the daemon nodes, and they may start creating new logical nodes and links on the current or any other daemons. Based on application need, multiple logical nodes can be created on one physical node.

A "MESSENGERS daemon" executes compiled Messengers. A daemon and all Messengers running on it share one process, and the Messengers are linked to the process dynamically. Messengers are allowed to call C functions, grouped in a user library which is also dynamically linked to the process. There are four tasks for a daemon. First, to accept signals, such as UNIX signals, to inject Messengers. These signals are sent by the program minject or another messenger. Second, to respond to requests, such as "search node" and "complete link," from other Messengers. Third, to add incoming Messengers to a ready list. And fourth, to execute Messengers. In addition, a daemon also provides a function, the calling of which would result in the autonomous caller Messenger being sent to a destination daemon. Socket-level message passing is used by a daemon or a Messenger to communicate with remote daemons.

The structure of a Messenger is depicted in FIG. 6. A Messenger may include a small Messenger control block ("MCB") 100, which stores data such as "pointer to next function," library name, and Messenger size. The Messenger may further include agent variables 200, a vector of offsets 300 used to access memory in a Messenger heap used for dynamic arrays, and the heap itself 400.

US 7,712,080 B2

9

There are two types of variables in MESSENGERS: agent variables and node variables. An agent variable is private to a particular Messenger and travels with that Messenger as it migrates through the logical network. A node variable is stationary and is accessible by all Messengers currently at the logical node to which the variable belongs. Hence agent variables can be used to carry data between nodes, while node variables can be used for inter-agent communication.

A Messenger's programmer may tell it to migrate using the navigational statements, such as hop( ). A destination node's logical address or a logical link between the source and the destination nodes can be used as the argument for the statements. When a Messenger hops, it takes the data in its agent variables with it to wherever it migrates.

A Messenger can spawn another Messenger using a statement, such as inject( ). Synchronization among Messengers uses "events," and statements, such as signalEvent( ) and waitEvent( ). Since no remote data accessing is allowed, the events are local and so is synchronization. A Messenger's execution is not preempted between any two navigational statements. A Messenger must explicitly relinquish control to other Messengers using statements such as hop( ). We call this feature non-preemptive scheduling.

The Messenger compiler lies at the heart of the system. Messengers code, with strong mobility, is translated into stationary code communicating using message passing with sockets. The translated stationary code (in C) is then further compiled into machine native code for execution. Strong mobility in MESSENGERS means that computation migrates in the network in the form of a program counter. The actual mechanism for handling program counters can be seen from a simple example. The basic idea is to break a MESSENGERS program into smaller functions (in C) at navigational or other context-switching statements, and use the "pointer to next function" as an artificial program counter. Consider the following code:

```
(1) S1
(2) hop( )
(3) S2
```

This code shows two statements S1 and S2 separated by a context-switching statement hop( ). This code is compiled by the MESSENGERS compiler into two functions, each takes a pointer to an MCB 100 as its argument, shown in the following code:

```
(1) f1 (mcb)                  (1) f2 (mcb)
(2)     S1                    (2)     S2
(3)     mcb --> next_func = 2 (3)   end
(4)     .../* code for hop ( ) */
(5) end
```

In this program, f1( ) uses a "pointer to next function" to point to function f2( ), which is executed after migration. Line (4) in the program represents code that calls the daemon function mentioned earlier, and by calling this function the Messenger autonomously sends itself to a destination daemon.

One feature of the MESSENGERS system is that it allows code to either be loaded from a shared disk or, in a non-shared file system, be sent across the network at most once, irrespec-

10

tive of how many times the locus of computation moves across the network. This feature is the key to efficient agent migration.

The overhead of mobile agent navigation in MESSENGERS may be relatively small due to the following reasons. First, since a Messenger is compiled into smaller functions at navigational statements, it is not necessary to save the function stack but only the pointer to next function. Second, the extra information associated with a Messenger's status (i.e., MCB 100) is small. Third, no marshalling and unmarshalling of the agent variables is needed. Fourth, a Messenger runs in the same memory space of a daemon, which is why adding or removing it from the ready list takes only a few instructions to update some pointers in the list, instead of doing memory copying. The navigation of Messengers is almost as fast as sending TCP messages using a C program.

In another aspect of navigational programming, an explicit-navigation mobile agent system may be built on top of a DSM. A DSM system may be used to serve as communication media for the globally accessible data, or in other words, agent variables. FIG. 7 depicts the functional components of such a system and the dependencies. A DSM 700 may be built on top of a physical network of machines 800. The mobile agent system 600, which may include a compiler and a daemon system, may be built on the DSM 700. An application may be implemented to include explicit agent navigation 500 that uses the mobile agent system 600. The advantages of such a DSM based explicit-navigation system include: 1) It prevents false sharing; 2) Agent migration is faster using DSM; 3) DSM memory consistency protocols can help to reuse the agent variables when the owner agent visits the same node multiple times; 4) Daemon programming on DSM is dramatically simpler than using socket level message passing programming.

In another aspect of navigational programming, an implicit-navigation mobile agent system may be based on a DSM. In this system, a mechanism is included that decides for the agent when and where to migrate, and how the migration is achieved. FIG. 8 depicts a functional design of an implicit-navigation agent system. A DSM 1200 may be built on top of a physical network of machines 1300. The design further includes a navigation protocol 1100, which decides when a Messenger migrates and the destination. These protocols 1100 may be designed to follow the principle of pivot-computes. The other component is a mobile agent system 1150 that is able to support run-time strong mobility, i.e., a Messenger should be able to migrate at run-time anywhere in the program without any user direction. An application may be implemented to include implicit agent navigation 1000 that uses the mobile agent system 1150 and navigation protocol 1100. The run-time strong mobility may be used in conjunction with the logical program counter, i.e., the "next function pointer" in MESSENGERS. This may result in more efficient agent navigation combining both the programmer's knowledge of the application and the run-time system's capability in dynamic situations.

In the foregoing specification, the invention has been described with reference to specific embodiments thereof. It will, however, be evident that various modifications and changes may be made thereto without departing from the broader spirit and scope of the invention. For example, the reader is to understand that the specific ordering and combination of process actions shown in the process flow diagrams described herein is merely illustrative, and the invention can be performed using different or additional process actions or a different combination or ordering of process actions. The

US 7,712,080 B2

**11**

specification and drawings are, accordingly, to be regarded in an illustrative rather than restrictive sense.

What is claimed is:

1. A method of developing a distributed parallel computing program, comprising steps of:

establishing at least one distributed shared variable, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically distributed across multiple memories;

developing at least one distributed sequential computing program to access the at least one distributed shared variable; and

transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program from the at least one distributed sequential computing program when at least one intermediate condition occurs within the at least one distributed sequential computing program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation.

2. The method of claim 1, wherein each of the at least one distributed sequential computing program includes at least one self-migrating thread, capable of migrating among at least one processor and capable of accessing the at least one distributed shared variable.

3. The method of claim 1, wherein the at least one distributed shared variable is configured to be located among a plurality of memories.

4. The method of claim 1, wherein the distributed parallel computing program is configured to operate across multiple processors.

5. The method of claim 1, wherein the distributed parallel computing program is configured to operate using multiple threads.

6. The method of claim 1, wherein the distributed parallel computing program is configured to operate across multiple nodes.

7. The method of claim 1, further comprising the step of configuring the at least one distributed sequential computing program to include at least one mobile agent.

**12**

8. The method of claim 7, wherein the at least one mobile agent is implemented using self-migrating threads.

9. A distributed parallel computing system, having at least one memory area and at least one processor, comprising:

at least one distributed shared variable capable of loading into the at least one memory area, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically loaded into the at least one memory area; and

at least one distributed sequential computing program, configured to operate in the at least one processor, configured to access the at least one distributed shared variable, and configured to transform into at least one distributed parallel computing program by spawning at least one child distributed sequential computing system program when at least one intermediate condition occurs within the at least one distributed sequential program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation.

10. The system of claim 9, wherein the at least one distributed sequential computing program comprises at least one mobile agent.

11. The system of claim 10, wherein the at least one mobile agent is implemented using self-migrating threads.

12. The system of claim 10, wherein the at least one mobile agent is an explicit-navigation mobile agent.

13. The system of claim 10, wherein the at least one mobile agent is an implicit-navigation mobile agent.

14. The system of claim 10, wherein the at least one mobile agent is configured to move from one processor to another processor.

15. The system of claim 10, wherein the at least one mobile agent operates within a distributed shared memory system.

16. The system of claim 9, wherein the at least one processor is located across a physical network.

17. The method of claim 1, wherein the distributed parallel computing program is configured to operate across a distributed shared memory system.

18. The method of claim 9, wherein the distributed parallel computing program is configured to operate across a distributed shared memory system.

\*   \*   \*   \*   \*