# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **Assurant, Inc.,** *Plaintiff*, v. **Intellectual Ventures I LLC, Intellectual Ventures II LLC, and Callahan Cellular L.L.C.,** *Defendants*. | C.A. No. 24-344-GBW<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF ASSURANT, INC.'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Of Counsel:

Keith E. Broyles
Matthew W. Howell
Thomas Finch
Carter E. Babaz
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree St. NE
Atlanta, Georgia 30309-3424
keith.broyles@alston.com
matthew.howell@alston.com
thomas.finch@alston.com
carter.babaz@alston.com

Steven J. Fineman (#4025)
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
fineman@rlf.com
farnan@rlf.com
metzler@rlf.com

*Attorneys for Plaintiff Assurant, Inc.*

Dated: June 5, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii
GLOSSARY .......................................................................................................................... iii
I.   Statement of the Nature and Stage of the Proceedings ............................................. 1
II.  Summary of the Argument ....................................................................................... 1
III. Statement of Facts .................................................................................................... 2
IV.  Argument .................................................................................................................. 5
   A.   IV's actions give rise to a substantial controversy between the parties of sufficient immediacy and realty for subject matter jurisdiction. ............................................... 5
   B.   IV's other arguments are unavailing. ...................................................................... 10
V.   Conclusion .............................................................................................................. 13

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ABB Inc. v. Cooper Indus., LLC*,
  635 F.3d 1345 (Fed. Cir. 2011) ............................................................................................... 7

*Arkema Inc. v. Honeywell Int'l*,
  706 F.3d 1351 (Fed. Cir. 2013) ............................................................................................. 10

*Benitec Australia, Ltd. v. Nucleonics, Inc.*,
  495 F.3d 1340 (Fed. Cir. 2007) ............................................................................................... 6

*Danisco US, Inc. v. Novozymes A/S*,
  744 F.3d 1325 (Fed. Cir. 2014) ............................................................................................... 9

*Hewlett-Packard Co. v. Acceleron LLC*,
  587 F.3d 1358 (Fed. Cir. 2009) ............................................................................................... 7

*In Re Mobile Telecommc'ns Techs. LLC*,
  247 F. Supp. 3d 456 (D. Del. 2017) ........................................................................................ 9

*Intellectual Ventures I LLC v. Comerica Inc.*,
  No. 2:23-cv-00524-JRG (E.D. Tex. Nov. 15, 2023), D.I. 1 ..................................................... 3

*Intellectual Ventures I LLC v. JP Morgan Chase & Co.*,
  No. 2:23-cv-523-JRG (E.D. Tex. Nov. 15, 2023), D.I. 1 ........................................................ 2

*Intellectual Ventures I LLC v. Liberty Mutual Holding Co.*,
  No. 2:23-cv-00525-JRG (E.D. Tex. Nov. 15, 2023), D.I. 1 ..................................................... 3

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ............................................................................................................ 6, 8

*Micron Tech., Inc. v. MOSAID Techs., Inc.*,
  518 F.3d 897 (Fed. Cir. 2008) ................................................................................................. 8

*Microsoft Corp. v. Webxchange, Inc.*,
  606 F. Supp. 2d 1087 (N.D. Cal. 2009) ................................................................................ 11

*SanDisk Corp. v. STMicroelectronics, Inc.*,
  480 F.3d 1372 (2007), *aff'd sub nom. Giuliano v. SanDisk LLC*, 705 F. App'x 957
  (Fed. Cir. 2017) ................................................................................................................. 8, 10

**GLOSSARY**

| Term | Definition |
|---|---|
| Assurant | Declaratory Judgment Plaintiff Assurant, Inc. |
| IV | Collectively, Declaratory Judgment Defendants Intellectual Ventures I LLC, Intellectual Ventures II LLC, and Callahan Cellular L.L.C. |
| Patents-In-Suit | Collectively, U.S. Patent Nos. 10,567,391, 8,332,844, 7,314,167, 7,949,785, and 7,712,080 |

I.      **Statement of the Nature and Stage of the Proceedings**

After months of back-and-forth over whether Assurant needed a license to use at least five of IV's patents, Assurant sought a declaratory judgment of non-infringement on those patents from this Court on March 15, 2004 (D.I. 1). IV did not answer that Complaint, but instead has sought to dismiss it for an alleged lack of any legal controversy (D.I. 13, 14). That motion factually concerns whether an actual controversy exists, not whether one was facially pled (D.I. 14 "Br." at 6-7).

II.     **Summary of the Argument**

IV's motion is premised on the assertion that it "never made any threats to sue Assurant" and, even if it did, Assurant was foolish to take those threats seriously (Br. at 1). IV now contends that when it made Assurant an "offer it can't refuse" it was acting more as a salesman overinflating the value of its goods, as opposed to delivering the veiled threat made famous by "The Godfather." But, in IV's words, its proposed license was "not an offer that can be refused; rather, it is a crucial step to ensure compliance with IV's patent portfolio" (D.I. 15-1 at 5).[1] Try as it might to now minimize the looming specter of patent litigation it raised against Assurant in the Eastern District of Texas if Assurant refused to license its patents; that threat, and the parties' opposite positions as to IV's patents, created the legal controversy that Assurant has asked this Court to resolve, and IV has asked this Court to dismiss.

Rather than acknowledge its own *explicit* threats, IV blames Assurant for this dispute throughout its motion. In IV's words, it merely engaged in "cordial negotiations" (Br. at 8), and all evidence to the contrary should be ignored as (1) mere puffery, (2) materials Assurant specifically requested, or (3) speculation. Yet, IV is a notorious non-practicing entity with a pattern of aggressive—*not* cordial—tactics. It followed the same strategy against Assurant as it has with

---

[1] For IV's Exhibits 1-7, Assurant has cited to the ECF page numbering, which includes the Exhibit's cover page, rather than the pagination on the exhibits themselves.

1

dozens of its other targets: *repeatedly* accusing Assurant of infringement and demanding that Assurant pay millions to license IV's patents (D.I. 15-1 at 4-5; D.I. 15-4; D.I. 15-5 at 2; D.I. 15-6 at 14). The materials IV provided were equally explicit: IV's "litigation tends to be in multiple waves," and it had already "initiated patent litigations against JPMC, Liberty Mutual, and Comerica, *with further actions planned*" (D.I. 15-4; D.I. 15-6 at 14). IV's threats were accompanied by saber-rattling: IV noted it "has filed 160+ cases to date" with a patent portfolio that has been "repeatedly validated in ligation" (D.I. 15-6 at 12) and that Assurant's "[e]xposure increased as time passed" (D.I. 15-6 at 14).

The law does not require Assurant to sit by and idly wait for IV to sue it for patent infringement as it has sued numerous others in the financial services industry; thus, when IV approached Assurant with an ultimatum—the offer that could not be refused to ensure compliance with IV's patents—Assurant reasonably and rightfully took that threat seriously, and sought declaratory relief from the Court to clear the infringement cloud IV left over its business. Regardless of IV's arguments to the contrary, its threats are of sufficient immediacy and reality and present a justiciable case or controversy that justifies the exercise of declaratory judgment jurisdiction. IV's motion should be denied.

### III.   Statement of Facts

On November 15, 2023, IV filed three lawsuits against JP Morgan, Comerica, and Liberty Mutual (the "East Texas Lawsuits") alleging, *inter alia*, those companies infringe the same patents at issue in this case via their use of the same third-party software at issue in this case. As part of the East Texas Lawsuits, IV publicly filed claim charts showing its belief that third-party software infringed the Patents-in-Suit. Notably, IV's allegations were premised on the mere use of the accused, third-party software, and not on any modifications or unique implementation by the East Texas Lawsuit Defendants. *See Intellectual Ventures I LLC v. JP Morgan Chase & Co.*, No. 2:23-

2

cv-523-JRG (E.D. Tex. Nov. 15, 2023), D.I. 1; *Intellectual Ventures I LLC v. Comerica Inc.*, No. 2:23-cv-00524-JRG (E.D. Tex. Nov. 15, 2023), D.I. 1; *Intellectual Ventures I LLC v. Liberty Mutual Holding Co.*, No. 2:23-cv-00525-JRG (E.D. Tex. Nov. 15, 2023), D.I. 1.

Just weeks later, on January 3, 2024, IV contacted Assurant to "initiate a dialogue concerning intellectual property and licensing matters with Assurant" (D.I. 15-1 at 6). Even from the start, IV expressly alleged that its "**patents cover some of the technology integral to Assurant's daily operations**, including cloud computing, networking, security, storage, digital payments, and utilization of open-source software, among others" (*id.*).[2] IV concluded by noting that it "look[ed] forward to [its] imminent interaction" with Assurant (*id.*).

Assurant did not "[take] the lead" in negotiations, as IV contends (Br. at 1). Rather, the following week IV emailed Assurant again, changing the email's subject to "**Urgent**" and demanding that IV "**must** address the **pressing need** for a patent license agreement with Assurant" (D.I. 15-1 at 5). IV "emphasize[d]" that it did not present a "selective initiative," but instead its proposed license was "**not an offer that can be refused**; rather, it is a **crucial step** to **ensure compliance** with IV's patent portfolio" (*id.*).

Assurant acknowledged receipt of the "Urgent" January 12 correspondence and indicated that it would "take a look into this matter" (*id.*, at 4). Minutes later, IV responded to propose "an introductory meeting" and offered "to share some material in advance of a meeting" (*id.* at 3-4). IV next approached Assurant to schedule a thirty minute discussion (*id.* at 3), and subsequently circulated presentations covering "IV, the IV patent portfolio, the relevance of the portfolio to insurance companies like Assurant and the scope of the IV patent licensing program" (*id.* at 2-3; *see also* D.I. 15-2 through 15-4). IV concluded that email by noting what it believed to be

---

[2] All emphasis is added unless otherwise noted.

3

Assurant's U.S. revenue, and how that was relevant to the license fee IV wanted Assurant to pay (D.I. 15-1 at 2).

Among the documents that IV provided as relevant to Assurant were three presentations. The first, "Banking Tech Presentation" (D.I. 15-2), expressly identified four of the five Patents-in-Suit, including specific asserted claims, and corresponding accused products (*id.* at 6-9, 14-17).

The second presentation, titled "IIF Licensing Opportunity: Financial Services," characterized IV as the "largest and most well-known patent aggregator worldwide" and noted IV's intent to "monetize a large global patent portfolio" (D.I. 15-3 at 4). Several slides also touted how IV's patent portfolio has been "repeatedly validated in litigation," noting IV "has filed 160+ cases to date," and mentioning IV's "litigation tends to be in multiple waves" with "Exposure Increas[ing] as Time Passed" (*id.* at 13-16). IV did not veil its threats in this presentation; one slide stated IV's patent portfolio "reads on many Open-Source / Enabling Technologies" (*id.* at 21; *see also id.* at 24-29), while another noted its "Active" campaign against JP Morgan Chase, Comerica, and Liberty Mutual included six patents—several of which overlapped with those identified in the Banking Tech Presentation (*id.* at 14; D.I. 15-2 at 6-9, 14-15).

The third presentation, IV's "Intellectual Ventures Financial Services Licensing Program" provided that IV had developed "pricing tiers" for a proposed license with Assurant that were based on "potential damages in litigation scenarios" (D.I. 15-4 at 2). Again, IV did not veil its threat: it noted to "reinforce [its] commitment," it had "initiated patent litigations against JPMC, Liberty Mutual, and Comerica, **with further actions planned**" (*id.*).

After this initial exchange, IV on February 6, 2024, indicated it would "send more specific details about technologies being used [presumably by Assurant] that are relevant to the IV patent portfolio" (D.I. 15-5 at 4). IV followed up six days later with two attachments, yet again with an

4

unveiled threat: the first document was "a PDF with targeted material on *Assurant's use of infringing technologies*" and the second was a draft patent license (*id.* at 3).

The referenced "PDF with targeted material on Assurant's use of [allegedly] infringing technologies" was just that: it was titled specific to Assurant—"IIF [or Invention Investment Funds] Licensing Opportunity: Assurant"—and contained the same threatening statements found in the prior Licensing Opportunity presentation, but now expressly aimed at Assurant instead of at the "financial services industry" (*compare* D.I. 15-3 at 4, 13-16, 21-22, 24-29 *with* D.I. 15-6 at 4, 12-15, 20, 23-24, 26-30). And the presentation included a slide identifying "Example IIF patents relevant to Assurant" which included all five Patents-in-Suit (D.I. 15-6 at 24). That slide was also expressly cited by IV's email: "One is a PDF with targeted material on Assurant's use of infringing technologies. *Please see pages 21-23*" (D.I. 15-5 at 3). Assurant filed this declaratory judgment action soon afterward to lift the cloud IV had placed over Assurant's business.

**IV.     Argument**

    **A.     IV's actions give rise to a substantial controversy between the parties of sufficient immediacy and realty for subject matter jurisdiction.**

Now that it is stuck litigating in a forum it apparently does not prefer, IV asks this Court to dismiss Assurant's declaratory judgment complaint so that IV—perhaps as soon as the day after any dismissal order—can simply refile this case in the Eastern District of Texas. This Court should not bless IV's attempt to forum shop, and instead should resolve the patent dispute IV itself created.

IV accuses Assurant of "blatant mischaracterizations of the communications between the parties," but IV's statements and actions plainly speak for themselves, among them:

- IV sent an email that stated its "patents cover some of the technology integral to Assurant's daily operations" (D.I. 15-1 at 6);

- When that email was not answered within nine days, IV sent another with "Urgent" in the subject line, and stated "[t]his is not an offer than can be refused; rather, it is a crucial step to ensure compliance with IV's patent portfolio" (D.I. 15-1 at 5);

- IV's presentations identified specific patents, specific claims, and accused specific technology of infringement (D.I. 15-2 at 6-9, 10-12, 14-17; D.I. 15-3 at 14, 20-22; D.I. 15-6 at 13, 19-24);

- IV identified ongoing litigation campaigns, and stated it had "further actions planned" (D.I. 15-3 at 13-16; D.I. 15-4 at 2; D.I. 15-6 at 12-15); and

- IV emailed Assurant "a PDF with targeted material on Assurant's use of infringing technologies" (D.I. 15-5 at 3).

Taken together, along with the facts pled in Assurant's Declaratory Judgment Complaint and discussed above, these statements "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Indeed, while Assurant provides additional considerable evidence below, either of IV's January 3 or February 12 emails ***alone*** is sufficient for subject matter jurisdiction, since both expressly alleged infringement. *See Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007) ("[i]f a party has actually been charged with infringement of [a] patent, there is, necessarily, a case or controversy adequate to support jurisdiction at that time.").

In addition to those express infringement allegations, IV directed multiple affirmative acts toward Assurant related to the enforcement of its patent rights. It initiated licensing discussions with Assurant, indicating that its proposed license was "not an offer that can be refused" (D.I. 15-1 at 5). That statement was intended literally: IV immediately tied it to "ensur[ing]" Assurant's

6

"compliance" with IV's patent portfolio (D.I. 15-1 at 5). While IV tries to shift responsibility away from it to Assurant, it was IV—not Assurant—that reached out shortly after the new year and sent an "Urgent" follow-up just days later. That Assurant felt sufficiently threatened by IV's initial licensing demands to follow up should not be held against Assurant.

As noted, IV shared pertinent documents with Assurant which (1) identified the Patents-in-Suit and accused products at issue in this litigation; (2) repeatedly referenced IV's extensive litigation history, including its history of asserting the Patents-in-Suit against parties using the same technology it has identified as infringing to Assurant; and (3) indicated that future litigation was planned (D.I. 15-2 at 6-17; D.I. 15-3 at 13-16; D.I. 15-4 at 2; D.I. 15-6 at 12-15, 19-24). Assurant did not draft those materials—IV itself did and then sent them to Assurant—so IV's academic quibble over whether Assurant requested them is of no moment.

Assurant did not view IV's correspondence as a business proposal. Why would it—IV is a serial filer of countless patent infringement lawsuits and has no business other than to "acquire, maintain and monetize a global patent portfolio" (D.I. 15-6 at 4). So when IV identified patents it owned and told Assurant they are infringed by software Assurant allegedly uses, a dispute arose (D.I. 15-6 at 23). *See Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1364 (Fed. Cir. 2009) (DJ jurisdiction exists where a non-practicing entity "took the affirmative step of twice contacting HP directly, making an implied assertion of its rights under the '021 patent against HP's Blade Server products, and HP disagreed.").

Solidifying that dispute, IV also informed Assurant it was litigating those same patents against companies similarly situated to Assurant and expressly provided that future litigation against other companies was planned. That too was enough. *See ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1349 (Fed. Cir. 2011) ("Under similar circumstances, our court recently applied

7

the *MedImmune* standard in finding an infringement controversy where the declaratory defendant had sent veiled warnings to the declaratory plaintiff and had already sued other companies that produced the same product accused of infringement.") (citing *Micron Tech., Inc. v. MOSAID Techs., Inc.*, 518 F.3d 897, 901 (Fed. Cir. 2008)).

Tellingly, although IV attempts to explain away its actions as merely "cordial negotiations," it never acknowledges its express infringement allegations or promises of future litigation, as if acting like they do not exist will make it so. This is not a case where Assurant simply "learn[ed] of the existence of a patent owner by another or even perceive[d] such a patent to pose a risk of infringement, without some affirmative act by the patentee." *See SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380-81 (2007), *aff'd sub nom. Giuliano v. SanDisk LLC*, 705 F. App'x 957 (Fed. Cir. 2017). Rather, IV made numerous affirmative acts targeted directly at Assurant, including explicitly alleging it uses purportedly infringing technology. That was not a "cordial" accusation, as IV suggests (Br. at 12). Nor is it speculative on Assurant's part.

Indeed, IV's correspondence made Assurant keenly aware of its other lawsuits against similarly situated parties—and longstanding history of litigious behavior—which IV admits the Court may consider in its analysis (Br. at 11). Now, however, IV repeatedly argues that its threats should be ignored because "***IV never sent Assurant any claim charts*** alleging Assurant infringed its patents" (Br. at 2; *see also* Br. at 6 ("IV never threatened to sue Assurant. It ***never sent claim charts*** asserting that Assurant infringed any of IV's patents."), Br. at 9 (alleging that IV's communications "do not contain any threats of litigation, ***nor do they contain any claim charts***")). Although IV did not explicitly send Assurant claim charts, it did explicitly direct Assurant to the East Texas Lawsuits, where IV publicly filed claim charts alleging infringement of each limitation of the Patents-in-Suit by the very same third-party software at issue here. IV cannot hide behind

the fact that it directly identified the Patents-in-Suit and allegedly infringing products to Assurant, then directed Assurant to more specific pending district court allegations against similarly-situated corporate defendants elsewhere.

IV's motion presents a similar rationale to supplier-customer declaratory judgment actions this Court often sees, in motions to dismiss it often denies. Assurant has been accused of using the same software that formed the basis of alleged infringement in the East Texas Lawsuits. Another Judge in this District, for example, has previously held that "repeated references identifying DJ Plaintiffs' products as infringing may give rise to a 'substantial controversy' about whether those products infringe the patents-in-suit." *In Re Mobile Telecommc'ns Techs. LLC*, 247 F. Supp. 3d 456, 461 (D. Del. 2017). In that case, the patentee had filed seven suits before the Eastern District of Texas, alleging infringement of three patents. *Id.* at 457. While no threats of litigation had been made against the declaratory judgment plaintiff suppliers in that case—unlike here where IV expressly alleged infringement at least twice—the Court still found that repeated references identifying the suppliers' products as infringing in the Texas litigation could give rise to a substantial controversy about whether those products infringe. *Id.* at 461. Much like IV here, the declaratory judgment defendant in *Mobile Telecommunications* had alleged infringement theories that were not customer specific, but rather based on a product that was sold to customers. *Id.* at 462. And the existence of other lawsuits against parties situated similarly to the declaratory judgment plaintiff, who operated in the same industry, also weighed in favor of a case and controversy. *Id.* at 462-63.

In view of the totality of the circumstances, for the facts set forth above, there has existed—and *still* exists—a justiciable controversy for this Court to decide. *See Danisco US, Inc. v. Novozymes A/S*, 744 F.3d 1325, 1330-31 (Fed. Cir. 2014).

9

### B. IV's other arguments are unavailing.

None of IV's other points should override the affirmative acts and uncontroverted statements discussed above. *First*, the law does not support IV's contentions. Rather than identify any authority where a motion to dismiss was *granted* under similar circumstances as those present here, IV instead attempts to distinguish the instant situation from a single case where the Federal Circuit found a case and controversy *existed* (Br. at 12 (citing *SanDisk Corp.*, 480 F.3d at 1382)). Moreover, *SanDisk* did not set a minimum threshold for a case or controversy to exist, and if "[a] specific threat of infringement litigation by the patentee is not required to establish jurisdiction," it follows that element-by-element claim charts—the factual point IV cites for that case—are also not required. *Arkema Inc. v. Honeywell Int'l*, 706 F.3d 1351, 1357 (Fed. Cir. 2013). Whether claim charts were provided is not the test; the totality of circumstances is.

Nor is it of any moment that IV never sent a formal notice letter to Assurant (Br. at 8); accusing Assurant of infringement in an email, as opposed to a letter, is certainly sufficient for adverse legal interests to arise. And here IV explicitly directed Assurant to other litigation where it publicly alleged, including in claim charts, that the same third-party software at issue here infringed the same Patents-in-Suit (D.I. 15-3 at 14; D.I. 15-6 at 13).

*Second*, IV next asserts that its threats against Assurant were "mere puffery" (Br. at 9). But the case it cites is incongruent with this one. There, the patentee had tried to *sell* its patents to declaratory judgment plaintiff Microsoft and told Microsoft the patents "give us control over any real-time transaction on the net," which was "*sales* puffery" (Ex. 1 at 9). In contrast, here the statement IV claims is puffery is its demand that its license offer was "not an offer that can be refused; rather, it is a crucial step to ensure compliance with IV's patent portfolio" (D.I. 15-1 at 5). That was *not* even arguable puffery, it was a *threat* and one directed at Assurant, and only Assurant: IV in no uncertain terms told Assurant it was "crucial" to "ensure compliance" with IV's patent

10

rights (*id.*). Only now that it is a declaratory judgment defendant does IV insist Assurant should not have taken that seriously.

The facts of *Microsoft* are so incongruent it is not clear why IV even cited it. There, the patentee (1) agreed Microsoft's software did not itself infringe the Patents-in-Suit, (2) "ha[d] conceded that it d[id] not have any facts or evidence supporting an inducement," and (3) had "stipulated to covenant not to sue Microsoft." *Microsoft Corp. v. Webxchange, Inc.*, 606 F. Supp. 2d 1087, 1088-90 (N.D. Cal. 2009). IV has made no such representations here.

*Third*, IV characterizes its presentations as "generic," as if Assurant should have understood them to be simple marketing pamphlets for IV's "monetization" business (Br. at 3-4, 8-9). But IV admits that at least some of its presentations "specifically related to potential intersections between IV's patent portfolio and Assurant's business" (Br. at 4). IV's update of those slides to target Assurant specifically (D.I. 15-6 at 23)—along with the cover email characterization that the presentation had "targeted material on Assurant's use of infringing technologies" (D.I. 15-5 at 3)—shows it was anything but generic or puffery that Assurant should ignore (D.I. 15-6 at 23).

IV cannot now claim that it "never stated or even implied that Assurant was part of a 'financial services litigation campaign'" (Br. at 9). It identified the portions of its portfolio that are "relevant to the financial services industry," in a presentation section titled "IIF Portfolio's Relevancy to Assurant" (D.I. 15-6 at 16-17). That plainly shows IV considers Assurant to be a part of the "financial services industry." Indeed, on March 13 IV provided to Assurant a "draft Agreement with the MFN [most favored nations] language" and noted the "availability of an MFN to financial services licensees will not be indefinite so I recommend that if you [Assurant] plan to take a license, you do so sooner than later" (D.I. 15-7 at 2). Likewise, practically every email IV

11

sent to Assurant had both "Assurant" and "Intellectual Ventures Financial Services Licensing Program" in the subject line (D.I. 15-1 at 2-7). And if Assurant really is not part of what IV considers to be "financial services," there was no reason for IV to send any "financial services" materials to Assurant in the first place.

In view of these facts, IV's representation to the Court that it "never stated or even implied that Assurant was part of a 'financial services' litigation campaign" (Br. at 9) is incorrect.

*Finally*, IV claims that Assurant is just speculating about a risk of a patent infringement lawsuit (Br. at 10). Not so. There is **nothing** speculative about IV sending Assurant an email that says IV's "patents cover some of the technology integral to Assurant's daily operations" or IV attaching "a PDF with targeted material on Assurant's use of infringing technologies." Nor is there anything speculative about the three patent infringement lawsuits IV filed in the Eastern District of Texas on the same patents identified in that Assurant-specific PDF, related to the same technology that IV identified in that Assurant-specific PDF (D.I. 15-3 at 14; D.I. 15-6 at 19-24). There was also nothing speculative about the "160+ cases to date" IV represented it had filed, or IV's statement it had "further actions planned" (D.I. 15-3 at 13; D.I. 15-4 at 2; D.I. 15-6 at 12). Far from speculation, these facts prove a justiciable case or controversy exists.

## V. Conclusion

For the reasons set forth above and the authorities cited, Assurant respectfully requests the Court deny IV's motion to dismiss.

|  |  |
|---|---|
| Of Counsel:<br><br>Keith E. Broyles<br>Matthew W. Howell<br>Thomas Finch<br>Carter E. Babaz<br>ALSTON & BIRD LLP<br>One Atlantic Center<br>1201 West Peachtree St. NE<br>Atlanta, Georgia 30309-3424<br>keith.broyles@alston.com<br>matthew.howell@alston.com<br>thomas.finch@alston.com<br>carter.babaz@alston.com<br><br>Dated: June 5, 2024 | /s/ Sara M. Metzler<br>Steven J. Fineman (#4025)<br>Kelly E. Farnan (#4395)<br>Sara M. Metzler (#6509)<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>(302) 651-7700<br>fineman@rlf.com<br>farnan@rlf.com<br>metzler@rlf.com<br><br>*Attorneys for Plaintiff Assurant, Inc.* |